# EXHIBIT B

AUDREY B. LITTLE

81439 Merv Griffin Way

La Quinta, CA 92253

Telephone: 310-283-4448

Email: audrey.little458@gmail.com

Plaintiff In Pro Per

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE – PALM SPRINGS BRANCH

| | |
|---|---|
| AUDREY B. LITTLE, | Case No.: CVPS2508295 |
| Plaintiff, | Dept.: PS1 |
| v. | |
| OAKTREE FUNDING CORPORATION; | |
| ROCKET CLOSE, LLC; | |
| ROCKET COMPANIES, INC.; | |
| and DOES 1 through 50, inclusive, | |
| Defendants. | |

**NOTICE OF MOTION AND MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF**
**MEMORANDUM OF POINTS AND AUTHORITIES**
**DECLARATION OF AUDREY B. LITTLE IN SUPPORT THEREOF**

Hearing Date: February 9, 2026
Time: 8:30 a.m.
Dept.: PS1

MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION

This motion seeks narrowly tailored injunctive relief to halt ongoing enforcement activity arising from a transaction that never validly closed because express escrow conditions precedent were not satisfied. This is not a dispute over payment terms or borrower performance. It is a case about whether acknowledged escrow and title failures—documented, undisputed, and uncured—may be ignored while enforcement proceeds and permanent harm accrues.

Despite repeated notice, escalation to enterprise leadership, invocation of Closing Protection Letter (CPL) coverage, and more than ten requests for a temporary pause, Defendants declined to preserve the status quo. As a result, irreparable harm has already occurred, including permanent credit injury and loss of essential caregiving support. Continued enforcement will compound that harm before judicial review can meaningfully occur.

II. UNDISPUTED FACTUAL BACKGROUND

A. Express Escrow Conditions Precedent Were Not Satisfied

The Specific Closing Instructions required, as conditions precedent to any authorized disbursement: (1) final quality control by Oaktree prior to funding; (2) recording in second lien position on or prior to disbursement; (3) compliance with title insurance requirements, including endorsements and issuance of a policy free of unpermitted liens; and (4) authorization to use funds only upon compliance with those conditions. None of these conditions was satisfied at the moment of disbursement.

B. Disbursement Occurred Before Recording and Before Insurance Attachment

Loan proceeds were disbursed on July 14, 2025. The deed of trust recorded on July 15, 2025. The lender's title policy confirms that insurance could not attach until recording. Accordingly, disbursement occurred without recording and without insurance attachment, in direct violation of the written instructions.

C. Title Review Was Facially Stale

The only title report that appears to have been run was dated October 15, 2024—nine months prior to the July 2025 disbursement. No bring-down or current title verification exists in the record. A current title report run as of recording shows senior liens visible at that time, confirming that second-lien status was not achieved.

D. Required Quality Control Was Not and Could Not Have Been Performed

Because recording in second position and current title verification were not achieved at funding, the factual predicates necessary to complete the required final QC review did not exist. Oaktree's own loan file—produced as the "complete loan file"—contains no QC checklist, sign-off, or documentation tied to actual lien position as of disbursement.

E. Knowledge, Notice, and Post-Notice Non-Cure

Defendants were on notice of the lien-priority defect by September 9, 2025, when Oaktree submitted a claim premised on lien-position failure. On November 4, 2025, Plaintiff escalated the matter to Rocket Companies' Chief Executive Officer, who designated the Chief Operating Officer of Rocket Close—the escrow arm that controlled settlement—to oversee review. Despite that escalation and operational authority, no cure, unwind, or pause was implemented.

Plaintiff did not receive any purported title claim denial or claim correspondence until December 10, 2025. Upon first receipt and review of those materials on December 10, 2025, Plaintiff immediately invoked Closing Protection Letter (CPL) coverage the same day. Enforcement nevertheless continued, and no CPL payment has been made.

F. Repeated Requests for a Temporary Pause Were Refused

Plaintiff requested a temporary pause of billing, collection, and reporting on at least ten occasions, directed to Oaktree, its servicer, and counsel. Each request sought only to preserve the status quo while the defects were addressed. These requests were made despite, and after, written acknowledgments from counsel for both Oaktree and Rocket confirming escrow failures. None was granted. Court intervention became necessary solely because Defendants declined that minimal, conservative remedy.

III. LEGAL STANDARD

Temporary and preliminary injunctive relief is appropriate where the moving party shows (1) a likelihood of success on the merits and (2) irreparable harm absent relief, with the balance of equities and public interest favoring intervention.

IV. LIKELIHOOD OF SUCCESS ON THE MERITS

California law requires strict compliance with written escrow instructions. Where express conditions precedent to disbursement are not satisfied, escrow acts without authority and liability follows. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Rianda v. San Benito Title Guaranty Co. (1950) 35 Cal.2d 170.)

The impairment of a bargained-for lien position constitutes present, actionable harm at the moment of impairment—not at foreclosure and not upon later enforcement. (Axley v.

Transamerica Title Ins. Co. (1978) 88 Cal.App.3d 1; Hovannisian v. First American Title Ins. Co.) Courts consistently reject "no loss yet" theories where lien priority is defeated.

Critically, once a lender or escrow participant has notice that express conditions precedent failed and that the promised security position was never delivered, continued enforcement ceases to be routine servicing and becomes independent wrongful conduct. California courts recognize that post-notice enforcement in the face of known defects exposes the enforcing party to separate equitable and remedial consequences. (Overholtzer v. Northern Counties Title Ins. Co. (1953) 116 Cal.App.2d 113.)

Here, the undisputed documentary record establishes: (1) failure of all express conditions precedent; (2) disbursement before recording and insurance attachment; (3) reliance on a facially stale title report; (4) absence of required QC; (5) continued enforcement after notice and CPL invocation; and (6) unexplained reliance on purported claim-denial rationales that do not correspond to the actual policy language or governing lien-impairment authority. Plaintiff is therefore likely to succeed on claims for breach of escrow instructions, negligence/professional negligence, negligent misrepresentation by conduct, failure to mitigate, and declaratory relief.

## V. IRREPARABLE HARM

Irreparable harm has already occurred and will continue absent relief. Plaintiff's credit has been permanently damaged, with reporting consequences extending for years. Essential caregiving hours have been reduced, resulting in medical risk and injury. These harms cannot be undone by later damages and will compound with each enforcement action before judicial review.

1  VI. BALANCE OF EQUITIES AND PUBLIC INTEREST

2  A temporary pause preserves the status quo and prevents further irreversible harm.

3  Defendants are sophisticated entities with insurance and corrective mechanisms; Plaintiff

4  bears the disproportionate risk. The public interest favors enforcement of escrow and title

5  safeguards that underpin California's real estate system.

6  VII. RELIEF REQUESTED

7  Plaintiff requests an order temporarily and preliminarily enjoining Defendants from

8  billing, collection activity, negative credit reporting, late fees, and enforcement related to

9  the subject loan pending further order of the Court.

10

11

1

2   DECLARATION OF AUDREY B. LITTLE

3   I, Audrey B. Little, declare:

4   1. I am the Plaintiff in this action and have personal knowledge of the facts stated herein.

5   2. This declaration supports my Motion for Temporary and Preliminary Injunctive Relief.
6   The transaction at issue never validly closed because express escrow conditions
7   precedent were not satisfied.

8   3. None of the written escrow conditions required prior to disbursement were met at
9   funding, including final QC, recording in second lien position on or prior to
10  disbursement, current title verification, and insurance attachment.

11  4. Loan proceeds were disbursed on July 14, 2025. The deed of trust recorded on July 15,
12  2025. The title policy's effective-date language confirms that insurance could not attach
13  until recording.

14  5. The only title report that appears to have been run is dated October 15, 2024. No bring-
15  down or current title verification exists. A title report run as of recording shows senior
16  liens visible.

17  6. Oaktree produced a file labeled the "complete loan file." That production does not
18  include the escrow instructions governing the transaction, does not include a complete
19  executed loan agreement as closed, and does not include any final settlement statement or

1  cost summary reflecting compliance with escrow conditions. It also contains no final QC

2  checklist or sign-off, no current title evidence, and no CPL documentation.

3  7. Defendants were on notice of the lien-priority defect no later than September 9, 2025.

4  Despite that knowledge, Defendants did not disclose the defect to me, did not pause

5  enforcement, and allowed me to make my first payment on the loan after they already

6  knew the lien-priority condition had failed. I was not informed of any lien problem by

7  Defendants.

8  8. I attempted to refinance the loan in early September 2025, consistent with the express

9  condition under which I agreed to it. In mid-September 2025, during that refinance

10  process, I was informed that there was a defect preventing refinance, but I was not told

11  the nature of the defect.

12  9. When I was told during the refinance process that there was a defect, I stated that this

13  was not possible because I had previously had the title report read to me and had

14  specifically asked whether there was any evidence of a family loan, and I was told there

15  was none. After learning that there was a lien issue, I contacted a knowledgeable friend to

16  determine when the family loan had recorded. He informed me that it recorded on

17  December 6, 2024. At that point, I understood that any title report relied upon at closing

18  must have predated that recording. I did not learn that the preliminary title report was

19  dated October 15, 2024 until November 19, 2025, when Oaktree finally provided the title

20  insurance commitment. That was the first time I was informed that the problem involved

21  lien priority. Defendants did not disclose this information to me prior to that call.

10. I did not receive any title claim denial or claim correspondence until December 10, 2025. I am informed and believe that a denial letter is dated October 24, 2025, but that denial was not provided to me at or near that time and was not disclosed to me when Defendants already had knowledge of the defect.

11. I also did not receive or see any title report, preliminary title, or title insurance commitment reflecting the lien-priority defect until November 19, 2025, when Oaktree finally provided me with the insurance commitment. Until that date, Defendants had not disclosed the contents or date of the title materials on which they relied, including that the only preliminary title was dated October 15, 2024. Upon reviewing those materials for the first time on December 10, 2025, I immediately invoked Closing Protection Letter (CPL) coverage the same day based on the acknowledged escrow failures. No CPL payment has been made.

12. Beginning in early October 2025, I made at least ten separate written requests directly to Oaktree Funding Corporation, its loan servicer, and Oaktree's counsel requesting a temporary pause of billing, collection, and enforcement activity. Each request sought only to preserve the status quo while the undisputed closing defects were addressed. Oaktree acknowledged that escrow errors had occurred and that a denial letter also attributed the loss to escrow error, yet Oaktree nevertheless refused or failed to grant every request for a pause.

13. As a result of continued enforcement despite notice, my credit has been permanently damaged. I was forced to reduce essential in-home caregiving support that I had relied upon for more than five years and as part of a medically established support relationship

1 spanning more than two decades. I expressly advised Defendants in advance that

2 reduction of this care would cause medical harm.

3 14. Prior to the loss of caregiving support, I was engaged in ongoing, cash-paid

4 therapeutic treatment specifically designed to prevent the need for surgery. That

5 treatment required approximately four hours per week. Because continued enforcement

6 forced me to reduce caregiving and divert funds away from these therapies, I was

7 required to discontinue them.

8 15. As a result of that discontinuation, my treating providers have advised that recovery

9 will now require approximately eight months of intensified treatment at roughly nine

10 hours per week—more than double the prior weekly requirement and duration. This

11 extended recovery period represents permanent life harm in the form of lost function, lost

12 time, and increased medical risk that cannot be restored.

13 16. Separately, the reduction in caregiving support caused me to perform physical tasks I

14 should not have been performing. This resulted in a significant shoulder injury, for which

15 I underwent an MRI on Friday and am awaiting results, and a serious fall while

16 attempting tasks normally performed by my caregiver.

17 17. Each additional month that enforcement continues without a pause extends my

18 recovery period by approximately two months at the intensified treatment level. By the

19 time this motion is heard, the continued lack of a pause will have added approximately

20 three additional months of recovery at roughly nine hours per week, compounding

21 permanent life and medical harm.

18. After the denial materials were received, Oaktree's in-house counsel, Robert Teague, contacted me by telephone and stated that he intended to report me to the FBI for mortgage fraud. During that call, I responded that I had signed the same escrow instructions Defendants were required to follow and asked how fraud could be alleged where I had no intent and no control over escrow, title, recording, or disbursement.

19. At that time, the only attorney involved on the Rocket side was counsel for Rocket Title Insurance Company. There was no counsel engaged to address Rocket Close's escrow conduct or enterprise-level resolution. I escalated the matter to the Chief Executive Officer of Rocket Companies because there was no single point of authority addressing the escrow failures, the denial, or the continued enforcement posture. The escalation to Rocket leadership followed the call with Mr. Teague and was undertaken to seek coordinated resolution across the Rocket entities.

20. I have more than thirty-six years of professional experience in large-scale operations, process design, and information systems that support complex, regulated transactions. Based on that experience, I was able to recognize immediately how the failures in this transaction occurred and why they were structural rather than accidental. Many attorneys I interacted with initially did not recognize the nature of the failure because it arose from process and systems breakdowns rather than a single document error. The failures here are not consistent with an isolated clerical mistake; they reflect a breakdown in process controls that would allow the same failure to recur absent corrective changes. I raised these concerns during my efforts to resolve this matter because the issue is systemic in nature, not unique to my loan.

1   21. On January 9, 2026, the Court granted my request for disability accommodations,

2   including permission to appear remotely where permitted.

3   22. Absent court-ordered relief, enforcement will continue to cause irreparable harm

4   before judicial review can occur.

5   I declare under penalty of perjury under the laws of the State of California that the

6   foregoing is true and correct.

7   Dated: January 13, 2026

8   /s/ Audrey B. Little

9   Audrey B. Little

10