CLERK, U.S. DISTRICT COURT

1/30/2026

CENTRAL DISTRICT OF CALIFORNIA

BY _____asi_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

5:26-cv-00402

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Audrey Little, appearing pro se, applies ex parte for a Temporary Restraining Order ("TRO") pursuant to Federal Rule of Civil Procedure 65 to preserve the status quo pending adjudication of jurisdiction and Plaintiff's Motion to Remand. This application is necessary because Defendants' Notice of Removal has stayed the state court's ability to act on Plaintiff's previously noticed and unopposed injunction, creating an immediate gap in judicial protection. Plaintiff seeks a narrow TRO restraining Defendants from enforcement actions related to the subject property until further order of the Court.

## I. LEGAL STANDARD

A temporary restraining order may issue where the movant demonstrates a likelihood of success on the merits or serious questions going to the merits, irreparable harm absent relief, that the balance of equities tips in the movant's favor, and that the public interest supports relief.

## II. STATEMENT OF IRREPARABLE HARM

Plaintiff has suffered and continues to suffer irreparable harm. On January 9, 2026, Plaintiff underwent an MRI confirming a partial rotator cuff tear. Defendants' ongoing enforcement conduct exacerbates Plaintiff's medical condition and creates a risk of permanent injury. Monetary damages cannot remedy this harm. Defendants removed this action after missing the deadline to oppose Plaintiff's injunction in state court, freezing the state court's ability to act. Without a TRO, Plaintiff will be left without protection while jurisdiction is resolved.

## III. RELIEF REQUESTED

Plaintiff respectfully requests that the Court issue a Temporary Restraining Order restraining Defendants from enforcement actions pending further order of the Court.

DATED: _____ /s/ Audrey Little Audrey Little, Plaintiff Pro Se


DATED: January 30, 2026

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

AUDREY LITTLE, Plaintiff, v. OAKTREE FUNDING CORPORATION, et al., Defendants. Case No. 5:26-cv-00402

DECLARATION OF AUDREY LITTLE

I, Audrey Little, declare under penalty of perjury as follows:

1. I am the Plaintiff in this action and am proceeding in pro per. I have personal knowledge of the facts stated herein.

2. I submit this declaration in support of (a) my Ex Parte Application for Temporary Restraining Order, (b) my Motion for Leave to File the Second Amended Complaint for purposes of clarifying jurisdiction, and (c) my Emergency Motion to Remand and for Fees under 28 U.S.C. § 1447(c).

3. Prior to removal, I provided Defendants with a complete redlined version of the First Amended Complaint reflecting that the pleading was entirely superseded, including removal of all RESPA / Regulation X claims. I expressly advised that the Second Amended Complaint (v82) proceeds solely on state-law causes of action.

4. I met and conferred with counsel for Rocket Close and Rocket Companies regarding the Second Amended Complaint. During that meet-and-confer, we reviewed the causes of action in the SAC cause-by-cause. I expressly advised that RESPA / Regulation X was removed. Rocket agreed to respond only to the Second Amended Complaint.

5. I did not have a meet-and-confer with Oaktree. Oaktree declined to meet and confer and declined to grant a temporary pause of enforcement.

6. I did not refuse to move the injunction hearing. When Oaktree's counsel requested that the hearing be continued to February 24, 2026, I explained that moving the hearing later without protection would cause me additional irreparable harm. I therefore proposed multiple reasonable alternatives to accommodate scheduling while preventing further harm: (a) continuing the hearing to February 24 with a temporary pause in enforcement until that date; (b) requesting that the Court advance the hearing to an earlier date; and (c) proceeding on the existing hearing date if no pause were granted. Oaktree declined all of these options.

7. After the deadline to oppose my state-court injunction motion passed without a timely opposition, Defendants filed a Notice of Removal on January 29, 2026, freezing the state court's ability to act and creating an immediate gap in judicial protection.

8. I am a disabled individual and have suffered irreparable harm and face imminent risk of additional irreparable harm absent immediate court intervention. This includes medically documented injury and health impacts caused and exacerbated by Defendants' continued enforcement posture.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 30, 2026. /s/ Audrey Little Audrey Little

DATED: January 30, 2026

EMERGENCY STATEMENT OF IRREPARABLE HARM

Plaintiff Audrey Little submits this Emergency Statement of Irreparable Harm in support of
her Ex Parte Application for Temporary Restraining Order ("TRO") pursuant to Federal Rule
of Civil Procedure 65.

I. IRREPARABLE HARM

Plaintiff is a disabled individual proceeding pro se. Plaintiff has already suffered irreparable
harm and faces an imminent risk of additional irreparable injury absent immediate court
intervention. On January 9, 2026, Plaintiff underwent an MRI confirming a partial rotator cuff
tear. This injury is medically documented and ongoing. Plaintiff's treating providers have
advised that continued stress and physical strain materially worsen her condition and create a
risk of permanent injury. Monetary damages cannot remedy physical deterioration, loss of
function, or worsening disability. Defendants' ongoing enforcement posture—including
refusal to pause, continued billing and collection pressure, and maintenance of default and
enforcement leverage—directly exacerbates Plaintiff's medical condition and places her at risk
of losing housing stability and essential support services.

II. JURISDICTIONAL GAP CREATED BY REMOVAL

Prior to removal, Plaintiff had a noticed injunction hearing set for February 9–10, 2026 in
Riverside County Superior Court. Defendants did not timely oppose that injunction. On
January 29, 2026, Defendants filed a Notice of Removal, immediately freezing the state court's
authority to act and creating a jurisdictional gap. Absent a TRO from this Court, Defendants'
removal leaves Plaintiff without judicial protection while venue is litigated. This gap is not
theoretical. Defendants have refused to implement any pause and continue to assert
enforcement rights despite notice of a July 15, 2025 recording and lien■priority defect.

III. BAD-FAITH REMOVAL AND IMMINENT PREJUDICE

Defendants removed this action based on a superseded pleading containing RESPA /
Regulation X claims that Plaintiff had already abandoned in a complete redline transmitted
before removal. Plaintiff's proposed Second Amended Complaint asserts only state-law causes
of action. Rocket Close and Rocket Companies had already agreed to respond only to the
Second Amended Complaint after reviewing it cause-by-cause. Removal was filed only after
Defendants missed their deadline to oppose Plaintiff's injunction and after Plaintiff refused to
delay injunctive relief without a pause. Defendants now seek to benefit from the jurisdictional
void they created.

IV. NEED FOR IMMEDIATE TEMPORARY RELIEF

Without immediate temporary restraining relief, Plaintiff will suffer irreparable harm before
the Court can resolve Defendants' removal or Plaintiff's Motion to Remand. A narrowly
tailored TRO preserving the status quo imposes no prejudice on Defendants and is necessary to
protect Plaintiff's health, housing stability, and access to judicial review.

DATED: _____ /s/ Audrey Little Audrey Little, Plaintiff Pro Se


DATED: January 30, 2026

# I. INTRODUCTION / NATURE OF ACTION

1. This is not a case about a loan payment dispute. The undisputed documentary record incorporated by reference shows that the regulated safeguards and gatekeepers that make California real-estate closings safe and workable were not satisfied, yet Defendants seek to enforce the transaction as if compliance does not matter. The closing instructions required, among other non-discretionary conditions, that (i) the loan record in verified second-lien position on or before the disbursement date and (ii) Oaktree perform final QC prior to funding. (Exs. A-1, A-2; D-1.) The record shows disbursement occurred on July 14, 2025 while recording occurred on July 15, 2025. (Exs. B-1; B-2.) As a matter of timing alone, the transaction could not have recorded in the required lien position on or before disbursement and therefore could not have been verified as such prior to the irreversible release of funds. These are independent, redundant gatekeepers; if even one had been satisfied, the transaction would not have funded into an impaired lien stack. Instead, the record reflects failure at every independent gate identified in the closing instructions and title/insurance pipeline, including: (1) verified second-lien recordation on or before disbursement; (2) lender final QC prior to funding; (3) current title/bring-down currency through funding/recording; (4) recording sequence controls; and (5) insurance/CPL attachment and claim-handling safeguards. The record further shows facially stale title materials bearing an October 15, 2024 date were used in the title/commitment package—months outside the funding window—thereby infecting downstream underwriting inputs and closing gates that depended on current title. (Ex. C-1; Ex. D-2.) The record also shows Defendants acquired notice of the defect and a title-claim posture existed, yet enforcement and withholding continued. (Exs. E-1; E-2; T-1;

1    T-2.) These documents present a narrow legal question under controlling California

2    appellate authority: whether parties who controlled the closing pipeline may disregard

3    mandatory safeguards and then enforce the transaction as if those safeguards were legally

4    immaterial. Oaktree's own production labeled "Complete Loan File" includes title

5    materials bearing a facial "Production Date: October 15, 2024," confirming Oaktree had

6    the stale-dated title package in its possession during the underwriting/closing pipeline,

7    and Oaktree's underwriting conditions required a "Final QC review prior to funding," yet

8    no contemporaneous QC sign-off verifying lien position and title currency has been

9    produced. Plaintiff alleges Oaktree possessed the same stale-dated title materials

10    throughout underwriting and closing and failed to detect or act on the facial date

11    discrepancy before authorizing funding.

12    1K. Plaintiff's consent to the transaction was categorically limited to a verified, insurable

13    second-lien loan intended to be refinanced immediately. Plaintiff would never have

14    accepted a third-lien loan under any circumstances, as third-position status would render

15    immediate refinancing infeasible and defeat the essential purpose of the transaction.

16    1L. Plaintiff's execution of documents, authorization of disbursement, and continued

17    performance were expressly conditioned on satisfaction of the written conditions

18    precedent requiring verified second-lien recordation on or before disbursement, lender

19    final QC prior to funding, and reliance on current title/bring-down through funding and

20    recording.

21    1M. Disbursement constituted an affirmative representation by conduct that all express

22    conditions precedent—particularly verified second-lien position—had been satisfied.

1   Because disbursement was prohibited absent compliance, funding necessarily

2   communicated compliance and induced Plaintiff not to rescind or halt the transaction.

3   **1N. These allegations are material to inducement, causation, reliance, damages, and**

4   **post-notice wrongdoing, and are incorporated by reference into each cause of action**

5                              **to the extent applicable.**

6   1A. UNDISPUTED DOCUMENTARY FACTS (THE RECORD SHOULD HAVE

7   ENDED THIS DISPUTE MONTHS AGO):

8   1B. A family deed of trust was dated December 6, 2024 and recorded in December 2024

9   (recording reflected as December 2024 (dated 12/06/2024; recorded 12/19/2024) in the

10  file) and existed in the recorded lien stack before the July 2025 closing. Plaintiff and her

11  co-borrower did not know it was recorded; it was discoverable only through current title

12  controlled by Defendants. (Exs. C-2; E-2; U-3B.)

13  1C. Underwriting opened in May 2025 and required current title/bring-down currency.

14  The title materials later provided to Plaintiff bore an obvious "as of October 15, 2024"

15  date—nine months stale—which Plaintiff caught within seconds the first time she saw it

16  on November 19, 2025. (Exs. C-1; D-2; M-2; U-3B.) Plaintiff alleges the stale date was

17  facially apparent on the documents Oaktree had in its underwriting/title package from the

18  May 2025 commitment period, and would have been detected by any reasonable final QC

19  review before funding.

20  1D. Oaktree's underwriting approved only a second-lien product ("Subject lien is a 2nd

21  mortgage") with "MAX CLTV = 75%," and recorded a represented "LTV / CLTV …

22  69.809%" based on a $2,850,000 collateral value. (Ex. D-1.)

1   1E. The recorded lien stack as of 7/15/2025 yields an implied CLTV of 84.55%

2   ($1,300,000 + $393,000 + $716,580 = $2,409,580; ÷ $2,850,000). If the $125,000 Pagel

3   deed of trust remained unreconveyed as of 7/15/2025, the implied CLTV is 88.93%.

4   These figures are above Oaktree's 75% cap and inconsistent with the represented

5   underwriting premise. (Exs. D-1; C-2; F; J.)

6   1F. At signing, Defendants presented written closing/escrow instructions containing non-

7   discretionary conditions precedent, including: "OAKTREE TO PERFORM FINAL QC

8   REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST RECORD IN 2ND LIEN

9   POSITION ON OR PRIOR TO THE DISBURSEMENT DATE." (Ex. A-1; Ex. A-2.)

10  Plaintiff and her co-borrower signed the closing instructions in the presence of a notary

11  and reasonably understood them to be binding closing/escrow instructions governing

12  authorized disbursement and recording sequence. Plaintiff relied on those written

13  conditions—particularly verified second-lien recordation on or before disbursement and

14  lender final QC prior to funding—in consenting to the transaction and permitting funds to

15  be released. Plaintiff signed believing the loan would close in verified second lien

16  position so she could refinance immediately, and she would not have signed otherwise.

17  (Ex. A-1; Ex. A-2; Ex. U-3B.)

18  Escrow Instructions Violated (non-discretionary safeguards):

19  1) Final QC prior to funding. (Ex. A-1; Ex. D-1.)

20  2) Record in 2nd lien position on/before disbursement. (Ex. A-1; Exs. B-1, B-2; Ex. C-2.)

21  3) Timely current title / bring-down through funding/recording. (Ex. D-2; Ex. C-1; Ex.

22  F.)

1   4) Title policy delivery/content requirements (endorsements; policy free of liens except

2   permitted). (Ex. A-1; Ex. C-4; Final Policy; Missing Docs v5.)

3   5) Payoff + reconveyance completion; Pagel $125k still of record as of 7/15. (Ex. A-1;

4   Ex. F; Ex. J.)

5   1G. Disbursement occurred July 14, 2025 and recording occurred July 15, 2025. The

6   second-position condition was not met on or before disbursement. (Exs. B-1; B-2; C-2.)

7   Plaintiff alleges disbursement is an irreversible act: once escrow released the funds, the

8   transaction could not be unwound by simply 'taking back' the proceeds.

9   1G-1. Because Rocket Close was the settlement/escrow agent controlling the funding and

10  recording sequence, Rocket Close necessarily knew at the moment it disbursed funds on

11  July 14, 2025 that recording had not yet occurred and therefore that the express condition

12  requiring recordation in verified second-lien position on or before the disbursement date

13  had not been satisfied. (Exs. A-1; B-1; B-2.)

14  Plaintiff further alleges that the written instructions assigned final QC to Oaktree

15  ("OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING"). Plaintiff is

16  not aware of any contemporaneous lender QC sign-off tied to verified lien position being

17  obtained before funds were released, and Defendants have not produced such a sign-off

18  or authority-to-disburse documentation. (Ex. A-1; Ex. D-1; Missing Documents Request

19  List (v5)

20  1H. Oaktree had knowledge by September 9–10, 2025 and tendered a title claim on

21  September 10, 2025, yet Plaintiff was not told and enforcement continued into the first

22  payment cycle. (Ex. N-5; Ex. M-2; Ex. U-3B.)

1    1I. The denial letter is dated October 24, 2025 and addressed to Oaktree (Teague), not

2    Plaintiff. Plaintiff alleges she first obtained the denial materials on or about December 10,

3    2025 and invoked CPL coverage the same day. (Ex. E-2; Ex. U-3B; Exs. H-2; H-3.)

4    21D-3. Plaintiff alleges she first obtained the denial materials package on or about

5    December 10, 2025. The same day, Plaintiff invoked Closing Protection Letter ("CPL")

6    coverage and requested a CPL coverage determination and production of the CPL

7    instrument, claim file, and any appeals/arbitration materials. Plaintiff also notified Rocket

8    Title's claims counsel that the denial letter relied on an "Exclusion 3(c)" 'no loss'

9    provision that did not appear in the policy materials produced to Plaintiff, underscoring

10   that Defendants were invoking unproduced incorporated policy terms while withholding

11   the complete policy jacket/conditions/endorsements and full claim record.

12   21D-1. The October 24, 2025 denial letter addressed to Oaktree acknowledges that the

13   Resnick deed of trust appears to fall within the policy's lack-of-priority coverage

14   provision, then denies present relief based on a "no loss" posture and instructs re-tender

15   only upon foreclosure-related events; it also discloses arbitration and complaint rights.

16   Plaintiff alleges that denial posture was invalid as applied to the documented defect and

17   should have been formally appealed or arbitrated, yet no Defendant pursued CPL

18   coverage or a meaningful cure. (Ex. E-2; Ex. E-3; Exs. H-2; H-3.)

19

20   1J. Continued enforcement after knowledge is not a neutral servicing act. Once Oaktree

21   and the Rocket enterprise had notice that express conditions precedent failed and the

22   promised insured second-lien status was never achieved, continued billing, collection

23   pressure, default escalation, autopay/withdrawal attempts, and adverse credit reporting

24   threats became knowing post-notice conduct. Plaintiff alleges that conduct is

1   independently actionable and independently exposes Defendants under California law

2   and                                    (Exs. N-5; M-2; T-1; T-2; U-3B.)

3   21F. Plaintiff alleges that by September 9–10, 2025 Defendants knew the loan had not

4   closed as conditioned and was defectively secured. Nonetheless, Defendants allowed the

5   first payment cycle to begin, continued sending payment/late notices, and maintained

6   enforcement posture while withholding the escrow file, QC sign-off, bring-down

7   evidence, and the CPL instrument. (Exs. N-5; M-2; T-1; T-2; H-2; H-3; Missing

8   Documents Request List (v5)

9   21D-2. To Plaintiff's knowledge, no Rocket entity tendered or processed a Closing

10  Protection Letter ("CPL") claim despite written acknowledgments of escrow instruction

11  failure and lien-priority impairment, and despite Plaintiff's repeated CPL invocation and

12  requests for a coverage determination. (Exs. H-2; H-3; H-3A; cpl invoke.pdf; cpl.pdf.)

13  21G. On information and belief, Defendants knew Plaintiff was not at fault. Defendants

14  had access to title materials within their files prior to closing, controlled the title/escrow

15  pipeline, and knew that the required pre-disbursement quality control tied to lien position

16  could not have been completed as instructed. Despite knowledge that conditions

17  precedent failed and the loan was defectively secured, Defendants chose to continue

18  enforcement month after month—sending billing/late communications, maintaining

19  collection posture, refusing a pause, and withholding the complete escrow/QC/bring-

20  down/CPL file—thereby shifting risk and cost onto Plaintiff and her co-borrower. (Exs.

21  A-1; D-1; D-2; N-5; M-2; T-1; T-2; U-3B.)

22          **I.B. EXISTING APPELLATE FRAMEWORK AND WHAT IT MEANS IF**

23                  **ENFORCEMENT IS PERMITTED HERE**

1    California appellate authority also recognizes that mortgage servicers and owners can be

2    subject to California's Rosenthal Fair Debt Collection Practices Act, and that debt

3    collection / foreclosure-related conduct may be actionable where the collector attempts to

4    collect despite having no legal right or while engaging in unlawful or unfair collection

5    practices. (Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568; Davidson v.

6    Seterus, Inc. (2018) 21 Cal.App.5th 283.)

7    California appellate authority recognizes that escrow instructions and conditions

8    precedent are not optional; escrow holders must comply strictly with written instructions

9    and may not disburse contrary to conditions precedent. (Amen v. Merced County Title

10    Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title

11    Co. (2002) 27 Cal.4th 705.)

12    California law also enforces title insurance policy language as written; policy scope,

13    effective-date clauses, and covered risks are determined by the contract, and post-

14    knowledge conduct can create independent exposure. (Hovannisian v. First American

15    Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group, LLC v. Stewart

16    Title Guaranty Co. (2002) 105 Cal.App.4th 315; Karl v. Commonwealth Land Title Ins.

17    Co. (1993) 20 Cal.App.4th 972.)

18    Plaintiff alleges that if the Court were to permit continued enforcement of a loan funded

19    in violation of express conditions precedent and under a false underwriting premise—

20    while Defendants withhold the escrow file, CPL, and QC/bring-down proof—it would

21    functionally nullify the regulated safeguards that make California secured real-estate

22    closings workable.

1    Plaintiff is disabled and alleges she faces immediate forced-sale pressure if enforcement

2    continues. The Court is therefore presented with a narrow question on undisputed

3    documents: whether Defendants may shift the risk and cost of their own closing-process

4    violations onto the only parties without access to the true lien stack (Plaintiff and her co-

5    borrower). (Exs. T-1; T-2; M-2; U-2.)

6

7    2. Plaintiff consented to one narrow transaction only: a verified, insurable second-lien

8    refinance based on accurate, current title and underwriting inputs. Plaintiff would never

9    have accepted a third-lien loan under any circumstances because the loan was accepted as

10    a temporary second-lien bridge intended to be refinanced immediately. Plaintiff was

11    induced to consent based on a represented combined loan-to-value ratio ("CLTV") of

12    approximately 69%, not the approximately 85% CLTV that resulted once the true

13    recorded lien stack existed at/after recording. (Exs. D-1; C-2; C-7.)

14    3. The only party who did not have access to correct, current lien information was the

15    borrower. Defendants—lender, escrow, and title participants—controlled the closing

16    pipeline, controlled the title search/bring-down process, and controlled the disbursement

17    and recording sequence. Plaintiff relied on Defendants' representations and the regulated

18    closing process. (Exs. C-1; D-2; A-1; A-2; Tables Section—Table A.)

19    3A. Had current title been run correctly at the outset of underwriting in May 2025, the

20    transaction would not have proceeded at all. The second-lien underwriting premise and

21    CLTV feasibility depended on accurate lien position and recorded encumbrances; stale

22    title and lack of a timely bring-down concealed the intervening lien-priority reality until

23    after disbursement/recording. (Exs. D-1; D-2; C-1; C-2.)

1    4. The closing did not occur as conditioned. Disbursement occurred July 14, 2025, while

2    Oaktree's deed of trust recorded July 15, 2025, and did not land in the contractually

3    required second position—facts that were not disclosed to Plaintiff at the time of signing

4    or funding. (Exs. B-1; B-2; A-1; C-2.)

5    5. The title policy language ties effectiveness to recording ("…or the date of recording of

6    the insured mortgage, whichever is later"), meaning the loan was funded before the

7    insured mortgage recorded and before coverage could attach as written. (Ex. C-4;

8    Supplemental Exhibit – Final Title Policy (as provided)). Plaintiff further alleges that

9    when she requested the lender's title insurance policy materials, Oaktree initially

10   provided only the ALTA commitment/commitment jacket (without the underlying title

11   report and without the final policy/endorsements) and presented it as "the policy,"

12   thereby withholding or mischaracterizing the operative policy and title materials needed

13   to assess coverage, currency, endorsements, and Schedule B exceptions.

14   5A. The lender's policy form ties effectiveness to the later of the stated policy date or the

15   recording of the insured mortgage; accordingly, where disbursement occurred before

16   recording, the transaction was funded before policy coverage could attach as written.

17   Rocket Close, as the closing agent handling policy issuance and recording, knew or

18   should have known this timing consequence when it released funds before recording. (Ex.

19   C-4; Exs. B-1/B-2.)

20

21   6. After Defendants had notice of the defect, Plaintiff demanded an immediate

22   enforcement stop (including disabling autopay/withdrawals and freezing adverse credit

23   reporting) and requested a temporary pause while the defect was cured and reviewed by

1    the Court. Defendants refused, continued enforcement, and withheld core

2    closing/escrow/CPL documentation. (Exs. T-1; T-2; D-3; H-2; H-3; H-3A.)

3    7. Plaintiff repeatedly offered cure and settlement terms designed to make Oaktree whole

4    while minimizing everyone's exposure (including a structured offer ladder and multiple

5    cure options). Defendants refused or ignored those mitigation attempts and escalated

6    enforcement instead. (Tables Section—Table C; Ex. T-1; Ex. T-2; Ex. M-2.)

7    27M-1. Plaintiff repeatedly requested a temporary pause of billing, drafts, and adverse

8    credit/enforcement activity while the defect and coverage/cure pathways were evaluated,

9    and Plaintiff communicated that if Oaktree implemented a pause and promptly produced

10   the missing QC/authority-to-disburse/bring-down and claim/CPL records, Plaintiff would

11   streamline the pleadings and reduce motion practice to avoid unnecessary litigation

12   expense. Oaktree refused to pause and continued enforcement posture, thereby increasing

13   foreseeable harm and compounding Plaintiff's damages while the underlying defect

14   remained unresolved. (Exs. T-1; T-2; E-3; E-4.)

15   7E. Plaintiff alleges that, having reviewed the appellate authority, the continued

16   enforcement pressure after notice is inexplicable on any innocent reading of the record.

17   The only explanation aligned with the documentary evidence is that continued pressure

18   shifts risk and cost onto the borrower even though post-knowledge conduct carries

19   independent exposure under California law.

20   7D. In the secured-lender context, appellate authority recognizes that a title-policy 'loss'

21   analysis cannot be manipulated by post-knowledge delay; the law fixes the relevant

22   measurement principles and attaches exposure to wrongful denials and bad-faith conduct.

1    (Karl v. Commonwealth Land Title Ins. Co. (1993) 20 Cal.App.4th 972; Karl v.

2    Commonwealth Land Title Ins. Co. (1997) 60 Cal.App.4th 858.)

3    7C. Title insurance is indemnity for covered loss and is governed by the policy language;

4    courts enforce those terms, including termination and scope provisions. (Hovannisian v.

5    First American Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group,

6    LLC v. Stewart Title Guaranty Co. (2002) 105 Cal.App.4th 315; Lick Mill Creek

7    Apartments v. Chicago Title Ins. Co. (1991) 231 Cal.App.3d 1654.)

8    7B. The escrow agency is limited—but it is real. The escrow holder's duties are defined

9    by the escrow instructions, and deviation from conditions precedent (especially

10    disbursement and recording sequence) creates liability and voidable consequences.

11    (Summit, supra, 27 Cal.4th at 712–716; Amen, supra, 58 Cal.2d at 534.)

12    7A. California courts have long held that an escrow holder is an agent and fiduciary of

13    the parties and must comply strictly with the parties' written instructions. (Amen v.

14    Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v.

15    Continental Lawyers Title Co. (2002) 27 Cal.4th 705; Lee v. Title Ins. & Trust Co.

16    (1968) 264 Cal.App.2d 160.)

17    **I.A. KEY CALIFORNIA APPELLATE AUTHORITY (NON-EXHAUSTIVE)**

18    **II. PARTIES**

19    8. Plaintiff AUDREY LITTLE ("Plaintiff") is an individual residing in Riverside County,

20    California.

21    9. Defendant ROCKET CLOSE, LLC (formerly Amrock Title California Inc.) ("Rocket

22    Close") acted as escrow holder and settlement agent for the refinance closing. (Exs. A-1,

23    A-2; B-3.)

1    10. Defendant ROCKET COMPANIES, INC. ("Rocket Companies") is the

2    parent/enterprise entity that exercised control over the Rocket closing/title ecosystem,

3    received enterprise notice, assigned "Client Resolution" handling, and continued to

4    withhold and refuse cure/pause despite full notice. (Exs. N-1 through N-4; Ex. N—

5    Rocket Corporate Materials (N-1/N-2)

6    11. Defendant OAKTREE FUNDING CORPORATION ("Oaktree") is the

7    lender/beneficiary on the deed of trust and the party demanding and/or permitting

8    continued enforcement after notice of the lien-priority defect, despite its own written

9    conditions precedent and QC requirements. (Exs. A-1, A-2; D-1; E-4; T-2.)

10    12. Plaintiff is ignorant of the true names and capacities of DOES 1–50 and therefore

11    sues them by fictitious names. Plaintiff will amend when their identities are ascertained.

12                              **III. JURISDICTION AND VENUE**

13    13. This Court has subject-matter jurisdiction because the amount in controversy exceeds

14    the jurisdictional minimum for unlimited civil cases.

15    14. Venue is proper in Riverside County because the property is located in Riverside

16    County and substantial events and injuries occurred here.

17                              **IV. GENERAL ALLEGATIONS**

18    15. Plaintiff incorporates by reference the Master Exhibit Binder (v9) submitted in

19    support of this Second Amended Complaint, including Exhibits A through U, the Tables

20    Section, and supplemental exhibits. The exhibits are incorporated by reference as though

21    fully set forth herein.

22    15A. Chronology of Origination and Inducement (Borrower Perspective; Undisputed

23    Where Documented)

1    15B. Plaintiff initially contacted a mortgage broker to open a loan for a HELOC/short-

2    term bridge structure with the express intent to refinance promptly. At intake, the broker

3    obtained title information through the Rocket title/closing ecosystem and reviewed the

4    lien stack. Plaintiff expected to see the existing Kinecta HELOC and the $125,000 Pagel

5    deed of trust, which were to be addressed/combined through the new transaction. (Ex. A-

6    1 (payoff requirements); Ex. C-1; Ex. J; Ex. F.)

7    15B-1. As underwriting proceeded, Plaintiff and her co-borrower were informed of the

8    key underwriting maximums and were comfortable with them because the transaction

9    was intended to be short-term and refinanced immediately. The underwriting conditions

10    reflected a second-lien product with "MAX CLTV = 75%" and "MAX DTI = 50%," and

11    recorded a represented "LTV / CLTV … 69.809%." (Ex. D-1.)

12    15B-2. Plaintiff understood any elevated debt-to-income ratio would be temporary only

13    and would be cured by immediate refinance once the transaction closed as represented in

14    verified second-lien position. Plaintiff's consent was therefore conditioned on the closing

15    process safeguards working as designed: current title verification, strict escrow

16    compliance, recording sequence, and insurance attachment. (Exs. A-1; D-1; D-2; Tables

17    Section—Table A.)

18    15C. Plaintiff told the mortgage broker she had a family loan for which she had signed

19    documents, and Plaintiff specifically asked whether any lien related to that family loan

20    appeared on title because Plaintiff understood she would not be approved if it did.

21    Plaintiff was assured that the title information being reviewed did not show any lien

22    regarding a family loan. (Ex. U-3B ¶¶6–9.)

1   15D. Unknown to Plaintiff (and unknowable to Plaintiff without a current title search

2   controlled by Defendants), a family deed of trust had been dated December 6, 2024 and

3   recorded in December 2024 (recording reflected as December 2024 (dated 12/06/2024;

4   recorded 12/19/2024) in the file) and existed in the lien stack. The title insurer later

5   characterized the intervening deed of trust as a family loan. (Ex. E-2; Ex. U-3B ¶7.)

6   15D-1. Plaintiff did not know that the family deed of trust had been recorded. Plaintiff

7   alleges she learned only after Oaktree finally disclosed that a recorded deed of trust

8   existed. At that point, Plaintiff contacted a third party with access to title data who

9   advised that the deed of trust appeared to have been recorded in December 2024. Plaintiff

10   did not learn the specific recorded date until Plaintiff later obtained a title report "as of

11   July 15, 2025," which reflected the recorded deed of trust and recording information. (Ex.

12   F; Ex. J; Ex. U-3B.)

13   15E. Plaintiff then proceeded to signing/closing. At signing, Plaintiff executed the loan

14   package and the borrower acknowledgment to the written closing/escrow instructions.

15   Those instructions contained express conditions precedent, including: "OAKTREE TO

16   PERFORM FINAL QC REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST

17   RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT

18   DATE." (Ex. A-1; Ex. A-2.)

19   15F. What Plaintiff did not know—because it was not disclosed and because Defendants

20   controlled the title pipeline—was that although underwriting proceeded in May 2025, the

21   title summary/commitment materials being relied upon bore an "October 15, 2024" date

22   (nine months stale) and/or were not timely updated with a bring-down through

23   funding/recording. Plaintiff first saw that stale date on November 19, 2025 and

1  recognized and flagged the discrepancy within seconds. (Exs. C-1; D-2; M-2; U-3B.)

2  Plaintiff alleges the stale-dated title materials were in Oaktree's possession as part of the

3  commitment/title package used for the transaction, and that noticing the stale date would

4  have compelled a current bring-down and prevented disbursement under the underwriting

5  cap and the express second-lien-on-or-before-disbursement condition.

6  20D. Industry-standard pull-down/bring-down practice and the commitment's own

7  currency terms require a current update shortly before closing. The ALTA Commitment

8  warns that in order to close and have a policy issued based on the commitment, the

9  commitment revision date must not be older than 14 days from closing, and after 180

10  days the commitment is void. Plaintiff alleges Defendants failed to obtain/retain a timely

11  bring-down within that window, which would have exposed the senior lien stack and

12  prevented disbursement under the underwriting cap and the second-position condition

13  precedent. (Ex. D-2; Ex. C-1; Ex. A-1; Ex. F.)

14  20F. ALTA Commitment / currency gate (who issued and why it matters). The ALTA

15  Commitment for Title Insurance (Commitment No. 74346744, dated May 8, 2025)

16  identifies Rocket Close and Title, Inc. as issuing agent for the lender's policy

17  commitment and contains express currency warnings requiring timely updates close to

18  closing (revision within 14 days; void after 180 days). (Ex. D-2.) Plaintiff pleads this

19  commitment and its currency terms not as an abstract of title, but to show the controlled

20  closing process required a timely bring-down/pull-down gate before

21  disbursement/recording, and that either no timely bring-down was obtained before

22  funding or a bring-down was obtained and ignored. (Exs. A-1; D-1; B-1/B-2; F.)

20D-1. Commitment currency and industry-standard bring-down practice. The ALTA

Commitment warns that to close a transaction and have a policy issued based on the

commitment, the Commitment Revision Date must not be older than 14 days from the

actual closing date, and after 180 days the commitment is void. Plaintiff alleges a timely

pull-down/bring-down no more than 14 days pre-close (and immediately before

funding/recording) is standard practice and required by the commitment's own terms; a

timely bring-down would have shown the senior lien stack and prevented funding under

both the underwriting cap and the express second-position-before-disbursement

condition. (Ex. D-2; Ex. C-1; Ex. A-1; Ex. D-1; Ex. F.)

20E. Plaintiff alleges this outcome could not occur if Defendants followed a single, basic

safeguard: current title verification immediately before funding/recording. Had Oaktree

and the closing/title participants obtained and relied upon a current title report / bring-

down within the required currency window, the senior/intervening lien stack would have

been visible and the loan would not have been funded as a second-lien product.

Accordingly, either (1) no timely current title / bring-down was obtained, or (2) a current

title / bring-down was obtained, revealed the intervening lien(s), and Defendants

proceeded anyway. Plaintiff alleges either alternative constitutes unlawful conduct and

breach of the written conditions precedent. (Exs. D-2; A-1; D-1; F; B-1; B-2.)

20E-1. Plaintiff further alleges she still has not received from Rocket the

contemporaneous title/bring-down evidence, escrow officer notes, or internal clearance

records that would resolve which alternative occurred. Accordingly, Plaintiff pleads in

the alternative that (1) no timely bring-down/current title was obtained and relied upon

prior to disbursement, or (2) a bring-down/current title was obtained, revealed the

1    intervening lien(s) and third-position outcome, and Defendants proceeded anyway.

2    Plaintiff further alleges that, to the extent Rocket or escrow personnel obtained current

3    title reflecting the defect, Oaktree either (a) did not receive that information due to

4    process failure, or (b) received it and nonetheless permitted or directed funding contrary

5    to its own written conditions precedent.

6    15G. Process Failure Chain (Step-by-Step — Why the Documentary Record Is

7    Dispositive)

8

9    The record shows this was not a single isolated mistake. Multiple independent,

10   mandatory checkpoints were required to prevent funding into an impaired lien stack, and

11   the documentary evidence shows the critical checkpoints did not occur as required. The

12   closing instructions required verified second-lien recordation on or before disbursement

13   and lender final QC prior to funding. (Ex. A-1; Ex. D-1.) The record shows disbursement

14   on 7/14/2025 and recording on 7/15/2025, which alone establishes the second-lien-on-or-

15   before-disbursement condition was not met. (Exs. B-1; B-2.) The record further shows

16   facially stale title materials (dated 10/15/2024) were used in the title/commitment

17   package and transmitted as part of the closing pipeline, despite express currency

18   warnings requiring timely updates close to closing. (Ex. C-1; Ex. D-2.) The required

19   QC/authority-to-disburse and bring-down records remain unproduced. Accordingly, the

20   only reasonable inferences are that the required gates were not performed, or were

21   performed and ignored, and Defendants proceeded anyway. These documentary facts do

22   not depend on any borrower narrative: they are the gatekeeper facts that should have

23   stopped funding, or required an immediate pause and cure once discovered.

1

2    Borrower disclosure does not change these gatekeeper failures. Even assuming full

3    disclosure, the written conditions precedent required verified second-lien recordation on

4    or before disbursement and lender final QC prior to funding, and the

5    disbursement/recording chronology establishes those conditions were not satisfied before

6    funds were irreversibly released.

7    The transaction had multiple independent, mandatory checkpoints designed to prevent

8    exactly this outcome. Each checkpoint was controlled by Defendants' process, and each

9    checkpoint failed. Even if Defendants attempt to attribute fault to Plaintiff, none of the

10   borrower-attribution theories would change the dispositive outcome: a current title/bring-

11   down and the written conditions precedent would have prevented funding or would have

12   required an immediate cure before enforcement. (Exs. A-1; D-1; D-2; B-1; B-2; F.)

13   15H. Immateriality of 'Borrower Non-Disclosure' Defenses. Defendants may argue

14   Plaintiff "should have disclosed" or "should have known." Plaintiff alleges she disclosed

15   the family loan and asked specifically whether it appeared on title and was told it did not.

16   (Ex. U-3B.) But even if Defendants dispute that exchange, it would not change the

17   outcome: the controlling failures were Defendants' failure to use current title, failure to

18   obtain a timely bring-down, failure to satisfy express conditions precedent before

19   disbursement, and failure to stop enforcement after knowledge. Those failures are

20   independent of borrower intent and would have defeated eligibility and/or barred funding

21   regardless. (Exs. D-1; D-2; A-1; B-1; B-2; F; M-2.)

22   15H-1. Borrower-attribution defenses do not change outcome. Defendants may argue

23   Plaintiff "should have disclosed" or "should have known" the recorded deed of trust.

1    Plaintiff alleges she disclosed the family loan, asked specifically whether it appeared on

2    title, and was told it did not, and further alleges she did not know the deed of trust was

3    recorded until Oaktree finally disclosed it. But even if Defendants dispute those facts, it

4    would not change the dispositive outcome because the closing process required

5    Defendants to run current title and a timely bring-down and to satisfy express conditions

6    precedent before disbursement. A timely bring-down would have revealed the senior lien

7    stack and prevented funding under the underwriting cap and the second-position-before-

8    disbursement condition; alternatively, if the bring-down was run and Defendants

9    proceeded anyway, the misconduct is worse. Either way, borrower narrative cannot cure

10   Defendants' process failures. (Exs. U-3B; D-2; D-1; A-1; F; B-1; B-2.)

11   16. Oaktree's written closing instructions imposed conditions precedent to

12   funding/disbursement and required second-lien recordation on or before the disbursement

13   date, as well as lender final QC prior to funding. (Exs. A-1, A-2; D-1.)

14   16A. The written closing instructions include multiple non-discretionary safeguards. For

15   example, the instructions expressly state: "CONDITIONS TO BE SATISFIED PRIOR

16   TO DISBURSEMENT OF LOAN PROCEEDS: OAKTREE TO PERFORM FINAL QC

17   REVIEW PRIOR TO FUNDING." (Ex. A-1.)

18   16B. The title/recording conditions are equally explicit. The instructions state: "THIS

19   LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE

20   DISBURSEMENT DATE NOTED ABOVE." (Ex. A-1.)

21   16C. The instructions further require delivery of "DUPLICATE ORIGINALS OF THE

22   ALTA TITLE POLICY," specify required endorsements, and require that the "ALTA

1   Title Policy must be free from liens, encumbrances, easements, encroachments and other

2   title matters" except limited items and taxes paid current. (Ex. A-1.)

3   16D. Oaktree's underwriting conditions confirm the transaction was approved only as a

4   second-lien product with strict feasibility limits. Oaktree's approval conditions state:

5   "MAX CLTV = 75%" and "Subject lien is a 2nd mortgage." (Ex. D-1.)

6   16E. The underwriting file also records the represented leverage at approval: "LTV /

7   CLTV / HCLTV 25.144% / 69.809% / …" with a collateral home value of

8   $2,850,000.00. (Ex. D-1.)

9   16F. Using the $2,850,000.00 collateral value reflected in underwriting, the minimum

10  known lien stack at/after recording included approximately $1,300,000 (first lien) +

11  $393,000 (Resnick) + $716,580 (Oaktree) = $2,409,580, yielding an implied CLTV of

12  84.55%—above Oaktree's "MAX CLTV = 75%" cap and above the represented 69.809%

13  CLTV. If the $125,000 Pagel deed of trust remained unreconveyed as of 7/15/2025, the

14  implied CLTV is higher still (88.93%). (Exs. D-1; C-2; F; J.)

15  16F-1. The July 15, 2025 title evidence shows that a deed of trust in the amount of

16  $125,000 recorded December 7, 2022 (Pagel) remained of record, meaning the

17  payoff/reconveyance documentation and recording confirmation were not completed or

18  not recorded when represented as paid off. This is further 'absence evidence' of

19  escrow/title process failure and explains why the lien stack available on 7/15 still

20  contained the $125,000 lien. (Ex. F; Ex. J; Missing Documents Request List (v5)

21  16G. Plaintiff and her co-borrower, Jacob Little, had no knowledge that the intervening

22  lien existed in the recorded lien stack at the time they were asked to sign. Defendants'

23  documents and process positioned the loan as a second-lien refinance based on current

title and a ~69.8% CLTV, and the closing instructions/underwriting conditions were not optional. The borrower was the only party without access to the actual, current recorded lien stack. (Exs. A-1; D-1; C-2; Tables Section—Table A.)

16H. Plaintiff and her co-borrower did not have access to the actual lien stack and could not independently verify lien priority or bring-down status. They relied on Defendants' regulated closing process and expressly assumed that loan proceeds would not be disbursed unless the written conditions precedent were satisfied—including verified second-lien position on or before disbursement and lender final QC prior to funding. (Ex. A-1; Ex. D-1; Tables Section—Table A.)

16H-1. Anticipated defense 'borrower should have known' is contradicted by the documentary record. The title commitment itself warns that it is void/ineffective for closing unless the revision date is within 14 days of closing and that after 180 days it is void—confirming that currency is controlled by the title/escrow pipeline, not the borrower. (Ex. D-2; Ex. C-1.)

16I. Plaintiff and her co-borrower did not receive current title evidence before funding; Oaktree's own chronology identifies that the borrower's first receipt of a preliminary title item occurred months later (November 19, 2025), after disbursement/recording. (Ex. M-2; Ex. H.)

16J. Anticipated defense 'borrower failed to disclose' is also contradicted by Defendants' admissions and by withheld file evidence. Defendants characterize the intervening deed of trust as a family loan and threatened Plaintiff with criminal referral over a "0% family loan" listed as borrowers customarily list family loans—while still refusing to produce

the complete origination/underwriting/escrow file that would resolve the question. (Exs. E-2; T-2; Tables Section—Table A; Missing Documents Request List (v5)

17. Underwriting materials reflect the second-lien premise and maximum CLTV/DTI constraints for a second mortgage, and specifically describe the subject lien as a "2nd mortgage." (Ex. D-1.)

18. The recorded public record and Defendants' own disbursement/recording proof show disbursement occurred July 14, 2025 and recording occurred July 15, 2025, violating the "record in 2nd position on or prior to disbursement" condition. (Exs. B-1; B-2; A-1.)

19. A recorded intervening deed of trust (the "Resnick" lien) existed in the recorded lien stack before Oaktree's deed of trust recorded, defeating the transaction feasibility and CLTV eligibility premise if current title had been run and accounted for. (Exs. C-2; C-7.)

20. Title materials show the use of stale title information and the absence of a timely bring-down through the July 2025 disbursement/recording window, including currency warnings and an extended gap between title work and funding. (Exs. C-1; D-2; C-6.)

20A. Current title should have been run at the outset of underwriting in May 2025 (Commitment/Prelim dated May 8, 2025) and then timely updated through closing with a bring-down within the commitment's currency window. Instead, Defendants relied on or transmitted title materials bearing an "October 15, 2024" date and/or failed to obtain a timely bring-down through funding/recording. (Ex. C-1; Ex. D-2; Ex. A-1.) Plaintiff alleges the October 15, 2024 date was obvious on the face of the transmitted materials; Oaktree had the same materials in its file, and a basic QC review would have flagged the currency failure before funding.

1    20C. Reasonable inference regarding the missing bring-down. Plaintiff alleges that a

2    timely pull-down/bring-down search was required immediately prior to funding and/or

3    immediately prior to recording to confirm the then-current lien stack and the required

4    second-lien outcome. It is a reasonable inference that no timely bring-down was run

5    before disbursement, because a bring-down would have shown the senior/intervening lien

6    stack and would have prevented funding under both the underwriting feasibility cap and

7    the express second-position-before-disbursement condition. In the alternative, if a bring-

8    down was run after disbursement and revealed the defect, proceeding anyway was an

9    intentional disregard of conditions precedent. Either scenario is fatal. (Exs. D-2; A-1; D-

10   1; F; B-1; B-2.)

11   21A. Defendants did not disclose any lien-priority defect at closing, at funding, or at the

12   time payments began. Plaintiff learned only because the loan was intended to be

13   refinanced immediately and Plaintiff attempted to refinance in early September 2025.

14   During that refinance process, Plaintiff was informed there was a defect preventing

15   refinance but was not told the nature of the defect, and refinancing could not proceed.

16   (Ex. U-3B ¶¶7–9.)

17   21E. Plaintiff did not learn that the preliminary/title materials bore an "October 15, 2024"

18   effective date until November 19, 2025, when Plaintiff first saw the document and

19   immediately recognized and flagged the discrepancy. Plaintiff alleges Defendants

20   controlled the title/escrow pipeline and had access to the date-stamped materials but

21   failed to disclose the mismatch at or before closing and funding. (Ex. C-1; Ex. D-2; Ex.

22   M-2; Ex. U-3B.)

1    21E-1. Plaintiff alleges Defendants had access to the public record and closing file at all

2    times, while Plaintiff and her co-borrower did not. Plaintiff did not learn the recorded

3    date details until she obtained the July 15 title report months later; Defendants' failure to

4    provide prompt notice and the complete file forced Plaintiff to reconstruct the record

5    herself. (Exs. F; J; D-3; Missing Documents Request List (v5)

6    21D. The title insurer's denial letter is dated October 24, 2025 and was addressed to

7    Oaktree (Robert Teague), not to Plaintiff, confirming Defendants' early knowledge

8    posture. (Ex. E-2.) Plaintiff did not receive that denial materials package at the time it

9    was issued; Plaintiff alleges she first obtained the denial materials on or about December

10   10, 2025 and invoked CPL coverage the same day. (Ex. U-3B ¶¶10–11; Exs. H-2; H-3.)

11

12   21B. Plaintiff was told by her mortgage broker that there was "a problem with title," but

13   the broker did not know what it was and did not provide current title details. Plaintiff and

14   her co-borrower did not yet know the nature of the defect, including the reliance on stale

15   title and/or the absence of a timely updated bring-down through funding/recording, and

16   reasonably relied on Defendants' controlled title/escrow process. (Ex. U-3B ¶¶8–9; Ex.

17   A-1; Ex. D-1.)

18

19

20   21C. The exhibit record reflects that Rocket and Oaktree had knowledge of the defect no

21   later than September 9–10, 2025, including Oaktree's Notice of Claim to Rocket Title

22   dated September 10, 2025. (Ex. N-5; Ex. U-3B at 314:22–25.)

23   21D. Despite that knowledge, Plaintiff was not timely told the nature of the defect and

24   continued making payments while billing and enforcement activity continued. Oaktree's

1    own correspondence states that it had actual knowledge no later than September 9, 2025,

2    yet did not timely disclose the defect and continued enforcement activity. (Ex. M-2 at

3    347:12–16; Ex. U-3B at 314:25–26.)

4

5    21. The lender's title policy form language ties effectiveness to recording of the insured

6    mortgage. Because recording occurred after disbursement, the loan was funded before

7    coverage could attach under the policy's own clause. (Ex. C-4; Supplemental Exhibit –

8    Final Title Policy (as provided)

9    22. Oaktree tendered a title claim asserting impairment of the loan position and

10   unsaleability absent cure, demonstrating actual notice of the defect. (Ex. E-1.)

11   23. Rocket Title's denial admitted the intervening lien was not excepted on Schedule B

12   and "appears to fall within" the lack-of-priority coverage, yet denied present relief on a

13   "no loss" posture and instructed re-tender only upon foreclosure-related events. (Exs. E-

14   2; C-8.)

15   **IV.B. Post-Notice Admissions, Lender's Policy Context, Withheld Escrow and CPL**

16   **Records, and Continued Enforcement**

17   24. Plaintiff does not allege that she is the insured under the lender's title insurance

18   policy or that she is entitled to payment of policy proceeds. The title policy insured

19   Oaktree Funding Corporation's lien position. References to the policy and denial are pled

20   solely to establish Defendants' knowledge, their post-notice conduct, and the

21   reasonableness of Plaintiff's requests for pause and cure. (Ex. E-2; Final Policy; Exs. T-

22   1/T-2.)

23   24A. Plaintiff has repeatedly requested the complete escrow/closing file and the complete

24   claim-related record, including all title-claim communications, appeals, reconsideration

1   requests, arbitration materials, and determinations, and all Closing Protection Letter

2   ("CPL") issuance and claim materials. Defendants have not produced these items.

3   Plaintiff further alleges that the production labeled "Complete Loan File" is not complete

4   and omits core categories such as (i) authority-to-disburse documentation, (ii) pre-

5   funding QC sign-off tied to verified lien position, (iii) bring-down/current title evidence

6   through funding/recording, and (iv) claim/CPL appeal or determination records. Plaintiff

7   pleads these omissions as absence evidence supporting the reasonable inference that

8   required safeguards were not performed or, if performed, revealed the defect and were

9   ignored. Oaktree's own production includes a stale-dated title item (Production Date:

10   October 15, 2024) while omitting the gatekeeper proof that would show compliance

11   (final QC sign-off, authority-to-disburse, and bring-down/current title evidence).

12   25. Plaintiff pleads concrete, present damages and irreparable harm already incurred that

13   are independent of any future foreclosure event, including loss of refinance opportunity,

14   ongoing enforcement leverage, credit impairment risk, and health-related impacts from

15   payment triage and withheld-file pressure.

16   26. The October 24, 2025 denial letter itself quotes the policy's lack-of-priority insuring

17   provision and states that the intervening deed of trust appears to fall within that coverage

18   grant. (Ex. E-2.)

19   27. After admitting that escrow errors had occurred and after Oaktree Funding

20   Corporation tendered a title claim based on lien-priority impairment, Defendants advised

21   Plaintiff that protection would not apply unless and until foreclosure or similar

22   enforcement events occurred. Defendants did not identify any policy provision requiring

1   foreclosure as a prerequisite to protection for lien-priority defects. (Ex. E-2; Ex. M-2; Ex.

2   U-3B.)

3   27A. Based on Defendants' statements, their refusal to grant any pause, and their

4   continued enforcement posture, it appears Defendants accepted a "no loss until

5   foreclosure" position despite acknowledging an existing lien-priority impairment.

6   Plaintiff is informed and believes that lien-priority protection under the applicable policy

7   is not conditioned on foreclosure, sale, or liquidation events, and that no such prerequisite

8   appears in the policy language governing lack-of-priority coverage. (Ex. E-2; Final

9   Policy.)

10  27B. Plaintiff repeatedly requested copies of all title-claim appeals, coverage challenges,

11  arbitration filings, determinations, and correspondence, as well as all Closing Protection

12  Letter ("CPL") claims, coverage letters, denials, appeals, and related communications.

13  Defendants produced none. (Tables Section—Table A; Exs. H-2; H-3; H-3A; Missing

14  Documents Request List (v5)

15  27C. Civil discovery production demand. Plaintiff has served Requests for Production of

16  Documents under Code of Civil Procedure § 2031 et seq. Rocket Close is required to

17  serve code-compliant written responses stating whether it will comply, lacks ability to

18  comply, or objects (CCP § 2031.210), and to produce responsive documents in a usable

19  form (CCP § 2031.280). Any refusal to produce, evasive response, or improper

20  withholding constitutes a misuse of discovery (CCP § 2023.010) and will be addressed by

21  motion to compel and sanctions. (Tables Section—Table A; Missing Documents Request

22  List (v5)

1    27D. Scope of custodians/systems (Amrock/Rocket Close). For avoidance of doubt,

2    Plaintiff's discovery requests and production demands include documents held by Rocket

3    Close's custodians and systems operating under any "Amrock"/amrock.com mailboxes or

4    branded departments used on this transaction (e.g., title clearance/funding), and Rocket

5    Close and Title, Inc. where referenced in closing/title documents; Defendants may not

6    avoid production by re-labeling custodians or systems. (Exs. N-1/N-2; Tables Section—

7    Table A.)

8    27E. On information and belief, and based on Defendants' failure to produce any such

9    documents despite repeated written requests, it appears that no appeal of the title-claim

10   denial was pursued, no CPL claim was tendered prior to Plaintiff's express CPL

11   invocation, and no CPL coverage determination was issued before enforcement

12   continued. (Ex. E-3; Exs. H-2/H-3; Tables Section—Table A.)

13   27F. Defendants also failed to produce the complete escrow file, including but not limited

14   to: current title and bring-down evidence, lien-priority verification, final quality-control

15   approval, authority-to-disburse documentation, recording sequencing records,

16   reconveyance confirmations, escrow officer notes, and CPL issuance or processing

17   records. These materials are mandatory for a lawfully closed, insured second-lien

18   transaction and are uniquely within Defendants' possession, custody, or control. (Ex. A-

19   1; Ex. D-1; Ex. D-2; Ex. D-3; Missing Documents Request List (v5)

20   27G. Notwithstanding admitted escrow error, acknowledged lien-priority impairment,

21   unresolved coverage obligations, and Plaintiff's repeated written requests for a temporary

22   pause, Defendants continued billing, collection pressure, enforcement threats, and refusal

1    to pause, while withholding the escrow file and all documentation reflecting coverage

2    review, appeal, or CPL processing. (Exs. T-1; T-2; Ex. M-2; Ex. U-3.)

3    27H. The absence of these records supports the reasonable inference that required

4    escrow, title, quality-control, and CPL safeguards were either not performed or were

5    performed, revealed the defect, and Defendants proceeded anyway. Either alternative

6    constitutes negligent and reckless post-notice conduct under California law. (Exs. D-2;

7    A-1; D-1; F; T-1; T-2.)

8    27I. At all relevant times after Defendants acquired actual knowledge of the defect,

9    Oaktree Funding Corporation knew that Plaintiff is disabled, knew that continued

10    enforcement posed an immediate and irreparable risk of Plaintiff losing her home, and

11    knew that coverage and cure obligations had not been resolved. Despite this knowledge,

12    Oaktree refused any pause, continued enforcement pressure, advised Plaintiff that

13    foreclosure would be required before protection could apply, and escalated enforcement

14    with threats of criminal referral, conduct undertaken with reckless disregard of the

15    probability of causing severe emotional distress. (Exs. U-3A/U-3B; T-1; T-2; M-2.)

16    27J. Plaintiff does not seek to adjudicate insurance coverage or compel payment under

17    the title policy; the existence of the policy and denial are alleged solely to demonstrate

18    Defendants' knowledge, unreasonable reliance, and continued enforcement despite

19    unresolved defects.

20    27K. Mitigation ladder and avoidable escalation. Plaintiff presented multiple cure and

21    settlement options designed to make Oaktree whole and stop harm early, including a

22    documented offer ladder beginning with $0 to Plaintiff and full payment of Oaktree's

23    principal balance ($716,580), followed by higher combinations (e.g., $63,000 +

1    $716,580; $98,000 + $716,580; $412,000 + $716,580) and other structures to unwind or

2    cure the transaction. These proposals were made while Plaintiff's damages were

3    comparatively limited (under approximately $100,000) and before enforcement pressure

4    compounded harm. Defendants refused or ignored these mitigation attempts and

5    continued enforcement posture instead. (Tables Section—Table C; Exs. T-1/T-2; M-2.)

6    27L. Enterprise escalation and delegated inaction. Plaintiff escalated the defect and

7    enforcement harm to Rocket Companies' executive level. Rocket Companies responded

8    by delegating the matter to Rocket Close's operations leadership (Vice

9    President/operations role) as the point of contact. Plaintiff continued copying Rocket

10   Companies on correspondence and repeatedly requested a pause and cure, yet no

11   effective action was taken and the refusal-to-mitigate posture continued. (Exs. N-1/N-2

12   (enterprise escalation communications); Tables Section—Tables A–C; Exs. T-1/T-2).

13   Plaintiff requested enterprise-level coordination because Rocket's title, escrow, and

14   insurance participants were pointing responsibility to one another; Rocket Companies'

15   CEO-level escalation resulted in delegation to Rocket Close operations leadership, but

16   the record reflects continued non-coordination and withholding after that handoff.

17   27M. Where allegations are made on information and belief, such allegations are based

18   on Defendants' statements, conduct, admissions, and failure to produce documents

19   uniquely within their possession, custody, or control, despite repeated written requests.

20   (Tables Section—Table A; Missing Documents Request List (v5)

21   27N. Damages and Irreparable Harm (Concrete Consequences of Defendants' Conduct):

22   27O. Plaintiff is disabled and depends on consistent, paid in-home assistance.

23   Defendants' continued enforcement posture and resulting financial disruption caused

1    Plaintiff to lose or reduce essential aide services, creating immediate safety and health

2    consequences. (Ex. U-3B; Ex. U-3A.)

3    27P. Plaintiff was forced to triage payments and could not fund pre-planned, once-in-a-

4    lifetime events and family commitments that had been scheduled and paid in reliance on

5    a promptly refinanced short-term bridge/HELOC structure. Plaintiff missed those events

6    because funds were diverted to avoid compounding default/collection pressure from

7    Defendants. (Ex. U-3B; Exs. T-1/T-2.) Plaintiff alleges this period also caused her to

8    miss significant family events and caregiving opportunities, including time with her

9    newborn grandchild and the ability to assist elderly and ill family members, as described

10   in her declarations.

11   27Q. Plaintiff was unable to host her annual holiday gathering, a longstanding family

12   tradition, due to the forced payment triage, loss of liquidity, and ongoing enforcement

13   pressure. (Ex. U-3B.)

14   27R. Defendants' refusal to pause and their continued billing/collection posture after

15   notice created an ongoing and irreparable risk of adverse credit reporting and credit

16   impairment to both Plaintiff and her co-borrower, which in turn impaired refinancing

17   ability and increased borrowing costs. (Exs. T-1; T-2; U-3B.)

18   27S. These harms are separate from (and in addition to) title-policy proceeds: they arise

19   from Defendants' closing-process failures and post-notice enforcement decisions,

20   including withholding the escrow file, QC records, bring-down evidence, and CPL

21   records needed to resolve the defect. (Exs. IV.B; Missing Documents Request List (v5)

22   27T. Plaintiff has spent at least 1,598 hours of unpaid time investigating, documenting,

23   communicating, and preparing filings and evidence to address Defendants' process

1    failures and ongoing enforcement posture—time that Plaintiff alleges constitutes

2    substantial lost professional and personal capacity directly caused by Defendants'

3    conduct. (Ex. U-3B; Tables Section—Tables A–C.)

4    27U. Plaintiff's treating providers have advised that, due to the medically documented

5    stress and functional decline caused by this prolonged enforcement pressure and financial

6    disruption, Plaintiff may require eight months or more to return to prior baseline physical

7    functioning. (Ex. U-3B; Ex. U-3A.)

8    27V. Plaintiff was forced to curtail or stop regular therapies and medically recommended

9    treatment because the loan's cost and Defendants' refusal to pause enforcement depleted

10    available funds. Plaintiff alleges this interruption itself worsened health outcomes and

11    increased recovery time. (Ex. U-3B; Ex. U-3A.)

12                                    **V. CAUSES OF ACTION**

13

14            **FIRST CAUSE OF ACTION – BREACH OF CONTRACT (CONDITIONS**

15                          **PRECEDENT / CLOSING INSTRUCTIONS)**

16    (Against Rocket Close and Oaktree)

17    Key authority (contract/escrow conditions precedent): Amen v. Merced County Title Co.

18    (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.

19    (2002) 27 Cal.4th 705.

20    28. Plaintiff realleges and incorporates paragraphs 1 through 27.

21    29. Oaktree's written closing instructions and conditions precedent governed

22    disbursement, lien position, recording, and the intended second-lien transaction, and were

23    incorporated into the closing and funding process. (Ex. A-1; Ex. D-1.) These written

24    closing/escrow instructions—including the non-discretionary conditions precedent to

1  funding and disbursement—were part of the escrow transaction documents presented at

2  signing. Plaintiff and her co-borrower were required to sign an acknowledgment of those

3  instructions and Plaintiff relied on them as governing the escrow holder's authority to

4  disburse. Under California law, an escrow holder must comply strictly with the parties'

5  written escrow instructions and may not disburse contrary to conditions precedent.

6  (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528, 531–532.) Plaintiff alleges she

7  was at minimum an intended beneficiary of these instructions and the protections they

8  imposed, because the conditions were expressly designed to prevent disbursement unless

9  the required lien position and lender QC conditions were satisfied.

10  30. Material conditions precedent included, at minimum: (i) Oaktree final QC prior to

11  funding; and (ii) recordation in second lien position on or prior to the disbursement date.

12  (Ex. A-1; Ex. D-1.)

13  31. Defendants breached by disbursing on July 14, 2025 without satisfying the express

14  second-position-before-disbursement condition and without producing any

15  contemporaneous evidence that final QC verified lien position prior to funding. (Exs. A-

16  1; B-1; B-2; Missing Documents Request List (v5)

17  31A. Plaintiff further alleges that the written instructions assigned final QC to Oaktree

18  prior to funding; yet no contemporaneous QC sign-off tied to verified lien position has

19  been produced. On information and belief, Oaktree did not complete the promised final

20  QC verifying lien position before authorizing funding, or such documentation exists and

21  has been withheld. (Exs. A-1; D-1; Missing Documents Request List (v5)

1    32. Defendants further breached by proceeding on a second-lien underwriting premise

2    that depended on accurate, current title; the intervening recorded lien defeated feasibility

3    and pushed the implied CLTV above Oaktree's maximum. (Exs. D-1; C-2; C-7.)

4    33. Plaintiff was damaged as a direct and proximate result, including loss of refinancing

5    opportunity, compounding interest, and credit/collection pressure after notice. (Exs. T-1;

6    T-2; Tables Section—Tables A–C.)

7

8    **SECOND CAUSE OF ACTION – BREACH OF ESCROW INSTRUCTIONS**

9    **(STRICT COMPLIANCE)**

10    (Against Rocket Close only)

11    Key authority (escrow holder strict compliance): Amen v. Merced County Title Co.

12    (1962) 58 Cal.2d 528; Lee v. Title Ins. & Trust Co. (1968) 264 Cal.App.2d 160; Summit

13    Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

14    34. Plaintiff realleges and incorporates paragraphs 1 through 27.

15    This breach-of-instructions claim alleges deviation from the written conditions precedent

16    that defined escrow's authority to disburse. It is distinct from (and complements)

17    Plaintiff's fiduciary-duty claim, which targets escrow's misuse of entrusted funds—

18    authorizing and releasing loan proceeds while knowing, or being obligated to confirm,

19    that conditions precedent had not been satisfied. (Ex. A-1; Exs. B-1/B-2.)

20    These instruction failures were material conditions precedent to authorized disbursement

21    and caused present prejudice, including funding into an impaired lien stack, loss of

22    immediate refinance opportunity, and post-notice enforcement leverage that compounded

23    damages. (Exs. A-1; B-1/B-2; D-1; F; T-1/T-2.)

1   35. Rocket Close, as escrow holder/settlement agent, owed a duty of strict compliance

2   with the written escrow/closing instructions and lacked authority to disburse contrary to

3   conditions precedent. (Ex. A-1.)

4   35A. Plaintiff alleges she was at minimum an intended beneficiary of the written

5   closing/escrow instructions and the protections they imposed, because those conditions

6   were expressly designed to prevent disbursement unless the required lien position and

7   lender QC conditions were satisfied. Under California law, an escrow holder must

8   comply strictly with the parties' written escrow instructions and may not disburse

9   contrary to conditions precedent. (Amen v. Merced County Title Co. (1962) 58 Cal.2d

10  528, 531–532.)

11  36. The escrow/closing instructions imposed at least five non-discretionary safeguards:

12  (1) Oaktree final QC review prior to funding; (2) second-lien recordation on or prior to

13  disbursement; (3) accurate final Closing Disclosure reflecting specified payoffs; (4)

14  delivery of duplicate originals of the ALTA title policy with specified endorsements; and

15  (5) ALTA policy free from liens/encumbrances except limited enumerated matters and

16  taxes paid current. (Ex. A-1.)

17  37. Rocket Close breached by disbursing funds when the deed of trust had not been

18  recorded into the required lien position on or before the disbursement date. (Exs. A-1; B-

19  1; B-2; C-2.)

20  37A. Rocket Close's breach was not a mere administrative timing issue. At the moment

21  of disbursement, Rocket Close knew recording had not yet occurred (recording occurred

22  the following day) and therefore knew the required second-lien recordation condition had

23  not been met on or before disbursement. Rocket Close nonetheless released funds,

1  exceeding escrow's limited authority and defeating the very safeguard the instructions

2  imposed. (Exs. A-1; B-1; B-2.)

3  38. Rocket Close's breach caused foreseeable harm, including the creation of an

4  improperly secured loan, subsequent enforcement pressure, and economic loss. (Exs. T-2;

5  Tables Section—Table B; Tables Section—Table C.)

6

7  **THIRD CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY (ESCROW**

8  **HOLDER)**

9  (Against Rocket Close only)

10  Key authority (escrow fiduciary duties): Lee v. Title Ins. & Trust Co. (1968) 264

11  Cal.App.2d 160; Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit

12  Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

13  39. Plaintiff realleges and incorporates paragraphs 1 through 27.

14  40. As escrow holder, Rocket Close owed fiduciary duties of fidelity, neutrality, and

15  strict adherence to escrow instructions regarding handling of funds and documents.

16  41. Rocket Close breached those duties by acting outside written authority,

17  funding/disbursing without satisfaction of conditions precedent, and enabling an unlawful

18  disbursement/recording sequence that defeated the promised lien position. (Exs. A-1; B-

19  1; B-2; C-2.)

20  41A. Rocket Close's fiduciary breach includes knowingly disbursing while the deed of

21  trust remained unrecorded and while the promised second-lien position had not been

22  secured. Because the policy's effectiveness is tied to recording, Rocket Close further

23  knew or should have known that releasing funds before recording created an uninsured

24  funding window under the policy language. (Ex. C-4; Exs. B-1/B-2; A-1.)

1    42. Plaintiff suffered damages according to proof. (Exs. T-2; Tables Section—Table B;

2    Tables Section—Table C.)

3

4    **FOURTH CAUSE OF ACTION – NEGLIGENCE / PROFESSIONAL**

5    **NEGLIGENCE**

6    (Against Rocket Close and Oaktree)

7    Key authority (negligence duty / economic loss factors): Biakanja v. Irving (1958) 49

8    Cal.2d 647; J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799; Summit Financial Holdings,

9    Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

10   50. Plaintiff realleges and incorporates paragraphs 1 through 27.

11   51. Defendants owed duties of reasonable care in the closing process safeguards pleaded

12   herein, including underwriting feasibility review as conditioned, current title

13   verification/bring-down, lien-priority confirmation, and compliance with the

14   funding/recording sequence required by the written conditions precedent. (Exs. D-1; D-2;

15   A-1.) With respect to Oaktree, Plaintiff does not allege only a conventional lender role;

16   Plaintiff alleges Oaktree expressly undertook and required specific pre-funding

17   safeguards—including "FINAL QC REVIEW PRIOR TO FUNDING" and verified

18   second-lien recordation on or before disbursement—as conditions to authorized

19   disbursement. (Exs. A-1; D-1.) Having undertaken those safeguards as part of the

20   transaction's conditions precedent, Oaktree owed a duty to exercise reasonable care in

21   performing them and not to authorize disbursement unless the required QC and lien-

22   position conditions were satisfied. Oaktree's duty is further supported by the fact that

23   Oaktree possessed the stale-dated title materials in its file and tracked title/CPL currency

1    as underwriting conditions, making detection of a facially stale title package and

2    verification of lien position central to the pre-funding QC gate Oaktree undertook.

3    52. Defendants breached by relying on stale title, failing to obtain a timely bring-down

4    through the disbursement/recording window, failing to verify second-lien position before

5    disbursement, and funding before recording contrary to mandatory conditions. (Exs. C-1;

6    D-2; B-1; B-2; C-2.) As to Oaktree specifically, Plaintiff alleges Oaktree breached its

7    undertaken pre-funding QC safeguard by permitting or authorizing funding and

8    disbursement without performing the promised final QC tied to verified lien position and

9    without ensuring the express second-lien-on-or-before-disbursement condition had been

10    satisfied. As a further breach, Oaktree possessed the title materials bearing the facially

11    stale October 15, 2024 date and failed to notice or act on that obvious discrepancy before

12    authorizing funding; had the date been flagged, a current bring-down would have been

13    required and the transaction would not have funded into an impaired lien position. As a

14    further breach, Oaktree had the stale-dated title package in its possession and

15    nevertheless authorized funding without verifying current title/bring-down through the

16    disbursement/recording window and without producing any contemporaneous final QC

17    sign-off tied to verified lien position.

18    53. Plaintiff suffered damages according to proof. (Tables Section—Table B; Tables

19    Section—Table C; Ex. T-2.)

20

21           **FIFTH CAUSE OF ACTION – FRAUDULENT INDUCEMENT BY**

22           **CONCEALMENT (ESCROW) / POST-NOTICE CONCEALMENT**

23    (Against Rocket Close, LLC (pre-closing and at disbursement) and Rocket Companies,

24    Inc. (post-notice concealment and inducement of continued performance))

1    Key authority (concealment / duty to disclose / inducement): LiMandri v. Judkins (1997)

2    52 Cal.App.4th 326; Lazar v. Superior Court (1996) 12 Cal.4th 631; Robinson Helicopter

3    Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979.

4    62. Plaintiff realleges and incorporates paragraphs 1 through 27.

5    63. Plaintiff's consent to execute the loan documents, to permit disbursement of loan

6    proceeds, and to accept the transaction at all was expressly and unambiguously

7    conditioned on Defendants' satisfaction of the written conditions precedent set forth in

8    the closing and escrow instructions, including but not limited to: (a) verified recordation

9    in second-lien position on or before disbursement; (b) lender final quality-control

10    approval prior to funding; and (c) reliance on current title/bring-down through funding

11    and recording.

12    64. Plaintiff would never have accepted, signed for, or permitted funding of a third-lien

13    loan under any circumstances, because the transaction was approved, priced, and

14    accepted solely as a temporary second-lien bridge transaction intended to be refinanced

15    immediately. A third-lien position would have made immediate refinancing infeasible

16    and would have defeated the essential purpose of the transaction.

17    65. Defendants concealed and failed to disclose material facts within their exclusive

18    possession, custody, and control, including: (a) absence of a timely current title bring-

19    down through funding/recording; (b) failure to satisfy the written requirement that the

20    loan record in second-lien position on or before disbursement; (c) failure to complete

21    lender final QC tied to verified lien position prior to funding; and (d) disbursement before

22    recording and before the promised insured lien-priority status could attach under the

23    policy's effectiveness clause. (Exs. A-1; A-2; B-1; B-2; C-2; D-2; C-4.)

1    65A. Defendants further concealed and continue to withhold the complete claim and

2    coverage handling record (including any appeals, arbitration submissions, coverage

3    determinations, and CPL issuance/claim processing materials), while maintaining

4    enforcement posture and refusing a pause. Plaintiff alleges this withholding was material

5    to her ability to pursue timely cure, loss-mitigation relief, and protection from avoidable

6    harm.

7    66. These facts were material because they went to the existence and feasibility of the

8    only transaction Plaintiff agreed to enter—namely, a verified and insurable second-lien

9    transaction permitting immediate refinancing. Plaintiff and her co-borrower had no

10   access to the true, current recorded lien stack and could not reasonably discover these

11   facts, which were controlled by Defendants' title, escrow, and funding pipeline.

12   67. Defendants' disbursement of loan proceeds constituted an affirmative representation

13   by conduct that the express conditions precedent had been satisfied. Because the written

14   instructions prohibited disbursement absent compliance—particularly verified second-

15   lien position—Defendants' act of funding necessarily communicated compliance.

16   68. Plaintiff reasonably and justifiably relied on Defendants' concealment and on the

17   affirmative compliance representation inherent in disbursement. Had Defendants

18   disclosed that the conditions precedent were not satisfied, or that the loan would record in

19   third position, Plaintiff would have rescinded, halted, or refused to permit completion of

20   the transaction and would not have allowed funding to proceed.

21   69. After Defendants had notice of the lien-priority defect and failed conditions

22   precedent, Rocket Close and Rocket Companies continued enforcement pressure while

23   withholding the escrow file, QC sign-off, bring-down evidence, and CPL materials,

1  thereby continuing to conceal material facts and inducing Plaintiff's continued

2  performance. Plaintiff alleges malice, oppression, and/or fraud within the meaning of

3  Civil Code § 3294, supporting punitive damages to the extent permitted by law. (Exs. T-

4  1; T-2; H-2; H-3.)

5  **SIXTH CAUSE OF ACTION – UNFAIR COMPETITION LAW (Bus. & Prof.**

6  **Code § 17200)**

7  (Against All Defendants)

8  Key authority (UCL): Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.

9  (1999) 20 Cal.4th 163; Kwikset Corp. v. Superior Court (2011) 51 Cal.4th 310; Korea

10  Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134.

11  70. Plaintiff realleges and incorporates paragraphs 1 through 27.

12  71. Defendants engaged in unlawful, unfair, and fraudulent practices by closing and

13  enforcing a purported second-lien loan contrary to written conditions and recorded

14  reality, and by refusing to pause and withholding core closing documents after notice.

15  (Exs. A-1; B-1; B-2; C-2; T-2; Tables Section—Tables A–C.)

16  72. Defendants' enterprise materials emphasize urgency and compliance standards

17  inconsistent with the conduct at issue and are relevant to willfulness and unfairness.

18  (Exhibit N (N-1/N-2)

19  73. Plaintiff seeks restitution and injunctive relief under § 17200. Restitution is sought to

20  the extent Defendants received borrower-paid closing and settlement charges and

21  premiums in connection with the transaction (including escrow/settlement/title-related

22  charges reflected on the Closing Disclosure), and injunctive relief is sought to stop

23  continued enforcement and related unfair practices pending cure/adjudication.

24

1    **SEVENTH CAUSE OF ACTION – NEGLIGENT POST-NOTICE CONDUCT**

2    **(REFUSAL TO PAUSE / WRONGFUL ENFORCEMENT PRESSURE)**

3    (Against Oaktree and Rocket Companies)

4    Key authority (post-notice enforcement / debt collection): Best v. Ocwen Loan Servicing,

5    LLC (2021) 64 Cal.App.5th 568; Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283;

6    Minser v. Collect Access, LLC (2023) 93 Cal.App.5th 102.

7    74. Plaintiff realleges and incorporates paragraphs 1 through 27.

8    75. After receiving notice of the lien-priority defect and the disbursement/recording

9    sequence, Defendants owed a duty to exercise reasonable care to avoid compounding

10   harm through enforcement pressure while the defect was investigated and cured.

11   76. Plaintiff requested temporary pauses and offered cure/mitigation paths designed to

12   make Oaktree whole. Defendants refused or ignored those requests and continued

13   billing/collection pressure. (Tables Section—Table B; Tables Section—Table C; Exs. T-

14   1; T-2; M-2). Plaintiff further alleges Oaktree directed her to the servicer for a pause

15   while the servicer indicated it could not grant relief without Oaktree's authorization,

16   delaying mitigation and compounding harm.

17   77. Defendants' post-knowledge enforcement conduct caused additional foreseeable

18   harm, including credit risk, bounced payment risk, and escalating damages. (Exs. T-2;

19   Tables Section—Table B.)

20   The SAC pleads non-speculative, present harm from this post-notice conduct, including

21   inability to refinance, forced payment triage, loss/reduction of essential services and

22   therapies, time loss, and irreparable credit risk, all occurring while Defendants withheld

23   the closing file and refused a pause. (Exs. U-3A/U-3B; T-1/T-2; IV.B.)

1    Plaintiff alleges Rocket Companies' post-notice involvement is shown by executive-level

2    escalation and delegated handling through Rocket Close operations, followed by

3    continued refusal to pause, cure, or mitigate while Plaintiff continued copying Rocket

4    Companies on written requests. This enterprise-level inaction and obstruction is pled as

5    part of Defendants' negligent post-notice conduct and wrongful risk-shifting. (Exs. N-

6    1/N-2; Tables Section—Tables A–C; Exs. T-1/T-2.)

7    Plaintiff seeks recovery of all reasonably foreseeable damages proximately caused by this

8    post-notice conduct, including economic loss, irreparable credit harm risk, and severe

9    emotional distress and health impacts (loss of aide services, interrupted therapies, and

10   physician-advised extended recovery time) as pled in the damages section. This is the

11   substance sometimes labeled "NIED," but is pled here as negligence damages flowing

12   from Defendants' post-notice breach of duty. (Exs. U-3A/U-3B; T-1/T-2.)

13

14            **EIGHTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF**

15                           **EMOTIONAL DISTRESS (IIED)**

16   (Against Oaktree only)

17   Key authority (IIED): Hughes v. Pair (2009) 46 Cal.4th 1035; Potter v. Firestone Tire &

18   Rubber Co. (1993) 6 Cal.4th 965; Christensen v. Superior Court (1991) 54 Cal.3d 868.

19   80. Plaintiff realleges and incorporates paragraphs 1 through 27.

20   80A. Plaintiff alleges Oaktree's post-notice conduct went far beyond routine servicing.

21   After Oaktree had actual notice that the loan did not close as conditioned (including

22   failure of the second-lien-on-or-before-disbursement condition and failure of pre-funding

23   QC), Oaktree repeatedly refused to implement any temporary pause, failed to respond

24   substantively to documented requests, redirected Plaintiff to the servicer while the

servicer indicated it could not act without Oaktree's authorization, maintained

enforcement posture, and withheld core closing/QC/bring-down and claim/CPL records

needed to cure the defect. Plaintiff further alleges she requested a temporary pause and

communicated that if a pause were implemented and core cure records were produced,

she would streamline the pleadings to avoid unnecessary expense; yet Oaktree refused to

pause and continued enforcement posture despite actual knowledge of Plaintiff's

disability-related vulnerability and foreseeable risk of severe distress.

Oaktree's IIED exposure arises from post-notice conduct: after Oaktree had actual

knowledge of escrow instruction failure and lien-priority impairment, Oaktree refused to

pause enforcement, continued monthly pressure, and escalated the matter with threats of

criminal referral while knowing Plaintiff is disabled and that continued enforcement

created an immediate risk of forced sale and serious health consequences. Plaintiff

alleges this refusal-to-pause posture—despite notice and repeated requests—is the core

outrageous conduct supporting IIED against Oaktree. (Exs. M-2; T-1/T-2; U-3; IV.B.)

81. After notice and admissions establishing the defect, Oaktree continued enforcement

pressure and refused any pause while withholding core documentation needed to cure,

including QC/authority-to-disburse and bring-down evidence, and while maintaining

collection posture through billing/withdrawal attempts and delinquency/return notices.

Plaintiff alleges this conduct was intentional or carried out with reckless disregard of the

probability of causing severe emotional distress, given Oaktree's actual knowledge of

Plaintiff's disability, health sensitivity to stress, and risk of forced sale. (Exs. F-1; F-4; T-

1; T-2; E-4.)

82. Plaintiff suffered severe emotional distress and damages according to proof.

82A. Plaintiff alleges the distress was severe and manifested in medically documented exacerbation of symptoms, disruption of medically necessary therapy, loss or reduction of essential in-home assistance, and heightened risk of permanent physical injury, all during the period Oaktree maintained enforcement posture after notice and refused to implement a temporary pause. (Exs. F-3; F-4.)

Plaintiff alleges Oaktree's post-notice conduct was willful and carried out with conscious disregard of Plaintiff's rights and safety, constituting malice and/or oppression within the meaning of Civil Code § 3294, supporting punitive damages on this cause to the extent permitted by law.

### NINTH CAUSE OF ACTION – ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (Civ. Code § 1788 et seq.)

(Against Oaktree and Servicer (DOE))

Key authority (Rosenthal Act / mortgage servicing collection): Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283; Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568.

87. Plaintiff realleges and incorporates paragraphs 1 through 27.

88. Defendants attempted to collect and enforce amounts under a defective, disputed transaction while refusing to provide core documentation and while continuing billing/collection pressure after notice and dispute. (Exs. T-1; T-2; Tables Section—Table B.)

89. Plaintiff suffered damages according to proof.

1  **TENTH CAUSE OF ACTION – CANCELLATION OF INSTRUMENT (Civ. Code**

2  **§ 3412)**

3  Key authority (cancellation of instrument): Civ. Code § 3412; See Robinson Helicopter

4  Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979 (fraud/independent duty); LiMandri v.

5  Judkins (1997) 52 Cal.App.4th 326 (concealment duty).

6  **VI. PRAYER FOR RELIEF**

7  WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

8  1. For general, special, and consequential damages according to proof;

9  2. For punitive and exemplary damages against the appropriate Defendants on the tort

10  causes of action, pursuant to Civil Code § 3294, according to proof.

11  3. For restitution/disgorgement of escrow fees, premiums, and amounts wrongfully

12  retained;

13  4. For declaratory relief under Code Civ. Proc. § 1060;

14  5. For preliminary and permanent injunctive relief stopping enforcement activity pending

15  cure/adjudication;

16  6. For cancellation of instruments under Civil Code § 3412;

17

18

19  8. For costs of suit and such other relief as the Court deems just and proper.

20  **VII. DEMAND FOR JURY TRIAL**

21  Plaintiff demands trial by jury on all causes of action so triable.

22  **VIII. SIGNATURE**

23  Dated: 1/28/26

1    /s/ Audrey Little (for electronic filing)

2    AUDREY LITTLE, Plaintiff in Pro Per

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2



**From:** **Audrey Little** audreylittle@icloud.com
**Subject:** Redlined version of FAC
**Date:** January 23, 2026 at 1:57 PM
**To:** Goldstein, Jason E. jgoldstein@buchalter.com
**Cc:** Audrey Little audreylittle@icloud.com, Iqbal, Zeeshan ZIqbal@hinshawlaw.com

For your reference I have included a redlined version of the FAC. As you can see the entire complaint has been modified. This is largely due to the fact that when I submitted the first complaint I had not received any evidence from any parties in the case including oak tree. I received 99% of yours on December 10, 2025 and one piece November 19, 2025. The SAC is written based on the evidence I have been able to obtain since the FAC. Even if some things remained they are not in the same place or substantively changed.

**FAC_Redline_Deletions Only.pdf**
145 KB


**From: Audrey Little** audreylittle@icloud.com
**Subject:** Rock
**Date:** January 23, 2026 at 10:53 AM
**To:** Goldstein, Jason E. jgoldstein@buchalter.com
**Cc:** Audrey Little audreylittle@icloud.com



Jason,

I wanted to extend the courtesy of letting you know that yesterday I had a phone conference with counsel for Rocket Close and Rocket Companies regarding the First Amended Complaint and the scope of changes reflected in the Second Amended Complaint ("SAC"). Rocket's counsel indicated his clients are willing to stipulate to the filing of the SAC and to defer responding to the current FAC in order to avoid spending resources responding to a pleading that has been materially superseded.

I am asking whether Oaktree will also stipulate so that all parties can respond to the same operative complaint. The SAC is materially different from the FAC and addresses many of the issues that would otherwise be raised in response to the FAC.

If Oaktree does not stipulate, Rocket has indicated it will hold its response until the SAC is filed (assuming leave is required), while Oaktree would likely proceed on the FAC. That would result in parallel responsive pleadings to two different complaints and unnecessary motion practice.

Separately, if Oaktree intends to challenge the SAC once filed, I am available to meet and confer in advance so that we can narrow issues and avoid unnecessary filings. I am unavailable next Tuesday and Wednesday all day, and part of Monday morning. If you would like to meet, please propose a few times outside those windows and I will confirm promptly.

Please let me know whether Oaktree will:

1.  stipulate to allow filing of the SAC and respond only to the SAC; or

2.  decline to stipulate and proceed with a response to the FAC.

Once I hear from you, I will notify Rocket's counsel.

Thank you,
Audrey Little
Plaintiff in Pro Per





**From:** **Audrey Little**  audreylittle458@gmail.com
**Subject:** Re: Oaktree/Rocket/Little [IMAN-BUCHALTER.FID6170674]
**Date:** January 27, 2026 at 1:31 PM
**To:** Goldstein Jason E.  jgoldstein@buchalter.com

I can move it to the 9th but I cannot access delay it u less oaktrrenagrees to pause februaries payment until after. I have a hearing date scheduled for the 25th so if I couldn't get the 24th, we could have it heard the 25th but I would need for you to agree to do the pause because it's set so if the injunction happens, I won't need to pay February if you agreed to pause until the hearing and no enforcement for that month then I will absolutely agree to move the hearing and then can you send me the stipulation in writing so I can send it to Z and I'll file the second amended complaint I'm out of town but I will be back tomorrow and it's pretty much ready to file so I'll file it now. I wish I brought my computer with me. I took a break.
Warmest Regards,
Audrey

Sent from my iPhone

> On Jan 27, 2026, at 12:32 PM, Goldstein, Jason E. <jgoldstein@buchalter.com> wrote:
>
> Hi Audrey:
>
> This email is to advise that I am now in the position to be able to stipulate to your filing a Second Amended Complaint.
>
> Also, I would request that you stipulate to an order continuing the hearing on your injunction motion from February 10 to February 24.  I will be out of state on the 10th at a conference.
>
> Please let me know if you would be amenable to the above and I can prepare the stipulation as to the injunction motion and you can send me your stipulation on the Second Amended Complaint.
>
> Please advise.
>
>
> **Buchalter LLP**
> ────────────────
>
> **Jason E. Goldstein**
> Partner
> **T** (949) 224-6235
> **F** (949) 720-0182
> jgoldstein@Buchalter.com
> ────────────────
>
> 18400 Von Karman Avenue, Suite 800
> Irvine, CA 92612-0514
> www.buchalter.com | Bio | LinkedIn
>
>
> Buchalter

Buchalter

**Jason E. Goldstein**
Partner
**T** (949) 224-6235
**F** (949) 720-0182
jgoldstein@Buchalter.com

18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
www.buchalter.com | Bio | LinkedIn

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/about/firm-policies/.

**From:** **Audrey Little**  audreylittle458@gmail.com
**Subject:** Re: Stupulation
**Date:** January 28, 2026 at 1:07 PM
**To:** Goldstein Jason E.  jgoldstein@buchalter.com



Jason, I did not decline. I said I couldn't move it up by a day or up if the judge allowed or you could stipulate to a pause until you could have it because I can't afford to delay it because it will create a financial consequence for me again I gave you multiple options. I don't think it's fair to say that I declined. I declined to get hurt further.
Warmest Regards,
Audrey

Sent from my iPhone


On Jan 28, 2026, at 12:56 PM, Goldstein, Jason E. <jgoldstein@buchalter.com> wrote:

Audrey:

I requested a stipulation to continue the motion hearing due to my schedule.  You declined.  I am reconsidering whether to stipulate to a further amended complaint at this time.


Buchalter LLP
Jason E. Goldstein
Partner
T (949) 224-6235
F (949) 720-0182
jgoldstein@Buchalter.com
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
www.buchalter.com | Bio | LinkedIn




Buchalter

Jason E. Goldstein
Partner
T (949) 224-6235
F (949) 720-0182
jgoldstein@Buchalter.com

18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
www.buchalter.com


Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a

communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see www.buchalter.com/about/firm-policies.

-----Original Message-----
From: Audrey Little <audreylittle458@gmail.com>
Sent: Wednesday, January 28, 2026 12:55 PM
To: Goldstein, Jason E. <jgoldstein@Buchalter.com>
Subject: Stupulation

This message has originated from an External Email. Audrey Little <audreylittle458@gmail.com>:

Hi,

If you are planning to stipulate to the amended complaint,  I need to get the stipulation by first thing tomorrow am. Thank you.


Warmest Regards,
Audrey

Sent from my iPhone

AUDREY B. LITTLE

81439 Merv Griffin Way

La Quinta, CA 92253

Telephone: 310-283-4448

Email: audrey.little458@gmail.com

Plaintiff In Pro Per

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE – PALM SPRINGS BRANCH

| | |
|---|---|
| AUDREY B. LITTLE, | Case No.: CVPS2508295 |
| Plaintiff, | Dept.: PS1 |
| v. | |
| OAKTREE FUNDING CORPORATION; | |
| ROCKET CLOSE, LLC; | |
| ROCKET COMPANIES, INC.; | |
| and DOES 1 through 50, inclusive, | |
| Defendants. | |

**NOTICE OF MOTION AND MOTION FOR TEMPORARY AND PRELIMINARY
INJUNCTIVE RELIEF
MEMORANDUM OF POINTS AND AUTHORITIES
DECLARATION OF AUDREY B. LITTLE IN SUPPORT THEREOF**

Hearing Date: February 9, 2026
Time: 8:30 a.m.
Dept.: PS1

1    MEMORANDUM OF POINTS AND AUTHORITIES

2    I. INTRODUCTION

3    This motion seeks narrowly tailored injunctive relief to halt ongoing enforcement activity

4    arising from a transaction that never validly closed because express escrow conditions

5    precedent were not satisfied. This is not a dispute over payment terms or borrower

6    performance. It is a case about whether acknowledged escrow and title failures—

7    documented, undisputed, and uncured—may be ignored while enforcement proceeds and

8    permanent harm accrues.

9    Despite repeated notice, escalation to enterprise leadership, invocation of Closing

10   Protection Letter (CPL) coverage, and more than ten requests for a temporary pause,

11   Defendants declined to preserve the status quo. As a result, irreparable harm has already

12   occurred, including permanent credit injury and loss of essential caregiving support.

13   Continued enforcement will compound that harm before judicial review can meaningfully

14   occur.

15   II. UNDISPUTED FACTUAL BACKGROUND

16   A. Express Escrow Conditions Precedent Were Not Satisfied

17   The Specific Closing Instructions required, as conditions precedent to any authorized

18   disbursement: (1) final quality control by Oaktree prior to funding; (2) recording in

19   second lien position on or prior to disbursement; (3) compliance with title insurance

20   requirements, including endorsements and issuance of a policy free of unpermitted liens;

21   and (4) authorization to use funds only upon compliance with those conditions. None of

22   these conditions was satisfied at the moment of disbursement.

B. Disbursement Occurred Before Recording and Before Insurance Attachment

Loan proceeds were disbursed on July 14, 2025. The deed of trust recorded on July 15, 2025. The lender's title policy confirms that insurance could not attach until recording. Accordingly, disbursement occurred without recording and without insurance attachment, in direct violation of the written instructions.

C. Title Review Was Facially Stale

The only title report that appears to have been run was dated October 15, 2024—nine months prior to the July 2025 disbursement. No bring-down or current title verification exists in the record. A current title report run as of recording shows senior liens visible at that time, confirming that second-lien status was not achieved.

D. Required Quality Control Was Not and Could Not Have Been Performed

Because recording in second position and current title verification were not achieved at funding, the factual predicates necessary to complete the required final QC review did not exist. Oaktree's own loan file—produced as the "complete loan file"—contains no QC checklist, sign-off, or documentation tied to actual lien position as of disbursement.

E. Knowledge, Notice, and Post-Notice Non-Cure

Defendants were on notice of the lien-priority defect by September 9, 2025, when Oaktree submitted a claim premised on lien-position failure. On November 4, 2025, Plaintiff escalated the matter to Rocket Companies' Chief Executive Officer, who designated the Chief Operating Officer of Rocket Close—the escrow arm that controlled settlement—to oversee review. Despite that escalation and operational authority, no cure, unwind, or pause was implemented.

1    Plaintiff did not receive any purported title claim denial or claim correspondence until

2    December 10, 2025. Upon first receipt and review of those materials on December 10,

3    2025, Plaintiff immediately invoked Closing Protection Letter (CPL) coverage the same

4    day. Enforcement nevertheless continued, and no CPL payment has been made.

5    F. Repeated Requests for a Temporary Pause Were Refused

6    Plaintiff requested a temporary pause of billing, collection, and reporting on at least ten

7    occasions, directed to Oaktree, its servicer, and counsel. Each request sought only to

8    preserve the status quo while the defects were addressed. These requests were made

9    despite, and after, written acknowledgments from counsel for both Oaktree and Rocket

10   confirming escrow failures. None was granted. Court intervention became necessary

11   solely because Defendants declined that minimal, conservative remedy.

12   III. LEGAL STANDARD

13   Temporary and preliminary injunctive relief is appropriate where the moving party shows

14   (1) a likelihood of success on the merits and (2) irreparable harm absent relief, with the

15   balance of equities and public interest favoring intervention.

16   IV. LIKELIHOOD OF SUCCESS ON THE MERITS

17   California law requires strict compliance with written escrow instructions. Where express

18   conditions precedent to disbursement are not satisfied, escrow acts without authority and

19   liability follows. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Rianda v. San

20   Benito Title Guaranty Co. (1950) 35 Cal.2d 170.)

21   The impairment of a bargained-for lien position constitutes present, actionable harm at

22   the moment of impairment—not at foreclosure and not upon later enforcement. (Axley v.

1    Transamerica Title Ins. Co. (1978) 88 Cal.App.3d 1; Hovannisian v. First American Title

2    Ins. Co.) Courts consistently reject "no loss yet" theories where lien priority is defeated.

3    Critically, once a lender or escrow participant has notice that express conditions

4    precedent failed and that the promised security position was never delivered, continued

5    enforcement ceases to be routine servicing and becomes independent wrongful conduct.

6    California courts recognize that post-notice enforcement in the face of known defects

7    exposes the enforcing party to separate equitable and remedial consequences.

8    (Overholtzer v. Northern Counties Title Ins. Co. (1953) 116 Cal.App.2d 113.)

9    Here, the undisputed documentary record establishes: (1) failure of all express conditions

10    precedent; (2) disbursement before recording and insurance attachment; (3) reliance on a

11    facially stale title report; (4) absence of required QC; (5) continued enforcement after

12    notice and CPL invocation; and (6) unexplained reliance on purported claim-denial

13    rationales that do not correspond to the actual policy language or governing lien-

14    impairment authority. Plaintiff is therefore likely to succeed on claims for breach of

15    escrow instructions, negligence/professional negligence, negligent misrepresentation by

16    conduct, failure to mitigate, and declaratory relief.

17    V. IRREPARABLE HARM

18    Irreparable harm has already occurred and will continue absent relief. Plaintiff's credit

19    has been permanently damaged, with reporting consequences extending for years.

20    Essential caregiving hours have been reduced, resulting in medical risk and injury. These

21    harms cannot be undone by later damages and will compound with each enforcement

22    action before judicial review.

1    VI. BALANCE OF EQUITIES AND PUBLIC INTEREST

2    A temporary pause preserves the status quo and prevents further irreversible harm.

3    Defendants are sophisticated entities with insurance and corrective mechanisms; Plaintiff

4    bears the disproportionate risk. The public interest favors enforcement of escrow and title

5    safeguards that underpin California's real estate system.

6    VII. RELIEF REQUESTED

7    Plaintiff requests an order temporarily and preliminarily enjoining Defendants from

8    billing, collection activity, negative credit reporting, late fees, and enforcement related to

9    the subject loan pending further order of the Court.

10

11

1

2    DECLARATION OF AUDREY B. LITTLE

3    I, Audrey B. Little, declare:

4    1. I am the Plaintiff in this action and have personal knowledge of the facts stated herein.

5    2. This declaration supports my Motion for Temporary and Preliminary Injunctive Relief.

6    The transaction at issue never validly closed because express escrow conditions

7    precedent were not satisfied.

8    3. None of the written escrow conditions required prior to disbursement were met at

9    funding, including final QC, recording in second lien position on or prior to

10   disbursement, current title verification, and insurance attachment.

11   4. Loan proceeds were disbursed on July 14, 2025. The deed of trust recorded on July 15,

12   2025. The title policy's effective-date language confirms that insurance could not attach

13   until recording.

14   5. The only title report that appears to have been run is dated October 15, 2024. No bring-

15   down or current title verification exists. A title report run as of recording shows senior

16   liens visible.

17   6. Oaktree produced a file labeled the "complete loan file." That production does not

18   include the escrow instructions governing the transaction, does not include a complete

19   executed loan agreement as closed, and does not include any final settlement statement or

1    cost summary reflecting compliance with escrow conditions. It also contains no final QC

2    checklist or sign-off, no current title evidence, and no CPL documentation.

3    7. Defendants were on notice of the lien-priority defect no later than September 9, 2025.

4    Despite that knowledge, Defendants did not disclose the defect to me, did not pause

5    enforcement, and allowed me to make my first payment on the loan after they already

6    knew the lien-priority condition had failed. I was not informed of any lien problem by

7    Defendants.

8    8. I attempted to refinance the loan in early September 2025, consistent with the express

9    condition under which I agreed to it. In mid-September 2025, during that refinance

10    process, I was informed that there was a defect preventing refinance, but I was not told

11    the nature of the defect.

12    9. When I was told during the refinance process that there was a defect, I stated that this

13    was not possible because I had previously had the title report read to me and had

14    specifically asked whether there was any evidence of a family loan, and I was told there

15    was none. After learning that there was a lien issue, I contacted a knowledgeable friend to

16    determine when the family loan had recorded. He informed me that it recorded on

17    December 6, 2024. At that point, I understood that any title report relied upon at closing

18    must have predated that recording. I did not learn that the preliminary title report was

19    dated October 15, 2024 until November 19, 2025, when Oaktree finally provided the title

20    insurance commitment. That was the first time I was informed that the problem involved

21    lien priority. Defendants did not disclose this information to me prior to that call.

10. I did not receive any title claim denial or claim correspondence until December 10, 2025. I am informed and believe that a denial letter is dated October 24, 2025, but that denial was not provided to me at or near that time and was not disclosed to me when Defendants already had knowledge of the defect.

11. I also did not receive or see any title report, preliminary title, or title insurance commitment reflecting the lien-priority defect until November 19, 2025, when Oaktree finally provided me with the insurance commitment. Until that date, Defendants had not disclosed the contents or date of the title materials on which they relied, including that the only preliminary title was dated October 15, 2024. Upon reviewing those materials for the first time on December 10, 2025, I immediately invoked Closing Protection Letter (CPL) coverage the same day based on the acknowledged escrow failures. No CPL payment has been made.

12. Beginning in early October 2025, I made at least ten separate written requests directly to Oaktree Funding Corporation, its loan servicer, and Oaktree's counsel requesting a temporary pause of billing, collection, and enforcement activity. Each request sought only to preserve the status quo while the undisputed closing defects were addressed. Oaktree acknowledged that escrow errors had occurred and that a denial letter also attributed the loss to escrow error, yet Oaktree nevertheless refused or failed to grant every request for a pause.

13. As a result of continued enforcement despite notice, my credit has been permanently damaged. I was forced to reduce essential in-home caregiving support that I had relied upon for more than five years and as part of a medically established support relationship

1    spanning more than two decades. I expressly advised Defendants in advance that

2    reduction of this care would cause medical harm.

3    14. Prior to the loss of caregiving support, I was engaged in ongoing, cash-paid

4    therapeutic treatment specifically designed to prevent the need for surgery. That

5    treatment required approximately four hours per week. Because continued enforcement

6    forced me to reduce caregiving and divert funds away from these therapies, I was

7    required to discontinue them.

8    15. As a result of that discontinuation, my treating providers have advised that recovery

9    will now require approximately eight months of intensified treatment at roughly nine

10    hours per week—more than double the prior weekly requirement and duration. This

11    extended recovery period represents permanent life harm in the form of lost function, lost

12    time, and increased medical risk that cannot be restored.

13    16. Separately, the reduction in caregiving support caused me to perform physical tasks I

14    should not have been performing. This resulted in a significant shoulder injury, for which

15    I underwent an MRI on Friday and am awaiting results, and a serious fall while

16    attempting tasks normally performed by my caregiver.

17    17. Each additional month that enforcement continues without a pause extends my

18    recovery period by approximately two months at the intensified treatment level. By the

19    time this motion is heard, the continued lack of a pause will have added approximately

20    three additional months of recovery at roughly nine hours per week, compounding

21    permanent life and medical harm.

18. After the denial materials were received, Oaktree's in-house counsel, Robert Teague, contacted me by telephone and stated that he intended to report me to the FBI for mortgage fraud. During that call, I responded that I had signed the same escrow instructions Defendants were required to follow and asked how fraud could be alleged where I had no intent and no control over escrow, title, recording, or disbursement.

19. At that time, the only attorney involved on the Rocket side was counsel for Rocket Title Insurance Company. There was no counsel engaged to address Rocket Close's escrow conduct or enterprise-level resolution. I escalated the matter to the Chief Executive Officer of Rocket Companies because there was no single point of authority addressing the escrow failures, the denial, or the continued enforcement posture. The escalation to Rocket leadership followed the call with Mr. Teague and was undertaken to seek coordinated resolution across the Rocket entities.

20. I have more than thirty-six years of professional experience in large-scale operations, process design, and information systems that support complex, regulated transactions. Based on that experience, I was able to recognize immediately how the failures in this transaction occurred and why they were structural rather than accidental. Many attorneys I interacted with initially did not recognize the nature of the failure because it arose from process and systems breakdowns rather than a single document error. The failures here are not consistent with an isolated clerical mistake; they reflect a breakdown in process controls that would allow the same failure to recur absent corrective changes. I raised these concerns during my efforts to resolve this matter because the issue is systemic in nature, not unique to my loan.

1    21. On January 9, 2026, the Court granted my request for disability accommodations,

2    including permission to appear remotely where permitted.

3    22. Absent court-ordered relief, enforcement will continue to cause irreparable harm

4    before judicial review can occur.

5    I declare under penalty of perjury under the laws of the State of California that the

6    foregoing is true and correct.

7    Dated: January 13, 2026

8    /s/ Audrey B. Little

9    Audrey B. Little

10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

# Case No. 5:26-cv-00402

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

AUDREY LITTLE, Plaintiff, v. OAKTREE FUNDING CORPORATION, et al., Defendants. Case No. 5:26-cv-00402

DECLARATION OF AUDREY LITTLE

I, Audrey Little, declare under penalty of perjury as follows:

1. I am the Plaintiff in this action and am proceeding in pro per. I have personal knowledge of the facts stated herein.

2. I submit this declaration in support of (a) my Ex Parte Application for Temporary Restraining Order, (b) my Motion for Leave to File the Second Amended Complaint for purposes of clarifying jurisdiction, and (c) my Motion to Remand and for Fees under 28 U.S.C. § 1447(c).

3. Prior to removal, I provided Defendants a complete redlined version of the First Amended Complaint and advised in writing that the pleading was materially revised and being superseded. I also advised that the Second Amended Complaint (v82) removes any RESPA / Regulation X claim.

4. I met and conferred with counsel for Rocket Close and Rocket Companies regarding the Second Amended Complaint, reviewed the causes of action, and advised that RESPA / Regulation X was removed. Rocket agreed to respond only to the Second Amended Complaint.

5. I did not have a meet-and-confer with Oaktree. Oaktree declined to implement any temporary pause of enforcement. I offered to accommodate scheduling if Oaktree implemented a pause, and I also offered that the hearing could be moved earlier if the court permitted. Oaktree did not accept those options.

6. After the deadline to oppose my state-court injunction motion passed without a timely opposition, Defendants filed a Notice of Removal on January 29, 2026, freezing the state court's ability to act and creating an immediate gap in judicial protection.

7. I have suffered irreparable harm and face imminent risk of additional irreparable harm absent immediate relief. This includes medically documented injury and health impacts associated with ongoing enforcement pressure and the inability to secure timely judicial review.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on _____ at _____, California. /s/ Audrey Little Audrey Little

SUPPLEMENTAL DECLARATION OF AUDREY LITTLE IN SUPPORT OF MOTION TO ADVANCE CASE MANAGEMENT CONFERENCE

[¶ 1] I am a disabled individual with significant and ongoing medical conditions. My health is highly sensitive to prolonged stress, disruption of treatment, and physical overexertion. Procedural delay in this case is materially worsening my health and placing me at risk of permanent physical injury.

[¶ 2] I have a history of breast cancer and chronic autoimmune illness. My treating physicians have emphasized the importance of minimizing prolonged stress due to its impact on immune and inflammatory responses. Since this case began, sustained uncertainty, financial strain, and the risk of losing my home have caused a significant escalation of stress-related symptoms.

[¶ 3] For the first time since approximately 2009, I have experienced a flare of microscopic colitis, which is 100% stress-agitated. Due to the severity of symptoms, my physicians have recommended a colonoscopy and endoscopy. These symptoms arose during the pendency of this case.

[¶ 4] I have experienced new physical symptoms that I have never previously had, including persistent night sweats, unexplained body odor, hair loss, and immune-related issues. During this same period, I developed an ear infection for the first time in my life.

[¶ 5] I am a breast cancer survivor, having been diagnosed in 2017 and remaining cancer-free. Stress is a medically recognized risk factor for recurrence. Many of the physical stress responses I experience, including night sweats, are involuntary and not subject to conscious control.

[¶ 6] Due to the financial impact of this case, I have been forced to discontinue medically necessary therapies not covered by insurance. I have lost approximately three months of therapy that previously required approximately four hours per week.

[¶ 7] Based on my treatment history and medical guidance, therapy interruption has a compounding effect. Each month of missed therapy typically requires approximately two to two and a half months of increased therapy to recover lost function. As a result, recovery is now projected to require approximately five months at approximately nine hours per week.

[¶ 8] I have also been unable to participate in adaptive physical education activities, which typically require approximately twelve hours per week and are critical to maintaining strength and preventing surgical intervention.

[¶ 9] Due to financial strain, I have been forced to reduce long-standing in-home assistance that I relied on for over twenty years. As a result, I have performed physical tasks beyond my medical limitations.

[¶ 10] As a direct result, I sustained a shoulder injury and am scheduled to undergo an MRI on January 9, 2026.

[¶ 11] I have sought ongoing medical care from my primary physician and pain management physician and am now being referred to an orthopedic surgeon due to progression of injury.

[¶ 12] Continued delay places me at risk of requiring surgical intervention that could result in an estimated sixty percent loss of mobility.

[¶ 13] Continued delay also increases the risk that I may lose my home, which was specifically designed to accommodate my physical limitations. Relocation would place me at significant risk of serious physical injury.

[¶ 14] The cumulative effect of prolonged delay places me at risk of irreparable physical harm. Advancing the Case Management Conference will allow the Court to promptly address scheduling and prevent further injury.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on _____, at _____, California. _____ Audrey Little Plaintiff in Pro Per

**MC-410** **Disability Accommodation Request**

**CONFIDENTIAL**

If you have a disability and need an accommodation while you are at court, you can use this form to make your request. For more information, see form <u>MC-410-INFO</u>.

 Make this request at least **5 days** (when the court is open) before you need the accommodation.

*Clerk receives and date stamps here.*

**Court Name and Address:**

### 1 Your information

Name: Audrey Little

Address: 81439 Merv Griffin Way

La Quinta CA  92253

Phone: 310-283-4448

Email: audrey.little458@gmail.com

**Case Number (if you know it):**
CVPS2508295

**Case Name/Type (if you know it):**
Little  vs  Rocket

### 2 How are you involved in the case?
☐ Juror  ☒ Party  ☐ Witness  ☐ Lawyer
☐ Other (explain):

### 3 When and where do you need the accommodation? [date(s), time(s), and court location]
Supior court of Riversie , Palm Springs Division

### 4 What accommodation do you need at the court?
The ability to appear remotely (by Zoom or equivalent) when medically necessary;schedule hearings at earliest possible dates when court permits, consideration and limitations on continuances  where pheasa

### 5 Why do you need this accommodation to assist you in court?
I am disableld and this case is causng orolinged harm.  That these accommodations apply to all future hearings in this matter.

☒ More information on this request is attached.

Date: 12-31-2025

Audrey Little
Type or print name

*audrey Little*
Signature

(**Optional**) If a court employee, caregiver or other person helped fill out this form and is **willing to provide more information if needed**, provide contact information below:

Name:                              Email:                              Phone:

Judicial Council of California, *www.courts.ca.gov*
Rev. January 1, 2021, Optional Form
Cal. Rules of Court, rule 1.100

**Disability Accommodation Request**

MC-410, Page 1 of 2



Name: Audrey Little

Case Number (if you know it):
CVPS2508295

—————————— **Court fills out below** ——————————

**(Optional)**

(!) **Important!** If your case is delayed or dismissed after you make this request and you do not need the accommodation for the date you specified under 3, please contact the court at:

Phone: _____    Email: _____

☒ Your request is **GRANTED.** The court will provide the accommodation(s) requested.

☐ Your request is **DENIED IN WHOLE OR IN PART.** The denied portion of your request:

    ☐ Does not meet the requirements of Cal. Rules of Court, rule 1.100.

    ☐ Creates an undue financial or administrative burden for the court.

    ☐ Changes the basic nature of the court's service, program, or activity.

    Explain the reasons supporting the box(es) checked above:

    _____

    _____

    ☐ **Instead**, the court will provide the following accommodation(s):

    _____

    _____

**The court will provide the accommodation(s):**

☐ For the date(s) and time(s) requested    ☐ Indefinitely

☐ On date(s): _future courts hearings, unless trials or other evidentiary hearings where physical attendance is necessary._

☐ More information on this decision is attached.

Date: 1.09.26

Arthur C Hester
Type or print name

▶ _(signature)_
Signature

The court responded in person, by phone, or mail/email on: _____

**Note**: You may be able to ask for a review of this decision.
Cal. Rules of Court, rule 1.100(g) explains how to do this.

Rev. January 1, 2021

**Disability Accommodation Request**

MC-410, Page 2 of 2

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this form ]  [ Save this form ]      [ Clear this form ]

# EXHIBIT A-1 – Escrow Instructions (Original)

Specific Closing Instructions (scanned) and related closing record pages.

# EXHIBIT A

Escrow & Closing Records

FROM: OAKTREE FUNDING CORP
3133 WEST FRYE ROAD #205
CHANDLER, ARIZONA 85226
Phone: (480) 800-3800 /Fax: (480)857-8080

TO: AMROCK TITLE CALIFORNIA INC
17785 CENTER CRT DR N #760
CERRITOS, CALIFORNIA 90703
Phone: (866) 313-6336

ATTN: GARY WALLACE

RE: Borrower(s): AUDREY BETH LITTLE, JACOB LITTLE

Property Address: 81439 MERV GRIFFIN WAY, LA
QUINTA, CALIFORNIA 92253

Document Date: July 8, 2025
Closing Date: July 8, 2025
Disbursement: July 14, 2025
Case No.:
Loan No.: 22025050036
App. No.:
Order No.: 74346744
Escrow No.: 74346744

# SPECIFIC CLOSING INSTRUCTIONS

## LOAN DOCUMENTS:

We enclose the following documents necessary to complete the above referenced loan transaction:

(X) Note
(X) Deed of Trust
(X) Planned Unit Dev. Rider
(X) Payment Letter
(X) Hazard Ins. Req.
(X) Affidavit and Agreement
(X) Allonge to Note

(X) ATLA
(X) Consumer Credit Score Disclosure
(X) Privacy Policy
(X) CINF
(X) Borrowers Cert.
(X) 4506C
SEE ATTACHED SUPPLEMENTAL CLOSING INSTRUCTIONS

Deliver one (1) copy of all loan documents to the Borrower(s); deliver one (1) copy of the Federal Truth-In-Lending Disclosure
Statement or Closing Disclosure (as applicable) to **each Borrower.**

## LOAN TERMS:

Loan Amount: 716,580.00
Initial Advance:
Sales Price:
Term (Months): 360
Interest Rate: 9.625 %
Initial Payment: 6,090.85
First Payment Date: 09/01/25
Last Payment Date: 08/01/55

ARM Loan: ( ) Yes    (X ) No
Index:
Margin:
Periodic Rate Cap:
Lifetime Rate Cap:
Lifetime Rate Floor:
Interest Change Date:
Payment Change Date:
Loan Purpose: HOME EQUITY LOAN

## PAYOFF REQUIREMENTS:

It is a condition to the funding of this loan that the following payoffs be made through this closing.   Indicate payoffs on the
HUD-1 Settlement Statement or Closing Disclosure (as applicable) or provide other satisfactory evidence of payoff:
PAYOFF to KINECTA FCU for HELOC          360,584.08 PAYOFF to AMEX for Charge Account          16,850.00
PAYOFF to JPMCB CARD for Revolving Account     15,303.00 PAYOFF to WFBNA CARD for Revolving Account      5,799.00
PAYOFF to GS BANK for Revolving Account          22,813.00 SEE ATTACHED PAYOFF ADDENDUM.

## CONDITIONS TO BE SATISFIED PRIOR TO DISBURSEMENT OF LOAN PROCEEDS:

OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING.
BORROWER AND LOAN AGENT TO SIGN FINAL 1003 AT CLOSING.
FINAL CD TO REFLECT THE FOLLOWING PAYOFFS:

** SEE ATTACHED ADDENDUM TO CLOSING INSTRUCTIONS**

## TITLE INSURANCE REQUIREMENTS:

You are authorized to use funds for the account of the Borrowers and to record all instruments when you comply with the
following:
1. THIS LOAN MUST RECORD IN  2ND  LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT DATE
NOTED ABOVE.  PROVIDE DUPLICATE ORIGINALS OF THE ALTA TITLE POLICY.
2. Vesting to read: AUDREY BETH LITTLE, AN UNMARRIED WOMAN AND JACOB LITTLE, AN
UNMARRIED MAN, AS JOINT TENANTS WITH FULL RIGHTS OF SURVIVORSHIP

3. Title Policy must contain the following endorsements (or their equivalents):  8.1,9,5

4. ALTA Title Policy must be free from liens, encumbrances, easements, encroachments and other title matters except
(i) the lien of our loan in the amount of our loan on the property described herein showing the Instrument or
Document Number and the date of recording of the Security Instrument; (ii) general, specific, state, county, city,
school or other taxes and assessments not yet due or payable:  (ALL TAXES TO BE PAID CURRENT)

(iii) other items as permitted by us; and (iv) the following items as shown on the preliminary title report,
commitment, binder or equivalent dated  May 8, 2025

## SECONDARY FINANCING:

Secondary financing in the amount of $  NONE                has been approved.

## ESTIMATE OF FEES AND COSTS:

| ITEM | AMOUNT | POC | PAID BY |
|---|---|---|---|
| Document Prep fee to: Oaktree Funding Corp | 195.00 | | Borrower |
| Underwriting fee to: Oaktree Funding Corp | 695.00 | | Borrower |
| Appraisal fees to: AMC Direct Corporation | 900.00 | | Borrower |
| Appraisal Review Fee to: Clear Capital | 120.00 | | Borrower |
| TITLE - Lender's title insurance to: Amrock Title California INC | 575.00 | | Borrower |
| TITLE - Settlement Fee to: Amrock Title California INC | 475.00 | | Borrower |
| Mortgage recording fee to: Other | 256.00 | | Borrower |
| Originator compensation to: Adaxa, LLC | 14,331.60 | | Borrower |
| TITLE - Tax Certificate fee to: Amrock Title California INC | 25.00 | | Borrower |
| Deed Prep Fee to: RR MICHIGAN, LLC | 95.00 | | Borrower |

Subtotal of Estimated Fees and Costs:  $ __17,667.60__

## PER DIEM INTEREST:

From: 07/14/25          To:08/01/25
(Anticipated Closing Date)

__18__ days at $ __191.5856__ per day     Subtotal of Per Diem Interest:  $ __3,448.54__ *

## IMPOUNDS/ESCROWS:

Impound/escrow checks should be made payable to and sent to us together with the original final HUD-1 Settlement Statement or Closing Disclosure (as applicable).

| | | | |
|---|---|---|---|
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |
| _____ | _____ month(s) | at $ _____ per Month | = $ _____ |

Aggregate Escrow Adjustment:  $ __0.00__

* Interest paid by: Borrower

Impound Subtotal:  $ __0.00__
Mortgage Ins. Premium:  $ _____
**TOTAL OF FEES AND COSTS:**  $ __21,116.14__

## HUD-1 SETTLEMENT STATEMENT OR CLOSING DISCLOSURE:

The **final** HUD-1 Settlement Statement or Closing Disclosure (as applicable) must be completed at settlement and must accurately reflect all receipts and disbursements indicated in these closing instructions and any amended closing instructions subsequent hereto. If any changes to fees occur documents may need to be re-drawn and re-signed. Fax a certified copy of the final HUD-1 Settlement Statement or Closing Disclosure (as applicable) to    OAKTREE FUNDING CORP @ (909) 982-9614    Attention: Quality Assurance

Send the original final HUD-1 Settlement Statement or Closing Disclosure (as applicable) to us at the following address within 24 hours of settlement:    3133 WEST FRYE ROAD #205, CHANDLER, ARIZONA 85226

## ADDITIONAL INFORMATION: BORROWER MUST SIGN AND DATE THESE CLOSING INSTRUCTIONS.

If for any reason this loan does not close within 48 hours of your receipt of funds, immediately return all documents to Lender and wire all funds only to:    OAKTREE FUNDING CORP
3133 WEST FRYE ROAD #205, CHANDLER, ARIZONA 85226
PLEASE WIRE FUNDS BACK TO THE WAREHOUSE LINE
If you have any questions regarding any of these instructions, please contact  OAKTREE FUNDING CORP
at(480) 800-3800

**BORROWER ACKNOWLEDGMENT:** I/We have read and acknowledged receipt of these Closing Instructions.

_____          _____          _____          _____
Borrower AUDREY BETH LITTLE          Date          Borrower JACOB LITTLE          Date

# EXHIBIT A-2 – Escrow Instructions (Clean Version)

Clean, text-extractable version of the Specific Closing Instructions for court and counsel review.

SPECIFIC CLOSING INSTRUCTIONS


FROM: OAKTREE FUNDING CORP.

3133 WEST FRYE ROAD, #205, CHANDLER, ARIZONA 85226

Phone: (480) 800-3800 Fax: (480) 857-8080


TO: AMROCK TITLE CALIFORNIA, INC.

3133 WEST 1ST STREET, #2205, CHANDLER, ARIZONA 85703

Phone: (866) 313-8336


ATTN: GARY WALLACE


RE: Borrower(s): AUDREY BETH LITTLE, JACOB LITTLE


Property Address: 81439 MERV GRIFFIN WAY, LA QUINTA, CALIFORNIA 92253


Document Date: July 8, 2025

Closing Date: July 8, 2025

Disbursement: July 14, 2025


Loan No.: 22025050036

Order No.: 74346744

Escrow No.: 74346744


LOAN DOCUMENTS:

We enclose the following documents necessary to complete the above referenced loan transaction:

(X) Note

(X) Deed of Trust

(X) Planned Unit Dev. Rider

(X) Payment Letter

(X) Hazard Ins. Req.

(X) Affidavit and Agreement

(X) Allonge to Note

(X) ATLA

(X) Consumer Credit Score Disclosure

(X) Privacy Policy

(X) CINF

(X) Borrowers Cert.

(X) 4506C


SEE ATTACHED SUPPLEMENTAL CLOSING INSTRUCTIONS


Deliver one (1) copy of all loan documents to the Borrower(s); deliver one (1) copy of the Federal Truth-In-Lending Disclosure Statement or Closing Disclosure (as applicable) to each Borrower.


LOAN TERMS:

Loan Amount: 716,580.00

Term (Months): 360

Interest Rate: 9.625 %

Initial Payment: 6,090.85

First Payment Date: 09/01/25

Last Payment Date: 08/01/55

ARM Loan: ( ) Yes (X) No

Loan Purpose: HOME EQUITY LOAN


PAYOFF REQUIREMENTS:

It is a condition to the funding of this loan that the following payoffs be made through this closing. Indicate payoffs on the HUD-1 Settlement Statement or Closing Disclosure (as applicable) or provide other satisfactory evidence of payoff:

PAYOFF to KINECTA FCU for HELOC        360,584.08

PAYOFF to AMEX for Charge Account        16,850.00

PAYOFF to JPMCB CARD for Revolving Account 15,303.00

PAYOFF to WFBN CARD for Revolving Account 5,799.00

PAYOFF to GSBANK for Revolving Account    22,813.00

SEE ATTACHED PAYOFF ADDENDUM.


CONDITIONS TO BE SATISFIED PRIOR TO DISBURSEMENT OF LOAN PROCEEDS:

OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING.

BORROWER AND LOAN AGENT TO SIGN FINAL 103 AT CLOSING.

FINAL CD TO REFLECT THE FOLLOWING PAYOFFS:

** SEE ATTACHED ADDENDUM TO CLOSING INSTRUCTIONS **


TITLE INSURANCE REQUIREMENTS:

You are authorized to use funds for the account of the Borrowers and to record all instruments when you comply with the following:

1. THIS LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT DATE NOTED ABOVE. PROVIDE DUPLICATE ORIGINALS OF THE ALTA TITLE POLICY

2. Vesting to read: AUDREY BETH LITTLE, AN UNMARRIED WOMAN AND JACOB LITTLE, AN UNMARRIED MAN, AS JOINT TENANTS WITH FULL RIGHTS OF SURVIVORSHIP

3. Title Policy must contain the following endorsements (or their equivalents): 8.1, 9, 5

4. ALTA Title Policy must be free from liens, encumbrances, easements, encroachments and other title matters except (i) the lien of our loan… (ALL TAXES TO BE PAID CURRENT) … and (iv) the following items as shown on the preliminary title report dated May 8, 2025


SECONDARY FINANCING:

Secondary financing in the amount of $ NONE has been approved.


ESTIMATE OF FEES AND COSTS:


| ITEM | AMOUNT | POC | PAID BY |
|---|---|---|---|
| Document Prep fee to: Oaktree Funding Corp | 195.00 | | Borrower |
| Underwriting fee to: Oaktree Funding Corp | 695.00 | | Borrower |
| Appraisal fees to: AMC Direct Corporation | 900.00 | | Borrower |
| Appraisal Review Fee to: Clear Capital | 120.00 | | Borrower |
| TITLE - Lender's title insurance to: Amrock | 575.00 | | Borrower |
| TITLE - Settlement Fee to: Amrock Title | 475.00 | | Borrower |
| Mortgage recording fee to: Other | 256.00 | | Borrower |
| Originator compensation to: Adaxa, LLC | 14,331.60 | | Borrower |
| TITLE - Tax Certificate fee to: Amrock | 25.00 | | Borrower |
| Deed Prep Fee to: RR MICHIGAN, LLC | 95.00 | | Borrower |

Subtotal of Estimated Fees and Costs: $17,667.60

PER DIEM INTEREST:

From: 07/14/25 To: 08/01/25   18 days at $191.5856 per day

Subtotal of Per Diem Interest: $3,448.54 *

IMPOUNDS/ESCROWS:

(Blank table – no impounds listed)

Aggregate Escrow Adjustment: $0.00

Impound Total: $0.00

TOTAL OF FEES AND COSTS: $21,116.14

HUD-1 SETTLEMENT STATEMENT OR CLOSING DISCLOSURE:

The final HUD-1 or Closing Disclosure must accurately reflect all receipts and disbursements… Fax a certified copy to OAKTREE FUNDING CORP @ (909) 982-9614. Send original to 3133 WEST FRYE ROAD #205, CHANDLER, ARIZONA 85226.

ADDITIONAL INFORMATION:

BORROWER MUST SIGN AND DATE THESE CLOSING INSTRUCTIONS.

If loan does not close within 48 hours of receipt of funds, return documents and wire funds back to OAKTREE FUNDING CORP.

Please contact (480) 800-3800 with questions.

BORROWER ACKNOWLEDGMENT:

I/We have read and acknowledged receipt of these Closing Instructions.

Borrower: AUDREY BETH LITTLE       Date: _____

# EXHIBIT C

Disbursement evidence – July 14, 2025 bank statement showing Amrock proceeds

**CHASE** ◯

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

June 24, 2025 through July 22, 2025
Primary Account: **000000818985381**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-888-262-4273** |
| Para Espanol: | 1-888-262-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

00524608 DRE 703 219 20425 NNNNNNNNNNN  1 000000000 15 0000
AUDREY LITTLE
81439 MERV GRIFFIN WAY
LA QUINTA CA 92253-8084



## We're making changes to help better protect your account

1. **You may be required to use a trusted device for certain account and digital services**
   Starting September 21, 2025, you may need to use a trusted device to manage your account and digital profile, access or use certain account product and services (including certain wire transfers), make certain payments and transfers, or to provide authentication or approvals. A trusted device is a smartphone that has been enrolled with us based on specific criteria.

   **You may need to enroll a device**
   You may already be using a trusted device. If not, you'll receive instructions to make your device trusted the next time you try to perform an action that requires it.

   For more details, please see the Amendment in the Deposit Account Agreement and the new Section V. D. *Using trusted devices*.

2. **How we treat third-party endorsed check deposits is changing**
   A third-party endorsed check is a check that was originally payable to another person/entity that you attempt to deposit or cash. Beginning September 1, 2025, we may not accept a third-party check for deposit or to cash or we may require verification of endorsements. If we refuse a deposit, we may return the check or provide a substitute check to you.

   You can find this update in Section III. A. *Our rights and responsibilities for deposits*.

You can see the complete, updated Deposit Account Agreement beginning June 12, 2025, at **chase.com/disclosures**. If you have questions, please don't hesitate to contact us by calling the number on this statement.



June 24, 2025 through July 22, 2025
Primary Account: **000000818985381**

## CONSOLIDATED BALANCE SUMMARY

### ASSETS

| Checking & Savings | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Sapphire Checking | 000000818985381 | -$403.62 | $3,554.15 |
| Chase Premier Savings | 000003922213716 | 324.37 | 7.25 |
| Total | | -$79.25 | $3,561.40 |
| | | | |
| TOTAL ASSETS | | -$79.25 | $3,561.40 |

## CHASE SAPPHIRE CHECKING

AUDREY LITTLE                                         Account Number: 000000818985381

## CHECKING SUMMARY

| | AMOUNT |
|---|---|
| Beginning Balance | -$403.62 |
| Deposits and Additions | 157,336.82 |
| Checks Paid | -4,000.00 |
| ATM & Debit Card Withdrawals | -2,473.07 |
| Electronic Withdrawals | -138,846.98 |
| Other Withdrawals | -8,000.00 |
| Fees | -59.00 |
| Ending Balance | $3,554.15 |
| | |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Paid This Period | $0.05 |
| Interest Paid Year-to-Date | $0.13 |

Your account ending in 3716 is linked to this account for overdraft protection.

## CHECKS PAID

| CHECK NUMBER | DATE PAID | AMOUNT |
|---|---|---|
| 159 ^ | 07/17 | $4,000.00 |
| Total Checks Paid | | $4,000.00 |

If you see a check description in the Transaction Detail section, it means your check has already been converted for electronic payment. Because of this, we're not able to return the check to you or show you an image on Chase.com.

^ An image of this check may be available for you to view on Chase.com.



June 24, 2025 through July 22, 2025

Primary Account: **000000818985381**

## TRANSACTION DETAIL



| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | **Beginning Balance** | | **-$403.62** |
| 06/24 | Paypal      Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -40.93 | -444.55 |
| 06/24 | Overdraft Fee For A $755.36 Item - Details: Applecard Gsbank Payment 2523018    Web ID: 9999999999 | -34.00 | -478.55 |
| 06/25 | Real Time Transfer Recd From Aba/Contr Bnk-021000021  From: Bnf-Paypal Ref: 25062514674910352 Info: Text-  Iid: 20250624021000021P1Brjpc05280310903 Recd: 10:48:29 Trn: 0420712176GA Bref: 60E13C48-826D-4223-93Aa-D16546E229E | **1,708.27** | 1,229.72 |
| 06/25 | Delta Dental Ins Premium    018076134754    Tel ID: 1942761537 | -83.26 | 1,146.46 |
| 06/25 | 06/25 Payment To Chase Card Ending IN 8129 | -400.00 | 746.46 |
| 06/25 | Zelle Payment To Rosalina Ramirez 25251459632 | -105.00 | 641.46 |
| 06/25 | ATM Withdrawal      06/25 78805 Highway 111 LA Quinta CA Card 6892 | -200.00 | 441.46 |
| 06/25 | Paypal      Inst Xfer  Psmiley202461  Web ID: Paypalsi77 | -400.00 | 41.46 |
| 06/26 | Zelle Payment From Michael Nanko Backyn9U8D2X | **3,500.00** | 3,541.46 |
| 06/26 | Best Buy      Payment    201732781587864 Tel ID: Citigpufdr | -70.00 | 3,471.46 |
| 06/26 | 06/26 Online Domestic Wire Transfer Via: Kinecta Fcu MN Bch/322278073 A/C: Audrey Little LA Quinta CA 92253 US Imad: 0626Mmqfmp2N033511 Trn: 3640955177Es | -2,900.00 | 571.46 |
| 06/27 | Zelle Payment From Michael Nanko Bacpkqppy0On | **1,500.00** | 2,071.46 |
| 06/27 | Paypal      Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -13.48 | 2,057.98 |
| 06/30 | Fedwire Credit Via: Wells Fargo Bank, N.A./121000248 B/O: Stewart And Lynda Resnick Revocablelos Angeles CA US 90064-1549 Ref: Chase Nyc/Ctr/Bnf=Audrey Little LA Quinta CA 92253-8084 US/Ac-00000000 8189 Rfb=7918 Obi=2025 Gift To Audr Ey Little Bbi=/Chgs/USD0,00/ Imad: 0630I1B7031R024483 Trn: 1594531181Ff | **12,085.41** | 14,143.39 |
| 06/30 | Zelle Payment From Jacob Little 0Pe03Bz17Hat | **3,114.00** | 17,257.39 |
| 06/30 | Bmw Bank      Bmwfs Pymt      PPD ID: 0870631885 | -891.75 | 16,365.64 |
| 06/30 | Mercury Ins      Payment      PPD ID: Ay52211612 | -193.10 | 16,172.54 |
| 06/30 | 06/28 Payment To Chase Card Ending IN 8129 | -101.00 | 16,071.54 |
| 06/30 | Card Purchase      06/29 Sp+Aff* Snuggle ME Org Affirm.Com CA Card 6892 | -35.67 | 16,035.87 |
| 06/30 | Select Portfolio Sps      0031420235    Web ID: 1870465626 | -3,022.81 | 13,013.06 |
| 06/30 | Paypal      Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -64.99 | 12,948.07 |
| 06/30 | Paypal      Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -7.99 | 12,940.08 |
| 06/30 | Applecard Gsbank Payment    2523018      Web ID: 9999999999 | -1,121.00 | 11,819.08 |
| 06/30 | Paypal      Inst Xfer  Doordash Jambaj Web ID: Paypalsi77 | -19.31 | 11,799.77 |
| 06/30 | Zelle Payment To Marco 25313928185 | -1,800.00 | 9,999.77 |
| 06/30 | Zelle Payment To Rosario Sandoval Jpm99Be16Ghf | -3,200.00 | 6,799.77 |
| 06/30 | 06/30 Payment To Chase Card Ending IN 8129 | -200.00 | 6,599.77 |
| 07/01 | ODP Transfer From Savings …3716 | **314.83** | 6,914.60 |
| 07/01 | Recurring Card Purchase 06/30 Kickresume Beckov Card 6892 Euro 16.00 X 1.178750 (Exchg Rte) | -18.86 | 6,895.74 |
| 07/01 | Amazon Corp      Syf Paymnt 604578164927565 Web ID: 9069872103 | -3,589.47 | 3,306.27 |
| 07/01 | Kinecta Fcu      Transfer      Web ID: 322278073 | -2,789.07 | 517.20 |
| 07/01 | Paypal      Inst Xfer  Doordash Vons  Web ID: Paypalsi77 | -17.53 | 499.67 |
| 07/01 | Affirm Inc      Affirm Pay 2575152      Web ID: 0000317218 | -499.67 | 0.00 |
| 07/02 | Cnb Credit Card  Payment    06502238      Web ID: 7951780067 | -250.00 | -250.00 |
| 07/03 | Online Transfer From  Sav …3716 Transaction#: 24942710588 | **2,700.00** | 2,450.00 |
| 07/03 | Paypal      Inst Xfer  Instacart Costc Web ID: Paypalsi77 | -101.40 | 2,348.60 |
| 07/03 | Paypal      Inst Xfer  Instacart Costc Web ID: Paypalsi77 | -26.11 | 2,322.49 |
| 07/03 | Paypal      Inst Xfer  Netflix.Com    Web ID: Paypalsi77 | -24.99 | 2,297.50 |
| 07/07 | ODP Transfer From Savings …3716 | **12.99** | 2,310.49 |



June 24, 2025 through July 22, 2025

Primary Account: **000000818985381**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 07/07 | Remote Online Deposit          1 | **120.00** | 2,430.49 |
| 07/07 | Unitedhealthcare Premium    781482043821    Tel ID: 1836282001 | -544.24 | 1,886.25 |
| 07/07 | Unitedhcmedicare Medinspymt 000001321677779 Tel ID: 9000447048 | -115.40 | 1,770.85 |
| 07/07 | Zelle Payment To Ericpagelyahoo.Com Page1 Jpm99Bek5Ru3 | -1,041.67 | 729.18 |
| 07/07 | 07/04 Payment To Chase Card Ending IN 8129 | -300.00 | 429.18 |
| 07/07 | 07/06 Payment To Chase Card Ending IN 8129 | -100.00 | 329.18 |
| 07/07 | 07/06 Payment To Chase Card Ending IN 8129 | -190.00 | 139.18 |
| 07/07 | Affirm Inc        Affirm Pay 4428065       Web ID: 0000317218 | -275.48 | -136.30 |
| 07/07 | Affirm Inc        Affirm Pay 4780332       Web ID: 0000317218 | -80.07 | -216.37 |
| 07/07 | Bloomingdales    Auto Pymt 721716665280274 Web ID: Citiautfdr | -54.53 | -270.90 |
| 07/07 | Paypal          Inst Xfer  Instacart     Web ID: Paypalsi77 | -41.70 | -312.60 |
| 07/07 | Paypal          Inst Xfer  Instacart     Web ID: Paypalsi77 | -23.52 | -336.12 |
| 07/07 | Paypal          Inst Xfer  Adobe Inc Adobe Web ID: Paypalsi77 | -12.99 | -349.11 |
| 07/08 | Zelle Payment From Lance Betson Wfct0Yzvjr59 | **2,000.00** | 1,650.89 |
| 07/08 | 360 Sheffield Fi Trans Pmt        PPD ID: 1561771532 | -390.47 | 1,260.42 |
| 07/08 | Ebay Comwrxgt9B9 Payments   4Vbdfmirqgpom20 Web ID: 1395398000 | -191.25 | 1,069.17 |
| 07/08 | Griffin Ranch Ho L7709420        PPD ID: 1711041244 | -590.00 | 479.17 |
| 07/08 | Paypal          Inst Xfer  Flexjobs     Web ID: Paypalsi77 | -2.95 | 476.22 |
| 07/08 | Card Purchase With Pin  07/08 Homegoods 44439 Town C Palm Desert CA Card 6892 | -101.04 | 375.18 |
| 07/09 | Broadspire Svcs  Claimpmt   6710046536       CCD ID: B363917295 | **10,630.00** | 11,005.18 |
| 07/09 | Paypal          Inst Xfer  Google Google_Y Web ID: Paypalsi77 | -149.95 | 10,855.23 |
| 07/09 | Paypal          Inst Xfer  Instantink     Web ID: Paypalsi77 | -8.69 | 10,846.54 |
| 07/10 | Card Purchase          07/08 Hobby-Lobby #709 Rancho Mirage CA Card 6892 | -15.02 | 10,831.52 |
| 07/10 | Ally Home Loans  Loan Paymt 7123095684      Web ID: 9Drafting | -6,587.64 | 4,243.88 |
| 07/10 | Imp Irrig Dist  Power Bill        PPD ID: 9960038000 | -955.39 | 3,288.49 |
| 07/10 | Frontier Communi Bill Pay  21139369821     Tel ID: 7529252911 | -200.00 | 3,088.49 |
| 07/10 | Select Portfolio Sps       0031420235     Web ID: 1870465626 | -3,022.81 | 65.68 |
| 07/11 | Recurring Card Purchase 07/11 Hudforeclosed.Com 877-5038719 CA Card 6892 | -49.60 | 16.08 |
| 07/11 | Paypal          Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -106.98 | -90.90 |
| 07/11 | Paypal          Inst Xfer  Apple.Com Bill  Web ID: Paypalsi77 | -37.95 | -128.85 |
| 07/11 | Affirm Inc        Affirm Pay 6853746       Web ID: 0000317218 | -17.94 | -146.79 |
| 07/14 | Card Purchase Return   07/10 Hobby-Lobby #709 Rancho Mirage CA Card 6892 | **4.30** | -142.49 |
| 07/14 | Real Time Transfer Recd From Aba/Contr Bnk-072000326  From: Bnf-Amrock Ref: 746429 Info: Text-Rmtinf-Loan Proceeds Audrey Beth Little Iid: 20250714021000021P1Brjpc01440268995 Recd: 18:27:50 Trn: 1223962195Gc Bref: 2579A0A1-C0C6-4E23-Be12-8Cb259C708A | **85,790.31** | 85,647.82 |
| 07/14 | Zelle Payment From Rosalina Ramirez 25484359608 | **2,000.00** | 87,647.82 |
| 07/14 | Affirm Inc        Affirm Pay 7319217       Web ID: 0000317218 | -101.86 | 87,545.96 |
| 07/14 | Card Purchase          07/14 Sp+Aff * Snuggle ME O 855-423-3729 CA Card 6892 | -35.66 | 87,510.30 |
| 07/14 | Affirm Inc        Affirm Pay 7841309       Web ID: 0000317218 | -192.42 | 87,317.88 |
| 07/14 | Aqua Finance Inc Billpay        PPD ID: 1391615890 | -83.65 | 87,234.23 |
| 07/14 | Zelle Payment To Rosalina Ramirez 25483779585 | -2,685.00 | 84,549.23 |
| 07/14 | Zelle Payment To Rosario Sandoval Jpm99Bfqnm7U | -750.00 | 83,799.23 |
| 07/14 | Affirm Inc        Affirm Pay 7966272       Web ID: 0000317218 | -210.65 | 83,588.58 |
| 07/15 | Remote Online Deposit          1 | **1,690.41** | 85,278.99 |
| 07/15 | Manual CR-Bkrg | **8,000.00** | 93,278.99 |
| 07/15 | Online Transfer From Sav ...3716 Transaction#: 25494185710 | **4,000.00** | 97,278.99 |
| 07/15 | Zelle Payment From Rosalina Ramirez 25490370727 | **685.00** | 97,963.99 |

# EXHIBIT C – Riverside County Recording Proof

Riverside County Recorder self-service results showing recording of Oaktree Deed of Trust on 7/15/2025 (doc no. and timestamp).

---

**Advanced Search - Web**

Search one or several fields at a time.

**Individual Names** should be entered **Last First MI** (i.e. Smith James M). For a broader search, use only a last name and

---

## Assessor-County Clerk-Recorder

Language          Home          cart

Clerk Documents are Indexed from Jan 1, 1893 through Nov 21, 2025

Recorder Documents are Indexed from Jan 1, 1974 through Dec 31, 2025

| Document Number | Recording Date Start | Recording Date End | Name |
|---|---|---|---|
| | 07/13/2025 | 07/16/2025 | oaktree |

Document Types

Use Advanced Name Searching
([What is this?](#))

**Recent searches**          **Clear Selections**          **Search**

---

**Description (1)**

☐ Showing page 1 of 1 for 1 Total Results

**Advanced Search - Web** Recording Date is between Jul 13, 2025 and Jul 16, 2025 and Name contains oaktree



DEED OF T...          1

Name (4)

LITTLE AU...   1

**Back**

MORTGAG...   1

OAKTREE F...   1

Apply Filter...

D   **2025-0214839 • DEED OF TRUST**

| RecordingDate | Grantor (2) | Grantee (2) | # of Pages |
|---|---|---|---|
| 07/15/2025 08:20 AM | LITTLE AUDREY BETH LITTLE JACOB | OAKTREE FUNDING CORP MORTGAGE EL | 21 |

© Copyright 2014-2024 Tyler Technologies | Version 2024.4.21

# EXHIBIT D – Final Lender's Title Policy RTLSCA-104615

Final policy pages showing effective-date clause ('date of recording... whichever is later') and Schedule B.

# Mitigation Proposals / Cure Options — ALL Parties

Date • From/To • Proposal • Response (if any)

Prepared for: Audrey Little

Date generated: January 21, 2026

**Notes:**

Compiled from the uploaded Rocket and Oaktree email PDFs. (Pause/forbearance requests are in a separate file.)

| Date | From | To | Proposal / Request | Response (if any) | Response Date | Response From | Source PDF |
|------|------|------|------|------|------|------|------|
| 2025-10-08 | Audrey Little | Rocket Title (Teri Hill) + Oaktree (John Epstein) | Presented 3 resolution options: (1) pay off missed lien; (2) subordination + partial payment; (3) full indemnification. | Epstein acknowledged receipt; stated ownership must weigh in; would review and get back. | 2025-10-08 | Jon Epstein | TERI.pdf |
| 2025-11-10 | Garrett Bowlby (Oaktree) | Audrey Little | Offered refi at 6.99%; Oaktree covers fees; Order of Satisfaction; interest abatement if | Audrey asked whether subordination/position could work; requested call. | 2025-11-10 | Audrey Little | ROBERT 2.pdf |

| Date | From | To | Proposal / Request | Response (if any) | Response Date | Response From | Source PDF |
|------|------|----|--------------------|-------------------|---------------|---------------|------------|
| | | | closed in Nov; alternative sell scratch-and-dent then seek reimbursement from Rocket. | | | | |
| 2025-11-03 | Audrey Little | Rocket Close + Rocket Title counsel (copied Oaktree/ Rocket contacts) | Requested cure by paying ≈$393k lien; asked for single senior POC; requested production of escrow/title file; litigation hold. | Rocket Title counsel maintained denial and asserted you are not an insured; refused to produce title file to you; directed escrow docs to Rocket Close. | 2025-11-03 | Olivier J. Labarre (Rocket Title counsel) | STACEY.pdf |
| 2025-11-05 | Audrey Little (coverage enforcement framing) | Rocket Title counsel + Rocket Close + Rocket execs (copied Oaktree) | Three-day cure demand: cure prior lien (~$393k) OR indemnify loss (~$574k+) upon modifica | No written election located in provided excerpts. | — | — | ROBERT2.pdf |

| Date | From | To | Proposal / Request | Response (if any) | Response Date | Response From | Source PDF |
|------|------|-----|-------------------|-------------------|---------------|---------------|------------|
| | | | tion. | | | | |
| 2025-12-17 | Audrey Little | Varun Krishna + Heather Moldovan + Stacey Holubec | Rule 408 mitigation-focused alternative resolution structure; discussed converting loss into performing asset via a consolidated Rocket Mortgage loan structure. | No acceptance located in provided excerpt. | — | — | STACEY.pdf / to varun.pdf / varun1.pdf |

Requests for Pause or Forbearance

Subtotals (as stated): Rocket Group = 2; Oaktree Group = 10; Total = 12.

Prepared: 2026-01-21

Requests for Document Production

Subtotals (as stated): Rocket Group = 11; Oaktree Group = 5; Total = 16.

Note on QWRs: QWRs issued 11/17/2025 (Cornerstone) and 12/02/2025 (Oaktree; cc Cornerstone).

Prepared: 2026-01-21