FILED

CLERK, U.S. DISTRICT COURT

1/30/2026

CENTRAL DISTRICT OF CALIFORNIA

BY _____ ASI _____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

AUDREY LITTLE, Plaintiff, v. OAKTREE FUNDING CORPORATION, et al., Defendants.
Case No. 5:26-cv-00402

PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (FOR PURPOSES OF CLARIFYING JURISDICTION)

Plaintiff Audrey Little, appearing in pro per, moves for leave under Fed. R. Civ. P. 15(a)(2) to file the proposed Second Amended Complaint (v82) attached as Exhibit A. This motion is brought to clarify the operative pleading and eliminate any confusion regarding subject-matter jurisdiction.

I. RELIEF REQUESTED

Plaintiff requests an order granting leave to file the Second Amended Complaint (v82) as the operative pleading in this action.

II. GROUNDS

1. Rule 15(a)(2) provides that leave to amend should be freely given when justice so requires. 2. The proposed Second Amended Complaint abandons any RESPA / Regulation X claim and proceeds on state-law causes of action. Granting leave clarifies that no federal question remains. 3. Rocket Close and Rocket Companies agreed to respond only to the Second Amended Complaint after review, and granting leave avoids unnecessary motion practice. 4. Granting leave will not prejudice Defendants; it narrows issues and clarifies jurisdiction.

III. EXHIBIT

Exhibit A: Proposed Second Amended Complaint v82 (filed as an exhibit).

Dated: _____ /s/ Audrey Little Audrey Little, Plaintiff Pro Se


DATED: January 30, 2026

# I. INTRODUCTION / NATURE OF ACTION

1. This is not a case about a loan payment dispute. The undisputed documentary record incorporated by reference shows that the regulated safeguards and gatekeepers that make California real-estate closings safe and workable were not satisfied, yet Defendants seek to enforce the transaction as if compliance does not matter. The closing instructions required, among other non-discretionary conditions, that (i) the loan record in verified second-lien position on or before the disbursement date and (ii) Oaktree perform final QC prior to funding. (Exs. A-1, A-2; D-1.) The record shows disbursement occurred on July 14, 2025 while recording occurred on July 15, 2025. (Exs. B-1; B-2.) As a matter of timing alone, the transaction could not have recorded in the required lien position on or before disbursement and therefore could not have been verified as such prior to the irreversible release of funds. These are independent, redundant gatekeepers; if even one had been satisfied, the transaction would not have funded into an impaired lien stack. Instead, the record reflects failure at every independent gate identified in the closing instructions and title/insurance pipeline, including: (1) verified second-lien recordation on or before disbursement; (2) lender final QC prior to funding; (3) current title/bring-down currency through funding/recording; (4) recording sequence controls; and (5) insurance/CPL attachment and claim-handling safeguards. The record further shows facially stale title materials bearing an October 15, 2024 date were used in the title/commitment package—months outside the funding window—thereby infecting downstream underwriting inputs and closing gates that depended on current title. (Ex. C-1; Ex. D-2.) The record also shows Defendants acquired notice of the defect and a title-claim posture existed, yet enforcement and withholding continued. (Exs. E-1; E-2; T-1;

1    T-2.) These documents present a narrow legal question under controlling California

2    appellate authority: whether parties who controlled the closing pipeline may disregard

3    mandatory safeguards and then enforce the transaction as if those safeguards were legally

4    immaterial. Oaktree's own production labeled "Complete Loan File" includes title

5    materials bearing a facial "Production Date: October 15, 2024," confirming Oaktree had

6    the stale-dated title package in its possession during the underwriting/closing pipeline,

7    and Oaktree's underwriting conditions required a "Final QC review prior to funding," yet

8    no contemporaneous QC sign-off verifying lien position and title currency has been

9    produced. Plaintiff alleges Oaktree possessed the same stale-dated title materials

10    throughout underwriting and closing and failed to detect or act on the facial date

11    discrepancy before authorizing funding.

12    1K. Plaintiff's consent to the transaction was categorically limited to a verified, insurable

13    second-lien loan intended to be refinanced immediately. Plaintiff would never have

14    accepted a third-lien loan under any circumstances, as third-position status would render

15    immediate refinancing infeasible and defeat the essential purpose of the transaction.

16    1L. Plaintiff's execution of documents, authorization of disbursement, and continued

17    performance were expressly conditioned on satisfaction of the written conditions

18    precedent requiring verified second-lien recordation on or before disbursement, lender

19    final QC prior to funding, and reliance on current title/bring-down through funding and

20    recording.

21    1M. Disbursement constituted an affirmative representation by conduct that all express

22    conditions precedent—particularly verified second-lien position—had been satisfied.

1    Because disbursement was prohibited absent compliance, funding necessarily

2    communicated compliance and induced Plaintiff not to rescind or halt the transaction.

3    **1N. These allegations are material to inducement, causation, reliance, damages, and**

4    **post-notice wrongdoing, and are incorporated by reference into each cause of action**

5    **to the extent applicable.**

6    1A. UNDISPUTED DOCUMENTARY FACTS (THE RECORD SHOULD HAVE

7    ENDED THIS DISPUTE MONTHS AGO):

8    1B. A family deed of trust was dated December 6, 2024 and recorded in December 2024

9    (recording reflected as December 2024 (dated 12/06/2024; recorded 12/19/2024) in the

10   file) and existed in the recorded lien stack before the July 2025 closing. Plaintiff and her

11   co-borrower did not know it was recorded; it was discoverable only through current title

12   controlled by Defendants. (Exs. C-2; E-2; U-3B.)

13   1C. Underwriting opened in May 2025 and required current title/bring-down currency.

14   The title materials later provided to Plaintiff bore an obvious "as of October 15, 2024"

15   date—nine months stale—which Plaintiff caught within seconds the first time she saw it

16   on November 19, 2025. (Exs. C-1; D-2; M-2; U-3B.) Plaintiff alleges the stale date was

17   facially apparent on the documents Oaktree had in its underwriting/title package from the

18   May 2025 commitment period, and would have been detected by any reasonable final QC

19   review before funding.

20   1D. Oaktree's underwriting approved only a second-lien product ("Subject lien is a 2nd

21   mortgage") with "MAX CLTV = 75%," and recorded a represented "LTV / CLTV …

22   69.809%" based on a $2,850,000 collateral value. (Ex. D-1.)

1    1E. The recorded lien stack as of 7/15/2025 yields an implied CLTV of 84.55%

2    ($1,300,000 + $393,000 + $716,580 = $2,409,580; ÷ $2,850,000). If the $125,000 Pagel

3    deed of trust remained unreconveyed as of 7/15/2025, the implied CLTV is 88.93%.

4    These figures are above Oaktree's 75% cap and inconsistent with the represented

5    underwriting premise. (Exs. D-1; C-2; F; J.)

6    1F. At signing, Defendants presented written closing/escrow instructions containing non-

7    discretionary conditions precedent, including: "OAKTREE TO PERFORM FINAL QC

8    REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST RECORD IN 2ND LIEN

9    POSITION ON OR PRIOR TO THE DISBURSEMENT DATE." (Ex. A-1; Ex. A-2.)

10    Plaintiff and her co-borrower signed the closing instructions in the presence of a notary

11    and reasonably understood them to be binding closing/escrow instructions governing

12    authorized disbursement and recording sequence. Plaintiff relied on those written

13    conditions—particularly verified second-lien recordation on or before disbursement and

14    lender final QC prior to funding—in consenting to the transaction and permitting funds to

15    be released. Plaintiff signed believing the loan would close in verified second lien

16    position so she could refinance immediately, and she would not have signed otherwise.

17    (Ex. A-1; Ex. A-2; Ex. U-3B.)

18    Escrow Instructions Violated (non-discretionary safeguards):

19    1) Final QC prior to funding. (Ex. A-1; Ex. D-1.)

20    2) Record in 2nd lien position on/before disbursement. (Ex. A-1; Exs. B-1, B-2; Ex. C-2.)

21    3) Timely current title / bring-down through funding/recording. (Ex. D-2; Ex. C-1; Ex.

22    F.)

1    4) Title policy delivery/content requirements (endorsements; policy free of liens except

2    permitted). (Ex. A-1; Ex. C-4; Final Policy; Missing Docs v5.)

3    5) Payoff + reconveyance completion; Pagel $125k still of record as of 7/15. (Ex. A-1;

4    Ex. F; Ex. J.)

5    1G. Disbursement occurred July 14, 2025 and recording occurred July 15, 2025. The

6    second-position condition was not met on or before disbursement. (Exs. B-1; B-2; C-2.)

7    Plaintiff alleges disbursement is an irreversible act: once escrow released the funds, the

8    transaction could not be unwound by simply 'taking back' the proceeds.

9    1G-1. Because Rocket Close was the settlement/escrow agent controlling the funding and

10   recording sequence, Rocket Close necessarily knew at the moment it disbursed funds on

11   July 14, 2025 that recording had not yet occurred and therefore that the express condition

12   requiring recordation in verified second-lien position on or before the disbursement date

13   had not been satisfied. (Exs. A-1; B-1; B-2.)

14   Plaintiff further alleges that the written instructions assigned final QC to Oaktree

15   ("OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING"). Plaintiff is

16   not aware of any contemporaneous lender QC sign-off tied to verified lien position being

17   obtained before funds were released, and Defendants have not produced such a sign-off

18   or authority-to-disburse documentation. (Ex. A-1; Ex. D-1; Missing Documents Request

19   List (v5)

20   1H. Oaktree had knowledge by September 9–10, 2025 and tendered a title claim on

21   September 10, 2025, yet Plaintiff was not told and enforcement continued into the first

22   payment cycle. (Ex. N-5; Ex. M-2; Ex. U-3B.)

1    1I. The denial letter is dated October 24, 2025 and addressed to Oaktree (Teague), not

2    Plaintiff. Plaintiff alleges she first obtained the denial materials on or about December 10,

3    2025 and invoked CPL coverage the same day. (Ex. E-2; Ex. U-3B; Exs. H-2; H-3.)

4    21D-3. Plaintiff alleges she first obtained the denial materials package on or about

5    December 10, 2025. The same day, Plaintiff invoked Closing Protection Letter ("CPL")

6    coverage and requested a CPL coverage determination and production of the CPL

7    instrument, claim file, and any appeals/arbitration materials. Plaintiff also notified Rocket

8    Title's claims counsel that the denial letter relied on an "Exclusion 3(c)" 'no loss'

9    provision that did not appear in the policy materials produced to Plaintiff, underscoring

10   that Defendants were invoking unproduced incorporated policy terms while withholding

11   the complete policy jacket/conditions/endorsements and full claim record.

12   21D-1. The October 24, 2025 denial letter addressed to Oaktree acknowledges that the

13   Resnick deed of trust appears to fall within the policy's lack-of-priority coverage

14   provision, then denies present relief based on a "no loss" posture and instructs re-tender

15   only upon foreclosure-related events; it also discloses arbitration and complaint rights.

16   Plaintiff alleges that denial posture was invalid as applied to the documented defect and

17   should have been formally appealed or arbitrated, yet no Defendant pursued CPL

18   coverage or a meaningful cure. (Ex. E-2; Ex. E-3; Exs. H-2; H-3.)

19

20   1J. Continued enforcement after knowledge is not a neutral servicing act. Once Oaktree

21   and the Rocket enterprise had notice that express conditions precedent failed and the

22   promised insured second-lien status was never achieved, continued billing, collection

23   pressure, default escalation, autopay/withdrawal attempts, and adverse credit reporting

24   threats became knowing post-notice conduct. Plaintiff alleges that conduct is

1    independently actionable and independently exposes Defendants under California law

2    and                                    (Exs. N-5; M-2; T-1; T-2; U-3B.)

3    21F. Plaintiff alleges that by September 9–10, 2025 Defendants knew the loan had not

4    closed as conditioned and was defectively secured. Nonetheless, Defendants allowed the

5    first payment cycle to begin, continued sending payment/late notices, and maintained

6    enforcement posture while withholding the escrow file, QC sign-off, bring-down

7    evidence, and the CPL instrument. (Exs. N-5; M-2; T-1; T-2; H-2; H-3; Missing

8    Documents Request List (v5)

9    21D-2. To Plaintiff's knowledge, no Rocket entity tendered or processed a Closing

10    Protection Letter ("CPL") claim despite written acknowledgments of escrow instruction

11    failure and lien-priority impairment, and despite Plaintiff's repeated CPL invocation and

12    requests for a coverage determination. (Exs. H-2; H-3; H-3A; cpl invoke.pdf; cpl.pdf.)

13    21G. On information and belief, Defendants knew Plaintiff was not at fault. Defendants

14    had access to title materials within their files prior to closing, controlled the title/escrow

15    pipeline, and knew that the required pre-disbursement quality control tied to lien position

16    could not have been completed as instructed. Despite knowledge that conditions

17    precedent failed and the loan was defectively secured, Defendants chose to continue

18    enforcement month after month—sending billing/late communications, maintaining

19    collection posture, refusing a pause, and withholding the complete escrow/QC/bring-

20    down/CPL file—thereby shifting risk and cost onto Plaintiff and her co-borrower. (Exs.

21    A-1; D-1; D-2; N-5; M-2; T-1; T-2; U-3B.)

22    **I.B. EXISTING APPELLATE FRAMEWORK AND WHAT IT MEANS IF**

23    **ENFORCEMENT IS PERMITTED HERE**

1    California appellate authority also recognizes that mortgage servicers and owners can be

2    subject to California's Rosenthal Fair Debt Collection Practices Act, and that debt

3    collection / foreclosure-related conduct may be actionable where the collector attempts to

4    collect despite having no legal right or while engaging in unlawful or unfair collection

5    practices. (Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568; Davidson v.

6    Seterus, Inc. (2018) 21 Cal.App.5th 283.)

7    California appellate authority recognizes that escrow instructions and conditions

8    precedent are not optional; escrow holders must comply strictly with written instructions

9    and may not disburse contrary to conditions precedent. (Amen v. Merced County Title

10   Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title

11   Co. (2002) 27 Cal.4th 705.)

12   California law also enforces title insurance policy language as written; policy scope,

13   effective-date clauses, and covered risks are determined by the contract, and post-

14   knowledge conduct can create independent exposure. (Hovannisian v. First American

15   Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group, LLC v. Stewart

16   Title Guaranty Co. (2002) 105 Cal.App.4th 315; Karl v. Commonwealth Land Title Ins.

17   Co. (1993) 20 Cal.App.4th 972.)

18   Plaintiff alleges that if the Court were to permit continued enforcement of a loan funded

19   in violation of express conditions precedent and under a false underwriting premise—

20   while Defendants withhold the escrow file, CPL, and QC/bring-down proof—it would

21   functionally nullify the regulated safeguards that make California secured real-estate

22   closings workable.

1    Plaintiff is disabled and alleges she faces immediate forced-sale pressure if enforcement

2    continues. The Court is therefore presented with a narrow question on undisputed

3    documents: whether Defendants may shift the risk and cost of their own closing-process

4    violations onto the only parties without access to the true lien stack (Plaintiff and her co-

5    borrower). (Exs. T-1; T-2; M-2; U-2.)

6

7    2. Plaintiff consented to one narrow transaction only: a verified, insurable second-lien

8    refinance based on accurate, current title and underwriting inputs. Plaintiff would never

9    have accepted a third-lien loan under any circumstances because the loan was accepted as

10    a temporary second-lien bridge intended to be refinanced immediately. Plaintiff was

11    induced to consent based on a represented combined loan-to-value ratio ("CLTV") of

12    approximately 69%, not the approximately 85% CLTV that resulted once the true

13    recorded lien stack existed at/after recording. (Exs. D-1; C-2; C-7.)

14    3. The only party who did not have access to correct, current lien information was the

15    borrower. Defendants—lender, escrow, and title participants—controlled the closing

16    pipeline, controlled the title search/bring-down process, and controlled the disbursement

17    and recording sequence. Plaintiff relied on Defendants' representations and the regulated

18    closing process. (Exs. C-1; D-2; A-1; A-2; Tables Section—Table A.)

19    3A. Had current title been run correctly at the outset of underwriting in May 2025, the

20    transaction would not have proceeded at all. The second-lien underwriting premise and

21    CLTV feasibility depended on accurate lien position and recorded encumbrances; stale

22    title and lack of a timely bring-down concealed the intervening lien-priority reality until

23    after disbursement/recording. (Exs. D-1; D-2; C-1; C-2.)

1    4. The closing did not occur as conditioned. Disbursement occurred July 14, 2025, while

2    Oaktree's deed of trust recorded July 15, 2025, and did not land in the contractually

3    required second position—facts that were not disclosed to Plaintiff at the time of signing

4    or funding. (Exs. B-1; B-2; A-1; C-2.)

5    5. The title policy language ties effectiveness to recording ("…or the date of recording of

6    the insured mortgage, whichever is later"), meaning the loan was funded before the

7    insured mortgage recorded and before coverage could attach as written. (Ex. C-4;

8    Supplemental Exhibit – Final Title Policy (as provided)). Plaintiff further alleges that

9    when she requested the lender's title insurance policy materials, Oaktree initially

10    provided only the ALTA commitment/commitment jacket (without the underlying title

11    report and without the final policy/endorsements) and presented it as "the policy,"

12    thereby withholding or mischaracterizing the operative policy and title materials needed

13    to assess coverage, currency, endorsements, and Schedule B exceptions.

14    5A. The lender's policy form ties effectiveness to the later of the stated policy date or the

15    recording of the insured mortgage; accordingly, where disbursement occurred before

16    recording, the transaction was funded before policy coverage could attach as written.

17    Rocket Close, as the closing agent handling policy issuance and recording, knew or

18    should have known this timing consequence when it released funds before recording. (Ex.

19    C-4; Exs. B-1/B-2.)

20

21    6. After Defendants had notice of the defect, Plaintiff demanded an immediate

22    enforcement stop (including disabling autopay/withdrawals and freezing adverse credit

23    reporting) and requested a temporary pause while the defect was cured and reviewed by

1    the Court. Defendants refused, continued enforcement, and withheld core

2    closing/escrow/CPL documentation. (Exs. T-1; T-2; D-3; H-2; H-3; H-3A.)

3    7. Plaintiff repeatedly offered cure and settlement terms designed to make Oaktree whole

4    while minimizing everyone's exposure (including a structured offer ladder and multiple

5    cure options). Defendants refused or ignored those mitigation attempts and escalated

6    enforcement instead. (Tables Section—Table C; Ex. T-1; Ex. T-2; Ex. M-2.)

7    27M-1. Plaintiff repeatedly requested a temporary pause of billing, drafts, and adverse

8    credit/enforcement activity while the defect and coverage/cure pathways were evaluated,

9    and Plaintiff communicated that if Oaktree implemented a pause and promptly produced

10   the missing QC/authority-to-disburse/bring-down and claim/CPL records, Plaintiff would

11   streamline the pleadings and reduce motion practice to avoid unnecessary litigation

12   expense. Oaktree refused to pause and continued enforcement posture, thereby increasing

13   foreseeable harm and compounding Plaintiff's damages while the underlying defect

14   remained unresolved. (Exs. T-1; T-2; E-3; E-4.)

15   7E. Plaintiff alleges that, having reviewed the appellate authority, the continued

16   enforcement pressure after notice is inexplicable on any innocent reading of the record.

17   The only explanation aligned with the documentary evidence is that continued pressure

18   shifts risk and cost onto the borrower even though post-knowledge conduct carries

19   independent exposure under California law.

20   7D. In the secured-lender context, appellate authority recognizes that a title-policy 'loss'

21   analysis cannot be manipulated by post-knowledge delay; the law fixes the relevant

22   measurement principles and attaches exposure to wrongful denials and bad-faith conduct.

1    (Karl v. Commonwealth Land Title Ins. Co. (1993) 20 Cal.App.4th 972; Karl v.

2    Commonwealth Land Title Ins. Co. (1997) 60 Cal.App.4th 858.)

3    7C. Title insurance is indemnity for covered loss and is governed by the policy language;

4    courts enforce those terms, including termination and scope provisions. (Hovannisian v.

5    First American Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group,

6    LLC v. Stewart Title Guaranty Co. (2002) 105 Cal.App.4th 315; Lick Mill Creek

7    Apartments v. Chicago Title Ins. Co. (1991) 231 Cal.App.3d 1654.)

8    7B. The escrow agency is limited—but it is real. The escrow holder's duties are defined

9    by the escrow instructions, and deviation from conditions precedent (especially

10   disbursement and recording sequence) creates liability and voidable consequences.

11   (Summit, supra, 27 Cal.4th at 712–716; Amen, supra, 58 Cal.2d at 534.)

12   7A. California courts have long held that an escrow holder is an agent and fiduciary of

13   the parties and must comply strictly with the parties' written instructions. (Amen v.

14   Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v.

15   Continental Lawyers Title Co. (2002) 27 Cal.4th 705; Lee v. Title Ins. & Trust Co.

16   (1968) 264 Cal.App.2d 160.)

17   **I.A. KEY CALIFORNIA APPELLATE AUTHORITY (NON-EXHAUSTIVE)**

18   **II. PARTIES**

19   8. Plaintiff AUDREY LITTLE ("Plaintiff") is an individual residing in Riverside County,

20   California.

21   9. Defendant ROCKET CLOSE, LLC (formerly Amrock Title California Inc.) ("Rocket

22   Close") acted as escrow holder and settlement agent for the refinance closing. (Exs. A-1,

23   A-2; B-3.)

1    10. Defendant ROCKET COMPANIES, INC. ("Rocket Companies") is the

2    parent/enterprise entity that exercised control over the Rocket closing/title ecosystem,

3    received enterprise notice, assigned "Client Resolution" handling, and continued to

4    withhold and refuse cure/pause despite full notice. (Exs. N-1 through N-4; Ex. N—

5    Rocket Corporate Materials (N-1/N-2)

6    11. Defendant OAKTREE FUNDING CORPORATION ("Oaktree") is the

7    lender/beneficiary on the deed of trust and the party demanding and/or permitting

8    continued enforcement after notice of the lien-priority defect, despite its own written

9    conditions precedent and QC requirements. (Exs. A-1, A-2; D-1; E-4; T-2.)

10    12. Plaintiff is ignorant of the true names and capacities of DOES 1–50 and therefore

11    sues them by fictitious names. Plaintiff will amend when their identities are ascertained.

12                                    **III. JURISDICTION AND VENUE**

13    13. This Court has subject-matter jurisdiction because the amount in controversy exceeds

14    the jurisdictional minimum for unlimited civil cases.

15    14. Venue is proper in Riverside County because the property is located in Riverside

16    County and substantial events and injuries occurred here.

17                                    **IV. GENERAL ALLEGATIONS**

18    15. Plaintiff incorporates by reference the Master Exhibit Binder (v9) submitted in

19    support of this Second Amended Complaint, including Exhibits A through U, the Tables

20    Section, and supplemental exhibits. The exhibits are incorporated by reference as though

21    fully set forth herein.

22    15A. Chronology of Origination and Inducement (Borrower Perspective; Undisputed

23    Where Documented)

1    15B. Plaintiff initially contacted a mortgage broker to open a loan for a HELOC/short-

2    term bridge structure with the express intent to refinance promptly. At intake, the broker

3    obtained title information through the Rocket title/closing ecosystem and reviewed the

4    lien stack. Plaintiff expected to see the existing Kinecta HELOC and the $125,000 Pagel

5    deed of trust, which were to be addressed/combined through the new transaction. (Ex. A-

6    1 (payoff requirements); Ex. C-1; Ex. J; Ex. F.)

7    15B-1. As underwriting proceeded, Plaintiff and her co-borrower were informed of the

8    key underwriting maximums and were comfortable with them because the transaction

9    was intended to be short-term and refinanced immediately. The underwriting conditions

10    reflected a second-lien product with "MAX CLTV = 75%" and "MAX DTI = 50%," and

11    recorded a represented "LTV / CLTV … 69.809%." (Ex. D-1.)

12    15B-2. Plaintiff understood any elevated debt-to-income ratio would be temporary only

13    and would be cured by immediate refinance once the transaction closed as represented in

14    verified second-lien position. Plaintiff's consent was therefore conditioned on the closing

15    process safeguards working as designed: current title verification, strict escrow

16    compliance, recording sequence, and insurance attachment. (Exs. A-1; D-1; D-2; Tables

17    Section—Table A.)

18    15C. Plaintiff told the mortgage broker she had a family loan for which she had signed

19    documents, and Plaintiff specifically asked whether any lien related to that family loan

20    appeared on title because Plaintiff understood she would not be approved if it did.

21    Plaintiff was assured that the title information being reviewed did not show any lien

22    regarding a family loan. (Ex. U-3B ¶¶6–9.)

1    15D. Unknown to Plaintiff (and unknowable to Plaintiff without a current title search

2    controlled by Defendants), a family deed of trust had been dated December 6, 2024 and

3    recorded in December 2024 (recording reflected as December 2024 (dated 12/06/2024;

4    recorded 12/19/2024) in the file) and existed in the lien stack. The title insurer later

5    characterized the intervening deed of trust as a family loan. (Ex. E-2; Ex. U-3B ¶7.)

6    15D-1. Plaintiff did not know that the family deed of trust had been recorded. Plaintiff

7    alleges she learned only after Oaktree finally disclosed that a recorded deed of trust

8    existed. At that point, Plaintiff contacted a third party with access to title data who

9    advised that the deed of trust appeared to have been recorded in December 2024. Plaintiff

10    did not learn the specific recorded date until Plaintiff later obtained a title report "as of

11    July 15, 2025," which reflected the recorded deed of trust and recording information. (Ex.

12    F; Ex. J; Ex. U-3B.)

13    15E. Plaintiff then proceeded to signing/closing. At signing, Plaintiff executed the loan

14    package and the borrower acknowledgment to the written closing/escrow instructions.

15    Those instructions contained express conditions precedent, including: "OAKTREE TO

16    PERFORM FINAL QC REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST

17    RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT

18    DATE." (Ex. A-1; Ex. A-2.)

19    15F. What Plaintiff did not know—because it was not disclosed and because Defendants

20    controlled the title pipeline—was that although underwriting proceeded in May 2025, the

21    title summary/commitment materials being relied upon bore an "October 15, 2024" date

22    (nine months stale) and/or were not timely updated with a bring-down through

23    funding/recording. Plaintiff first saw that stale date on November 19, 2025 and

1    recognized and flagged the discrepancy within seconds. (Exs. C-1; D-2; M-2; U-3B.)

2    Plaintiff alleges the stale-dated title materials were in Oaktree's possession as part of the

3    commitment/title package used for the transaction, and that noticing the stale date would

4    have compelled a current bring-down and prevented disbursement under the underwriting

5    cap and the express second-lien-on-or-before-disbursement condition.

6    20D. Industry-standard pull-down/bring-down practice and the commitment's own

7    currency terms require a current update shortly before closing. The ALTA Commitment

8    warns that in order to close and have a policy issued based on the commitment, the

9    commitment revision date must not be older than 14 days from closing, and after 180

10    days the commitment is void. Plaintiff alleges Defendants failed to obtain/retain a timely

11    bring-down within that window, which would have exposed the senior lien stack and

12    prevented disbursement under the underwriting cap and the second-position condition

13    precedent. (Ex. D-2; Ex. C-1; Ex. A-1; Ex. F.)

14    20F. ALTA Commitment / currency gate (who issued and why it matters). The ALTA

15    Commitment for Title Insurance (Commitment No. 74346744, dated May 8, 2025)

16    identifies Rocket Close and Title, Inc. as issuing agent for the lender's policy

17    commitment and contains express currency warnings requiring timely updates close to

18    closing (revision within 14 days; void after 180 days). (Ex. D-2.) Plaintiff pleads this

19    commitment and its currency terms not as an abstract of title, but to show the controlled

20    closing process required a timely bring-down/pull-down gate before

21    disbursement/recording, and that either no timely bring-down was obtained before

22    funding or a bring-down was obtained and ignored. (Exs. A-1; D-1; B-1/B-2; F.)

1    20D-1. Commitment currency and industry-standard bring-down practice. The ALTA

2    Commitment warns that to close a transaction and have a policy issued based on the

3    commitment, the Commitment Revision Date must not be older than 14 days from the

4    actual closing date, and after 180 days the commitment is void. Plaintiff alleges a timely

5    pull-down/bring-down no more than 14 days pre-close (and immediately before

6    funding/recording) is standard practice and required by the commitment's own terms; a

7    timely bring-down would have shown the senior lien stack and prevented funding under

8    both the underwriting cap and the express second-position-before-disbursement

9    condition. (Ex. D-2; Ex. C-1; Ex. A-1; Ex. D-1; Ex. F.)

10    20E. Plaintiff alleges this outcome could not occur if Defendants followed a single, basic

11    safeguard: current title verification immediately before funding/recording. Had Oaktree

12    and the closing/title participants obtained and relied upon a current title report / bring-

13    down within the required currency window, the senior/intervening lien stack would have

14    been visible and the loan would not have been funded as a second-lien product.

15    Accordingly, either (1) no timely current title / bring-down was obtained, or (2) a current

16    title / bring-down was obtained, revealed the intervening lien(s), and Defendants

17    proceeded anyway. Plaintiff alleges either alternative constitutes unlawful conduct and

18    breach of the written conditions precedent. (Exs. D-2; A-1; D-1; F; B-1; B-2.)

19    20E-1. Plaintiff further alleges she still has not received from Rocket the

20    contemporaneous title/bring-down evidence, escrow officer notes, or internal clearance

21    records that would resolve which alternative occurred. Accordingly, Plaintiff pleads in

22    the alternative that (1) no timely bring-down/current title was obtained and relied upon

23    prior to disbursement, or (2) a bring-down/current title was obtained, revealed the

1    intervening lien(s) and third-position outcome, and Defendants proceeded anyway.

2    Plaintiff further alleges that, to the extent Rocket or escrow personnel obtained current

3    title reflecting the defect, Oaktree either (a) did not receive that information due to

4    process failure, or (b) received it and nonetheless permitted or directed funding contrary

5    to its own written conditions precedent.

6    15G. Process Failure Chain (Step-by-Step — Why the Documentary Record Is

7    Dispositive)

8

9    The record shows this was not a single isolated mistake. Multiple independent,

10   mandatory checkpoints were required to prevent funding into an impaired lien stack, and

11   the documentary evidence shows the critical checkpoints did not occur as required. The

12   closing instructions required verified second-lien recordation on or before disbursement

13   and lender final QC prior to funding. (Ex. A-1; Ex. D-1.) The record shows disbursement

14   on 7/14/2025 and recording on 7/15/2025, which alone establishes the second-lien-on-or-

15   before-disbursement condition was not met. (Exs. B-1; B-2.) The record further shows

16   facially stale title materials (dated 10/15/2024) were used in the title/commitment

17   package and transmitted as part of the closing pipeline, despite express currency

18   warnings requiring timely updates close to closing. (Ex. C-1; Ex. D-2.) The required

19   QC/authority-to-disburse and bring-down records remain unproduced. Accordingly, the

20   only reasonable inferences are that the required gates were not performed, or were

21   performed and ignored, and Defendants proceeded anyway. These documentary facts do

22   not depend on any borrower narrative: they are the gatekeeper facts that should have

23   stopped funding, or required an immediate pause and cure once discovered.

1

2    Borrower disclosure does not change these gatekeeper failures. Even assuming full

3    disclosure, the written conditions precedent required verified second-lien recordation on

4    or before disbursement and lender final QC prior to funding, and the

5    disbursement/recording chronology establishes those conditions were not satisfied before

6    funds were irreversibly released.

7    The transaction had multiple independent, mandatory checkpoints designed to prevent

8    exactly this outcome. Each checkpoint was controlled by Defendants' process, and each

9    checkpoint failed. Even if Defendants attempt to attribute fault to Plaintiff, none of the

10   borrower-attribution theories would change the dispositive outcome: a current title/bring-

11   down and the written conditions precedent would have prevented funding or would have

12   required an immediate cure before enforcement. (Exs. A-1; D-1; D-2; B-1; B-2; F.)

13   15H. Immateriality of 'Borrower Non-Disclosure' Defenses. Defendants may argue

14   Plaintiff "should have disclosed" or "should have known." Plaintiff alleges she disclosed

15   the family loan and asked specifically whether it appeared on title and was told it did not.

16   (Ex. U-3B.) But even if Defendants dispute that exchange, it would not change the

17   outcome: the controlling failures were Defendants' failure to use current title, failure to

18   obtain a timely bring-down, failure to satisfy express conditions precedent before

19   disbursement, and failure to stop enforcement after knowledge. Those failures are

20   independent of borrower intent and would have defeated eligibility and/or barred funding

21   regardless. (Exs. D-1; D-2; A-1; B-1; B-2; F; M-2.)

22   15H-1. Borrower-attribution defenses do not change outcome. Defendants may argue

23   Plaintiff "should have disclosed" or "should have known" the recorded deed of trust.

1    Plaintiff alleges she disclosed the family loan, asked specifically whether it appeared on

2    title, and was told it did not, and further alleges she did not know the deed of trust was

3    recorded until Oaktree finally disclosed it. But even if Defendants dispute those facts, it

4    would not change the dispositive outcome because the closing process required

5    Defendants to run current title and a timely bring-down and to satisfy express conditions

6    precedent before disbursement. A timely bring-down would have revealed the senior lien

7    stack and prevented funding under the underwriting cap and the second-position-before-

8    disbursement condition; alternatively, if the bring-down was run and Defendants

9    proceeded anyway, the misconduct is worse. Either way, borrower narrative cannot cure

10    Defendants' process failures. (Exs. U-3B; D-2; D-1; A-1; F; B-1; B-2.)

11    16. Oaktree's written closing instructions imposed conditions precedent to

12    funding/disbursement and required second-lien recordation on or before the disbursement

13    date, as well as lender final QC prior to funding. (Exs. A-1, A-2; D-1.)

14    16A. The written closing instructions include multiple non-discretionary safeguards. For

15    example, the instructions expressly state: "CONDITIONS TO BE SATISFIED PRIOR

16    TO DISBURSEMENT OF LOAN PROCEEDS: OAKTREE TO PERFORM FINAL QC

17    REVIEW PRIOR TO FUNDING." (Ex. A-1.)

18    16B. The title/recording conditions are equally explicit. The instructions state: "THIS

19    LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE

20    DISBURSEMENT DATE NOTED ABOVE." (Ex. A-1.)

21    16C. The instructions further require delivery of "DUPLICATE ORIGINALS OF THE

22    ALTA TITLE POLICY," specify required endorsements, and require that the "ALTA

1    Title Policy must be free from liens, encumbrances, easements, encroachments and other

2    title matters" except limited items and taxes paid current. (Ex. A-1.)

3    16D. Oaktree's underwriting conditions confirm the transaction was approved only as a

4    second-lien product with strict feasibility limits. Oaktree's approval conditions state:

5    "MAX CLTV = 75%" and "Subject lien is a 2nd mortgage." (Ex. D-1.)

6    16E. The underwriting file also records the represented leverage at approval: "LTV /

7    CLTV / HCLTV 25.144% / 69.809% / …" with a collateral home value of

8    $2,850,000.00. (Ex. D-1.)

9    16F. Using the $2,850,000.00 collateral value reflected in underwriting, the minimum

10   known lien stack at/after recording included approximately $1,300,000 (first lien) +

11   $393,000 (Resnick) + $716,580 (Oaktree) = $2,409,580, yielding an implied CLTV of

12   84.55%—above Oaktree's "MAX CLTV = 75%" cap and above the represented 69.809%

13   CLTV. If the $125,000 Pagel deed of trust remained unreconveyed as of 7/15/2025, the

14   implied CLTV is higher still (88.93%). (Exs. D-1; C-2; F; J.)

15   16F-1. The July 15, 2025 title evidence shows that a deed of trust in the amount of

16   $125,000 recorded December 7, 2022 (Pagel) remained of record, meaning the

17   payoff/reconveyance documentation and recording confirmation were not completed or

18   not recorded when represented as paid off. This is further 'absence evidence' of

19   escrow/title process failure and explains why the lien stack available on 7/15 still

20   contained the $125,000 lien. (Ex. F; Ex. J; Missing Documents Request List (v5)

21   16G. Plaintiff and her co-borrower, Jacob Little, had no knowledge that the intervening

22   lien existed in the recorded lien stack at the time they were asked to sign. Defendants'

23   documents and process positioned the loan as a second-lien refinance based on current

1  title and a ~69.8% CLTV, and the closing instructions/underwriting conditions were not

2  optional. The borrower was the only party without access to the actual, current recorded

3  lien stack. (Exs. A-1; D-1; C-2; Tables Section—Table A.)

4  16H. Plaintiff and her co-borrower did not have access to the actual lien stack and could

5  not independently verify lien priority or bring-down status. They relied on Defendants'

6  regulated closing process and expressly assumed that loan proceeds would not be

7  disbursed unless the written conditions precedent were satisfied—including verified

8  second-lien position on or before disbursement and lender final QC prior to funding. (Ex.

9  A-1; Ex. D-1; Tables Section—Table A.)

10  16H-1. Anticipated defense 'borrower should have known' is contradicted by the

11  documentary record. The title commitment itself warns that it is void/ineffective for

12  closing unless the revision date is within 14 days of closing and that after 180 days it is

13  void—confirming that currency is controlled by the title/escrow pipeline, not the

14  borrower. (Ex. D-2; Ex. C-1.)

15  16I. Plaintiff and her co-borrower did not receive current title evidence before funding;

16  Oaktree's own chronology identifies that the borrower's first receipt of a preliminary title

17  item occurred months later (November 19, 2025), after disbursement/recording. (Ex. M-

18  2; Ex. H.)

19  16J. Anticipated defense 'borrower failed to disclose' is also contradicted by Defendants'

20  admissions and by withheld file evidence. Defendants characterize the intervening deed

21  of trust as a family loan and threatened Plaintiff with criminal referral over a "0% family

22  loan" listed as borrowers customarily list family loans—while still refusing to produce

1    the complete origination/underwriting/escrow file that would resolve the question. (Exs.

2    E-2; T-2; Tables Section—Table A; Missing Documents Request List (v5)

3    17. Underwriting materials reflect the second-lien premise and maximum CLTV/DTI

4    constraints for a second mortgage, and specifically describe the subject lien as a "2nd

5    mortgage." (Ex. D-1.)

6    18. The recorded public record and Defendants' own disbursement/recording proof show

7    disbursement occurred July 14, 2025 and recording occurred July 15, 2025, violating the

8    "record in 2nd position on or prior to disbursement" condition. (Exs. B-1; B-2; A-1.)

9    19. A recorded intervening deed of trust (the "Resnick" lien) existed in the recorded lien

10    stack before Oaktree's deed of trust recorded, defeating the transaction feasibility and

11    CLTV eligibility premise if current title had been run and accounted for. (Exs. C-2; C-7.)

12    20. Title materials show the use of stale title information and the absence of a timely

13    bring-down through the July 2025 disbursement/recording window, including currency

14    warnings and an extended gap between title work and funding. (Exs. C-1; D-2; C-6.)

15    20A. Current title should have been run at the outset of underwriting in May 2025

16    (Commitment/Prelim dated May 8, 2025) and then timely updated through closing with a

17    bring-down within the commitment's currency window. Instead, Defendants relied on or

18    transmitted title materials bearing an "October 15, 2024" date and/or failed to obtain a

19    timely bring-down through funding/recording. (Ex. C-1; Ex. D-2; Ex. A-1.) Plaintiff

20    alleges the October 15, 2024 date was obvious on the face of the transmitted materials;

21    Oaktree had the same materials in its file, and a basic QC review would have flagged the

22    currency failure before funding.

1    20C. Reasonable inference regarding the missing bring-down. Plaintiff alleges that a

2    timely pull-down/bring-down search was required immediately prior to funding and/or

3    immediately prior to recording to confirm the then-current lien stack and the required

4    second-lien outcome. It is a reasonable inference that no timely bring-down was run

5    before disbursement, because a bring-down would have shown the senior/intervening lien

6    stack and would have prevented funding under both the underwriting feasibility cap and

7    the express second-position-before-disbursement condition. In the alternative, if a bring-

8    down was run after disbursement and revealed the defect, proceeding anyway was an

9    intentional disregard of conditions precedent. Either scenario is fatal. (Exs. D-2; A-1; D-

10   1; F; B-1; B-2.)

11   21A. Defendants did not disclose any lien-priority defect at closing, at funding, or at the

12   time payments began. Plaintiff learned only because the loan was intended to be

13   refinanced immediately and Plaintiff attempted to refinance in early September 2025.

14   During that refinance process, Plaintiff was informed there was a defect preventing

15   refinance but was not told the nature of the defect, and refinancing could not proceed.

16   (Ex. U-3B ¶¶7–9.)

17   21E. Plaintiff did not learn that the preliminary/title materials bore an "October 15, 2024"

18   effective date until November 19, 2025, when Plaintiff first saw the document and

19   immediately recognized and flagged the discrepancy. Plaintiff alleges Defendants

20   controlled the title/escrow pipeline and had access to the date-stamped materials but

21   failed to disclose the mismatch at or before closing and funding. (Ex. C-1; Ex. D-2; Ex.

22   M-2; Ex. U-3B.)

1  21E-1. Plaintiff alleges Defendants had access to the public record and closing file at all

2  times, while Plaintiff and her co-borrower did not. Plaintiff did not learn the recorded

3  date details until she obtained the July 15 title report months later; Defendants' failure to

4  provide prompt notice and the complete file forced Plaintiff to reconstruct the record

5  herself. (Exs. F; J; D-3; Missing Documents Request List (v5)

6  21D. The title insurer's denial letter is dated October 24, 2025 and was addressed to

7  Oaktree (Robert Teague), not to Plaintiff, confirming Defendants' early knowledge

8  posture. (Ex. E-2.) Plaintiff did not receive that denial materials package at the time it

9  was issued; Plaintiff alleges she first obtained the denial materials on or about December

10  10, 2025 and invoked CPL coverage the same day. (Ex. U-3B ¶¶10–11; Exs. H-2; H-3.)

11

12  21B. Plaintiff was told by her mortgage broker that there was "a problem with title," but

13  the broker did not know what it was and did not provide current title details. Plaintiff and

14  her co-borrower did not yet know the nature of the defect, including the reliance on stale

15  title and/or the absence of a timely updated bring-down through funding/recording, and

16  reasonably relied on Defendants' controlled title/escrow process. (Ex. U-3B ¶¶8–9; Ex.

17  A-1; Ex. D-1.)

18

19

20  21C. The exhibit record reflects that Rocket and Oaktree had knowledge of the defect no

21  later than September 9–10, 2025, including Oaktree's Notice of Claim to Rocket Title

22  dated September 10, 2025. (Ex. N-5; Ex. U-3B at 314:22–25.)

23  21D. Despite that knowledge, Plaintiff was not timely told the nature of the defect and

24  continued making payments while billing and enforcement activity continued. Oaktree's

1    own correspondence states that it had actual knowledge no later than September 9, 2025,

2    yet did not timely disclose the defect and continued enforcement activity. (Ex. M-2 at

3    347:12–16; Ex. U-3B at 314:25–26.)

4

5    21. The lender's title policy form language ties effectiveness to recording of the insured

6    mortgage. Because recording occurred after disbursement, the loan was funded before

7    coverage could attach under the policy's own clause. (Ex. C-4; Supplemental Exhibit –

8    Final Title Policy (as provided)

9    22. Oaktree tendered a title claim asserting impairment of the loan position and

10    unsaleability absent cure, demonstrating actual notice of the defect. (Ex. E-1.)

11    23. Rocket Title's denial admitted the intervening lien was not excepted on Schedule B

12    and "appears to fall within" the lack-of-priority coverage, yet denied present relief on a

13    "no loss" posture and instructed re-tender only upon foreclosure-related events. (Exs. E-

14    2; C-8.)

15    **IV.B. Post-Notice Admissions, Lender's Policy Context, Withheld Escrow and CPL**

16    **Records, and Continued Enforcement**

17    24. Plaintiff does not allege that she is the insured under the lender's title insurance

18    policy or that she is entitled to payment of policy proceeds. The title policy insured

19    Oaktree Funding Corporation's lien position. References to the policy and denial are pled

20    solely to establish Defendants' knowledge, their post-notice conduct, and the

21    reasonableness of Plaintiff's requests for pause and cure. (Ex. E-2; Final Policy; Exs. T-

22    1/T-2.)

23    24A. Plaintiff has repeatedly requested the complete escrow/closing file and the complete

24    claim-related record, including all title-claim communications, appeals, reconsideration

1    requests, arbitration materials, and determinations, and all Closing Protection Letter

2    ("CPL") issuance and claim materials. Defendants have not produced these items.

3    Plaintiff further alleges that the production labeled "Complete Loan File" is not complete

4    and omits core categories such as (i) authority-to-disburse documentation, (ii) pre-

5    funding QC sign-off tied to verified lien position, (iii) bring-down/current title evidence

6    through funding/recording, and (iv) claim/CPL appeal or determination records. Plaintiff

7    pleads these omissions as absence evidence supporting the reasonable inference that

8    required safeguards were not performed or, if performed, revealed the defect and were

9    ignored. Oaktree's own production includes a stale-dated title item (Production Date:

10   October 15, 2024) while omitting the gatekeeper proof that would show compliance

11   (final QC sign-off, authority-to-disburse, and bring-down/current title evidence).

12   25. Plaintiff pleads concrete, present damages and irreparable harm already incurred that

13   are independent of any future foreclosure event, including loss of refinance opportunity,

14   ongoing enforcement leverage, credit impairment risk, and health-related impacts from

15   payment triage and withheld-file pressure.

16   26. The October 24, 2025 denial letter itself quotes the policy's lack-of-priority insuring

17   provision and states that the intervening deed of trust appears to fall within that coverage

18   grant. (Ex. E-2.)

19   27. After admitting that escrow errors had occurred and after Oaktree Funding

20   Corporation tendered a title claim based on lien-priority impairment, Defendants advised

21   Plaintiff that protection would not apply unless and until foreclosure or similar

22   enforcement events occurred. Defendants did not identify any policy provision requiring

1    foreclosure as a prerequisite to protection for lien-priority defects. (Ex. E-2; Ex. M-2; Ex.

2    U-3B.)

3    27A. Based on Defendants' statements, their refusal to grant any pause, and their

4    continued enforcement posture, it appears Defendants accepted a "no loss until

5    foreclosure" position despite acknowledging an existing lien-priority impairment.

6    Plaintiff is informed and believes that lien-priority protection under the applicable policy

7    is not conditioned on foreclosure, sale, or liquidation events, and that no such prerequisite

8    appears in the policy language governing lack-of-priority coverage. (Ex. E-2; Final

9    Policy.)

10   27B. Plaintiff repeatedly requested copies of all title-claim appeals, coverage challenges,

11   arbitration filings, determinations, and correspondence, as well as all Closing Protection

12   Letter ("CPL") claims, coverage letters, denials, appeals, and related communications.

13   Defendants produced none. (Tables Section—Table A; Exs. H-2; H-3; H-3A; Missing

14   Documents Request List (v5)

15   27C. Civil discovery production demand. Plaintiff has served Requests for Production of

16   Documents under Code of Civil Procedure § 2031 et seq. Rocket Close is required to

17   serve code-compliant written responses stating whether it will comply, lacks ability to

18   comply, or objects (CCP § 2031.210), and to produce responsive documents in a usable

19   form (CCP § 2031.280). Any refusal to produce, evasive response, or improper

20   withholding constitutes a misuse of discovery (CCP § 2023.010) and will be addressed by

21   motion to compel and sanctions. (Tables Section—Table A; Missing Documents Request

22   List (v5)

1    27D. Scope of custodians/systems (Amrock/Rocket Close). For avoidance of doubt,

2    Plaintiff's discovery requests and production demands include documents held by Rocket

3    Close's custodians and systems operating under any "Amrock"/amrock.com mailboxes or

4    branded departments used on this transaction (e.g., title clearance/funding), and Rocket

5    Close and Title, Inc. where referenced in closing/title documents; Defendants may not

6    avoid production by re-labeling custodians or systems. (Exs. N-1/N-2; Tables Section—

7    Table A.)

8    27E. On information and belief, and based on Defendants' failure to produce any such

9    documents despite repeated written requests, it appears that no appeal of the title-claim

10   denial was pursued, no CPL claim was tendered prior to Plaintiff's express CPL

11   invocation, and no CPL coverage determination was issued before enforcement

12   continued. (Ex. E-3; Exs. H-2/H-3; Tables Section—Table A.)

13   27F. Defendants also failed to produce the complete escrow file, including but not limited

14   to: current title and bring-down evidence, lien-priority verification, final quality-control

15   approval, authority-to-disburse documentation, recording sequencing records,

16   reconveyance confirmations, escrow officer notes, and CPL issuance or processing

17   records. These materials are mandatory for a lawfully closed, insured second-lien

18   transaction and are uniquely within Defendants' possession, custody, or control. (Ex. A-

19   1; Ex. D-1; Ex. D-2; Ex. D-3; Missing Documents Request List (v5)

20   27G. Notwithstanding admitted escrow error, acknowledged lien-priority impairment,

21   unresolved coverage obligations, and Plaintiff's repeated written requests for a temporary

22   pause, Defendants continued billing, collection pressure, enforcement threats, and refusal

1    to pause, while withholding the escrow file and all documentation reflecting coverage

2    review, appeal, or CPL processing. (Exs. T-1; T-2; Ex. M-2; Ex. U-3.)

3    27H. The absence of these records supports the reasonable inference that required

4    escrow, title, quality-control, and CPL safeguards were either not performed or were

5    performed, revealed the defect, and Defendants proceeded anyway. Either alternative

6    constitutes negligent and reckless post-notice conduct under California law. (Exs. D-2;

7    A-1; D-1; F; T-1; T-2.)

8    27I. At all relevant times after Defendants acquired actual knowledge of the defect,

9    Oaktree Funding Corporation knew that Plaintiff is disabled, knew that continued

10    enforcement posed an immediate and irreparable risk of Plaintiff losing her home, and

11    knew that coverage and cure obligations had not been resolved. Despite this knowledge,

12    Oaktree refused any pause, continued enforcement pressure, advised Plaintiff that

13    foreclosure would be required before protection could apply, and escalated enforcement

14    with threats of criminal referral, conduct undertaken with reckless disregard of the

15    probability of causing severe emotional distress. (Exs. U-3A/U-3B; T-1; T-2; M-2.)

16    27J. Plaintiff does not seek to adjudicate insurance coverage or compel payment under

17    the title policy; the existence of the policy and denial are alleged solely to demonstrate

18    Defendants' knowledge, unreasonable reliance, and continued enforcement despite

19    unresolved defects.

20    27K. Mitigation ladder and avoidable escalation. Plaintiff presented multiple cure and

21    settlement options designed to make Oaktree whole and stop harm early, including a

22    documented offer ladder beginning with $0 to Plaintiff and full payment of Oaktree's

23    principal balance ($716,580), followed by higher combinations (e.g., $63,000 +

1   $716,580; $98,000 + $716,580; $412,000 + $716,580) and other structures to unwind or

2   cure the transaction. These proposals were made while Plaintiff's damages were

3   comparatively limited (under approximately $100,000) and before enforcement pressure

4   compounded harm. Defendants refused or ignored these mitigation attempts and

5   continued enforcement posture instead. (Tables Section—Table C; Exs. T-1/T-2; M-2.)

6   27L. Enterprise escalation and delegated inaction. Plaintiff escalated the defect and

7   enforcement harm to Rocket Companies' executive level. Rocket Companies responded

8   by delegating the matter to Rocket Close's operations leadership (Vice

9   President/operations role) as the point of contact. Plaintiff continued copying Rocket

10   Companies on correspondence and repeatedly requested a pause and cure, yet no

11   effective action was taken and the refusal-to-mitigate posture continued. (Exs. N-1/N-2

12   (enterprise escalation communications); Tables Section—Tables A–C; Exs. T-1/T-2).

13   Plaintiff requested enterprise-level coordination because Rocket's title, escrow, and

14   insurance participants were pointing responsibility to one another; Rocket Companies'

15   CEO-level escalation resulted in delegation to Rocket Close operations leadership, but

16   the record reflects continued non-coordination and withholding after that handoff.

17   27M. Where allegations are made on information and belief, such allegations are based

18   on Defendants' statements, conduct, admissions, and failure to produce documents

19   uniquely within their possession, custody, or control, despite repeated written requests.

20   (Tables Section—Table A; Missing Documents Request List (v5)

21   27N. Damages and Irreparable Harm (Concrete Consequences of Defendants' Conduct):

22   27O. Plaintiff is disabled and depends on consistent, paid in-home assistance.

23   Defendants' continued enforcement posture and resulting financial disruption caused

1    Plaintiff to lose or reduce essential aide services, creating immediate safety and health

2    consequences. (Ex. U-3B; Ex. U-3A.)

3    27P. Plaintiff was forced to triage payments and could not fund pre-planned, once-in-a-

4    lifetime events and family commitments that had been scheduled and paid in reliance on

5    a promptly refinanced short-term bridge/HELOC structure. Plaintiff missed those events

6    because funds were diverted to avoid compounding default/collection pressure from

7    Defendants. (Ex. U-3B; Exs. T-1/T-2.) Plaintiff alleges this period also caused her to

8    miss significant family events and caregiving opportunities, including time with her

9    newborn grandchild and the ability to assist elderly and ill family members, as described

10    in her declarations.

11    27Q. Plaintiff was unable to host her annual holiday gathering, a longstanding family

12    tradition, due to the forced payment triage, loss of liquidity, and ongoing enforcement

13    pressure. (Ex. U-3B.)

14    27R. Defendants' refusal to pause and their continued billing/collection posture after

15    notice created an ongoing and irreparable risk of adverse credit reporting and credit

16    impairment to both Plaintiff and her co-borrower, which in turn impaired refinancing

17    ability and increased borrowing costs. (Exs. T-1; T-2; U-3B.)

18    27S. These harms are separate from (and in addition to) title-policy proceeds: they arise

19    from Defendants' closing-process failures and post-notice enforcement decisions,

20    including withholding the escrow file, QC records, bring-down evidence, and CPL

21    records needed to resolve the defect. (Exs. IV.B; Missing Documents Request List (v5)

22    27T. Plaintiff has spent at least 1,598 hours of unpaid time investigating, documenting,

23    communicating, and preparing filings and evidence to address Defendants' process

1  failures and ongoing enforcement posture—time that Plaintiff alleges constitutes

2  substantial lost professional and personal capacity directly caused by Defendants'

3  conduct. (Ex. U-3B; Tables Section—Tables A–C.)

4  27U. Plaintiff's treating providers have advised that, due to the medically documented

5  stress and functional decline caused by this prolonged enforcement pressure and financial

6  disruption, Plaintiff may require eight months or more to return to prior baseline physical

7  functioning. (Ex. U-3B; Ex. U-3A.)

8  27V. Plaintiff was forced to curtail or stop regular therapies and medically recommended

9  treatment because the loan's cost and Defendants' refusal to pause enforcement depleted

10  available funds. Plaintiff alleges this interruption itself worsened health outcomes and

11  increased recovery time. (Ex. U-3B; Ex. U-3A.)

12  **V. CAUSES OF ACTION**

13

14  **FIRST CAUSE OF ACTION – BREACH OF CONTRACT (CONDITIONS**

15  **PRECEDENT / CLOSING INSTRUCTIONS)**

16  (Against Rocket Close and Oaktree)

17  Key authority (contract/escrow conditions precedent): Amen v. Merced County Title Co.

18  (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.

19  (2002) 27 Cal.4th 705.

20  28. Plaintiff realleges and incorporates paragraphs 1 through 27.

21  29. Oaktree's written closing instructions and conditions precedent governed

22  disbursement, lien position, recording, and the intended second-lien transaction, and were

23  incorporated into the closing and funding process. (Ex. A-1; Ex. D-1.) These written

24  closing/escrow instructions—including the non-discretionary conditions precedent to

1   funding and disbursement—were part of the escrow transaction documents presented at

2   signing. Plaintiff and her co-borrower were required to sign an acknowledgment of those

3   instructions and Plaintiff relied on them as governing the escrow holder's authority to

4   disburse. Under California law, an escrow holder must comply strictly with the parties'

5   written escrow instructions and may not disburse contrary to conditions precedent.

6   (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528, 531–532.) Plaintiff alleges she

7   was at minimum an intended beneficiary of these instructions and the protections they

8   imposed, because the conditions were expressly designed to prevent disbursement unless

9   the required lien position and lender QC conditions were satisfied.

10   30. Material conditions precedent included, at minimum: (i) Oaktree final QC prior to

11   funding; and (ii) recordation in second lien position on or prior to the disbursement date.

12   (Ex. A-1; Ex. D-1.)

13   31. Defendants breached by disbursing on July 14, 2025 without satisfying the express

14   second-position-before-disbursement condition and without producing any

15   contemporaneous evidence that final QC verified lien position prior to funding. (Exs. A-

16   1; B-1; B-2; Missing Documents Request List (v5)

17   31A. Plaintiff further alleges that the written instructions assigned final QC to Oaktree

18   prior to funding; yet no contemporaneous QC sign-off tied to verified lien position has

19   been produced. On information and belief, Oaktree did not complete the promised final

20   QC verifying lien position before authorizing funding, or such documentation exists and

21   has been withheld. (Exs. A-1; D-1; Missing Documents Request List (v5)

1    32. Defendants further breached by proceeding on a second-lien underwriting premise

2    that depended on accurate, current title; the intervening recorded lien defeated feasibility

3    and pushed the implied CLTV above Oaktree's maximum. (Exs. D-1; C-2; C-7.)

4    33. Plaintiff was damaged as a direct and proximate result, including loss of refinancing

5    opportunity, compounding interest, and credit/collection pressure after notice. (Exs. T-1;

6    T-2; Tables Section—Tables A–C.)

7

8    **SECOND CAUSE OF ACTION – BREACH OF ESCROW INSTRUCTIONS**

9    **(STRICT COMPLIANCE)**

10    (Against Rocket Close only)

11    Key authority (escrow holder strict compliance): Amen v. Merced County Title Co.

12    (1962) 58 Cal.2d 528; Lee v. Title Ins. & Trust Co. (1968) 264 Cal.App.2d 160; Summit

13    Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

14    34. Plaintiff realleges and incorporates paragraphs 1 through 27.

15    This breach-of-instructions claim alleges deviation from the written conditions precedent

16    that defined escrow's authority to disburse. It is distinct from (and complements)

17    Plaintiff's fiduciary-duty claim, which targets escrow's misuse of entrusted funds—

18    authorizing and releasing loan proceeds while knowing, or being obligated to confirm,

19    that conditions precedent had not been satisfied. (Ex. A-1; Ex. B-1/B-2.)

20    These instruction failures were material conditions precedent to authorized disbursement

21    and caused present prejudice, including funding into an impaired lien stack, loss of

22    immediate refinance opportunity, and post-notice enforcement leverage that compounded

23    damages. (Exs. A-1; B-1/B-2; D-1; F; T-1/T-2.)

1    35. Rocket Close, as escrow holder/settlement agent, owed a duty of strict compliance

2    with the written escrow/closing instructions and lacked authority to disburse contrary to

3    conditions precedent. (Ex. A-1.)

4    35A. Plaintiff alleges she was at minimum an intended beneficiary of the written

5    closing/escrow instructions and the protections they imposed, because those conditions

6    were expressly designed to prevent disbursement unless the required lien position and

7    lender QC conditions were satisfied. Under California law, an escrow holder must

8    comply strictly with the parties' written escrow instructions and may not disburse

9    contrary to conditions precedent. (Amen v. Merced County Title Co. (1962) 58 Cal.2d

10    528, 531–532.)

11    36. The escrow/closing instructions imposed at least five non-discretionary safeguards:

12    (1) Oaktree final QC review prior to funding; (2) second-lien recordation on or prior to

13    disbursement; (3) accurate final Closing Disclosure reflecting specified payoffs; (4)

14    delivery of duplicate originals of the ALTA title policy with specified endorsements; and

15    (5) ALTA policy free from liens/encumbrances except limited enumerated matters and

16    taxes paid current. (Ex. A-1.)

17    37. Rocket Close breached by disbursing funds when the deed of trust had not been

18    recorded into the required lien position on or before the disbursement date. (Exs. A-1; B-

19    1; B-2; C-2.)

20    37A. Rocket Close's breach was not a mere administrative timing issue. At the moment

21    of disbursement, Rocket Close knew recording had not yet occurred (recording occurred

22    the following day) and therefore knew the required second-lien recordation condition had

23    not been met on or before disbursement. Rocket Close nonetheless released funds,

1    exceeding escrow's limited authority and defeating the very safeguard the instructions

2    imposed. (Exs. A-1; B-1; B-2.)

3    38. Rocket Close's breach caused foreseeable harm, including the creation of an

4    improperly secured loan, subsequent enforcement pressure, and economic loss. (Exs. T-2;

5    Tables Section—Table B; Tables Section—Table C.)

6

7    **THIRD CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY (ESCROW**

8    **HOLDER)**

9    (Against Rocket Close only)

10   Key authority (escrow fiduciary duties): Lee v. Title Ins. & Trust Co. (1968) 264

11   Cal.App.2d 160; Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit

12   Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

13   39. Plaintiff realleges and incorporates paragraphs 1 through 27.

14   40. As escrow holder, Rocket Close owed fiduciary duties of fidelity, neutrality, and

15   strict adherence to escrow instructions regarding handling of funds and documents.

16   41. Rocket Close breached those duties by acting outside written authority,

17   funding/disbursing without satisfaction of conditions precedent, and enabling an unlawful

18   disbursement/recording sequence that defeated the promised lien position. (Exs. A-1; B-

19   1; B-2; C-2.)

20   41A. Rocket Close's fiduciary breach includes knowingly disbursing while the deed of

21   trust remained unrecorded and while the promised second-lien position had not been

22   secured. Because the policy's effectiveness is tied to recording, Rocket Close further

23   knew or should have known that releasing funds before recording created an uninsured

24   funding window under the policy language. (Ex. C-4; Exs. B-1/B-2; A-1.)

1    42. Plaintiff suffered damages according to proof. (Exs. T-2; Tables Section—Table B;

2    Tables Section—Table C.)

3

4    **FOURTH CAUSE OF ACTION – NEGLIGENCE / PROFESSIONAL**

5    **NEGLIGENCE**

6    (Against Rocket Close and Oaktree)

7    Key authority (negligence duty / economic loss factors): Biakanja v. Irving (1958) 49

8    Cal.2d 647; J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799; Summit Financial Holdings,

9    Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

10   50. Plaintiff realleges and incorporates paragraphs 1 through 27.

11   51. Defendants owed duties of reasonable care in the closing process safeguards pleaded

12   herein, including underwriting feasibility review as conditioned, current title

13   verification/bring-down, lien-priority confirmation, and compliance with the

14   funding/recording sequence required by the written conditions precedent. (Exs. D-1; D-2;

15   A-1.) With respect to Oaktree, Plaintiff does not allege only a conventional lender role;

16   Plaintiff alleges Oaktree expressly undertook and required specific pre-funding

17   safeguards—including "FINAL QC REVIEW PRIOR TO FUNDING" and verified

18   second-lien recordation on or before disbursement—as conditions to authorized

19   disbursement. (Exs. A-1; D-1.) Having undertaken those safeguards as part of the

20   transaction's conditions precedent, Oaktree owed a duty to exercise reasonable care in

21   performing them and not to authorize disbursement unless the required QC and lien-

22   position conditions were satisfied. Oaktree's duty is further supported by the fact that

23   Oaktree possessed the stale-dated title materials in its file and tracked title/CPL currency

1    as underwriting conditions, making detection of a facially stale title package and

2    verification of lien position central to the pre-funding QC gate Oaktree undertook.

3    52. Defendants breached by relying on stale title, failing to obtain a timely bring-down

4    through the disbursement/recording window, failing to verify second-lien position before

5    disbursement, and funding before recording contrary to mandatory conditions. (Exs. C-1;

6    D-2; B-1; B-2; C-2.) As to Oaktree specifically, Plaintiff alleges Oaktree breached its

7    undertaken pre-funding QC safeguard by permitting or authorizing funding and

8    disbursement without performing the promised final QC tied to verified lien position and

9    without ensuring the express second-lien-on-or-before-disbursement condition had been

10   satisfied. As a further breach, Oaktree possessed the title materials bearing the facially

11   stale October 15, 2024 date and failed to notice or act on that obvious discrepancy before

12   authorizing funding; had the date been flagged, a current bring-down would have been

13   required and the transaction would not have funded into an impaired lien position. As a

14   further breach, Oaktree had the stale-dated title package in its possession and

15   nevertheless authorized funding without verifying current title/bring-down through the

16   disbursement/recording window and without producing any contemporaneous final QC

17   sign-off tied to verified lien position.

18   53. Plaintiff suffered damages according to proof. (Tables Section—Table B; Tables

19   Section—Table C; Ex. T-2.)

20

21          **FIFTH CAUSE OF ACTION – FRAUDULENT INDUCEMENT BY**

22          **CONCEALMENT (ESCROW) / POST-NOTICE CONCEALMENT**

23   (Against Rocket Close, LLC (pre-closing and at disbursement) and Rocket Companies,

24   Inc. (post-notice concealment and inducement of continued performance))

1    Key authority (concealment / duty to disclose / inducement): LiMandri v. Judkins (1997)

2    52 Cal.App.4th 326; Lazar v. Superior Court (1996) 12 Cal.4th 631; Robinson Helicopter

3    Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979.

4    62. Plaintiff realleges and incorporates paragraphs 1 through 27.

5    63. Plaintiff's consent to execute the loan documents, to permit disbursement of loan

6    proceeds, and to accept the transaction at all was expressly and unambiguously

7    conditioned on Defendants' satisfaction of the written conditions precedent set forth in

8    the closing and escrow instructions, including but not limited to: (a) verified recordation

9    in second-lien position on or before disbursement; (b) lender final quality-control

10   approval prior to funding; and (c) reliance on current title/bring-down through funding

11   and recording.

12   64. Plaintiff would never have accepted, signed for, or permitted funding of a third-lien

13   loan under any circumstances, because the transaction was approved, priced, and

14   accepted solely as a temporary second-lien bridge transaction intended to be refinanced

15   immediately. A third-lien position would have made immediate refinancing infeasible

16   and would have defeated the essential purpose of the transaction.

17   65. Defendants concealed and failed to disclose material facts within their exclusive

18   possession, custody, and control, including: (a) absence of a timely current title bring-

19   down through funding/recording; (b) failure to satisfy the written requirement that the

20   loan record in second-lien position on or before disbursement; (c) failure to complete

21   lender final QC tied to verified lien position prior to funding; and (d) disbursement before

22   recording and before the promised insured lien-priority status could attach under the

23   policy's effectiveness clause. (Exs. A-1; A-2; B-1; B-2; C-2; D-2; C-4.)

1    65A. Defendants further concealed and continue to withhold the complete claim and

2    coverage handling record (including any appeals, arbitration submissions, coverage

3    determinations, and CPL issuance/claim processing materials), while maintaining

4    enforcement posture and refusing a pause. Plaintiff alleges this withholding was material

5    to her ability to pursue timely cure, loss-mitigation relief, and protection from avoidable

6    harm.

7    66. These facts were material because they went to the existence and feasibility of the

8    only transaction Plaintiff agreed to enter—namely, a verified and insurable second-lien

9    transaction permitting immediate refinancing. Plaintiff and her co-borrower had no

10    access to the true, current recorded lien stack and could not reasonably discover these

11    facts, which were controlled by Defendants' title, escrow, and funding pipeline.

12    67. Defendants' disbursement of loan proceeds constituted an affirmative representation

13    by conduct that the express conditions precedent had been satisfied. Because the written

14    instructions prohibited disbursement absent compliance—particularly verified second-

15    lien position—Defendants' act of funding necessarily communicated compliance.

16    68. Plaintiff reasonably and justifiably relied on Defendants' concealment and on the

17    affirmative compliance representation inherent in disbursement. Had Defendants

18    disclosed that the conditions precedent were not satisfied, or that the loan would record in

19    third position, Plaintiff would have rescinded, halted, or refused to permit completion of

20    the transaction and would not have allowed funding to proceed.

21    69. After Defendants had notice of the lien-priority defect and failed conditions

22    precedent, Rocket Close and Rocket Companies continued enforcement pressure while

23    withholding the escrow file, QC sign-off, bring-down evidence, and CPL materials,

1    thereby continuing to conceal material facts and inducing Plaintiff's continued

2    performance. Plaintiff alleges malice, oppression, and/or fraud within the meaning of

3    Civil Code § 3294, supporting punitive damages to the extent permitted by law. (Exs. T-

4    1; T-2; H-2; H-3.)

5    **SIXTH CAUSE OF ACTION – UNFAIR COMPETITION LAW (Bus. & Prof.**

6    **Code § 17200)**

7    (Against All Defendants)

8    Key authority (UCL): Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.

9    (1999) 20 Cal.4th 163; Kwikset Corp. v. Superior Court (2011) 51 Cal.4th 310; Korea

10    Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134.

11    70. Plaintiff realleges and incorporates paragraphs 1 through 27.

12    71. Defendants engaged in unlawful, unfair, and fraudulent practices by closing and

13    enforcing a purported second-lien loan contrary to written conditions and recorded

14    reality, and by refusing to pause and withholding core closing documents after notice.

15    (Exs. A-1; B-1; B-2; C-2; T-2; Tables Section—Tables A–C.)

16    72. Defendants' enterprise materials emphasize urgency and compliance standards

17    inconsistent with the conduct at issue and are relevant to willfulness and unfairness.

18    (Exhibit N (N-1/N-2)

19    73. Plaintiff seeks restitution and injunctive relief under § 17200. Restitution is sought to

20    the extent Defendants received borrower-paid closing and settlement charges and

21    premiums in connection with the transaction (including escrow/settlement/title-related

22    charges reflected on the Closing Disclosure), and injunctive relief is sought to stop

23    continued enforcement and related unfair practices pending cure/adjudication.

24

1    **SEVENTH CAUSE OF ACTION – NEGLIGENT POST-NOTICE CONDUCT**

2    **(REFUSAL TO PAUSE / WRONGFUL ENFORCEMENT PRESSURE)**

3    (Against Oaktree and Rocket Companies)

4    Key authority (post-notice enforcement / debt collection): Best v. Ocwen Loan Servicing,

5    LLC (2021) 64 Cal.App.5th 568; Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283;

6    Minser v. Collect Access, LLC (2023) 93 Cal.App.5th 102.

7    74. Plaintiff realleges and incorporates paragraphs 1 through 27.

8    75. After receiving notice of the lien-priority defect and the disbursement/recording

9    sequence, Defendants owed a duty to exercise reasonable care to avoid compounding

10   harm through enforcement pressure while the defect was investigated and cured.

11   76. Plaintiff requested temporary pauses and offered cure/mitigation paths designed to

12   make Oaktree whole. Defendants refused or ignored those requests and continued

13   billing/collection pressure. (Tables Section—Table B; Tables Section—Table C; Exs. T-

14   1; T-2; M-2). Plaintiff further alleges Oaktree directed her to the servicer for a pause

15   while the servicer indicated it could not grant relief without Oaktree's authorization,

16   delaying mitigation and compounding harm.

17   77. Defendants' post-knowledge enforcement conduct caused additional foreseeable

18   harm, including credit risk, bounced payment risk, and escalating damages. (Exs. T-2;

19   Tables Section—Table B.)

20   The SAC pleads non-speculative, present harm from this post-notice conduct, including

21   inability to refinance, forced payment triage, loss/reduction of essential services and

22   therapies, time loss, and irreparable credit risk, all occurring while Defendants withheld

23   the closing file and refused a pause. (Exs. U-3A/U-3B; T-1/T-2; IV.B.)

1  Plaintiff alleges Rocket Companies' post-notice involvement is shown by executive-level

2  escalation and delegated handling through Rocket Close operations, followed by

3  continued refusal to pause, cure, or mitigate while Plaintiff continued copying Rocket

4  Companies on written requests. This enterprise-level inaction and obstruction is pled as

5  part of Defendants' negligent post-notice conduct and wrongful risk-shifting. (Exs. N-

6  1/N-2; Tables Section—Tables A–C; Exs. T-1/T-2.)

7  Plaintiff seeks recovery of all reasonably foreseeable damages proximately caused by this

8  post-notice conduct, including economic loss, irreparable credit harm risk, and severe

9  emotional distress and health impacts (loss of aide services, interrupted therapies, and

10  physician-advised extended recovery time) as pled in the damages section. This is the

11  substance sometimes labeled "NIED," but is pled here as negligence damages flowing

12  from Defendants' post-notice breach of duty. (Exs. U-3A/U-3B; T-1/T-2.)

13

14  **EIGHTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF**

15  **EMOTIONAL DISTRESS (IIED)**

16  (Against Oaktree only)

17  Key authority (IIED): Hughes v. Pair (2009) 46 Cal.4th 1035; Potter v. Firestone Tire &

18  Rubber Co. (1993) 6 Cal.4th 965; Christensen v. Superior Court (1991) 54 Cal.3d 868.

19  80. Plaintiff realleges and incorporates paragraphs 1 through 27.

20  80A. Plaintiff alleges Oaktree's post-notice conduct went far beyond routine servicing.

21  After Oaktree had actual notice that the loan did not close as conditioned (including

22  failure of the second-lien-on-or-before-disbursement condition and failure of pre-funding

23  QC), Oaktree repeatedly refused to implement any temporary pause, failed to respond

24  substantively to documented requests, redirected Plaintiff to the servicer while the

1    servicer indicated it could not act without Oaktree's authorization, maintained

2    enforcement posture, and withheld core closing/QC/bring-down and claim/CPL records

3    needed to cure the defect. Plaintiff further alleges she requested a temporary pause and

4    communicated that if a pause were implemented and core cure records were produced,

5    she would streamline the pleadings to avoid unnecessary expense; yet Oaktree refused to

6    pause and continued enforcement posture despite actual knowledge of Plaintiff's

7    disability-related vulnerability and foreseeable risk of severe distress.

8    Oaktree's IIED exposure arises from post-notice conduct: after Oaktree had actual

9    knowledge of escrow instruction failure and lien-priority impairment, Oaktree refused to

10   pause enforcement, continued monthly pressure, and escalated the matter with threats of

11   criminal referral while knowing Plaintiff is disabled and that continued enforcement

12   created an immediate risk of forced sale and serious health consequences. Plaintiff

13   alleges this refusal-to-pause posture—despite notice and repeated requests—is the core

14   outrageous conduct supporting IIED against Oaktree. (Exs. M-2; T-1/T-2; U-3; IV.B.)

15   81. After notice and admissions establishing the defect, Oaktree continued enforcement

16   pressure and refused any pause while withholding core documentation needed to cure,

17   including QC/authority-to-disburse and bring-down evidence, and while maintaining

18   collection posture through billing/withdrawal attempts and delinquency/return notices.

19   Plaintiff alleges this conduct was intentional or carried out with reckless disregard of the

20   probability of causing severe emotional distress, given Oaktree's actual knowledge of

21   Plaintiff's disability, health sensitivity to stress, and risk of forced sale. (Exs. F-1; F-4; T-

22   1; T-2; E-4.)

23   82. Plaintiff suffered severe emotional distress and damages according to proof.

82A. Plaintiff alleges the distress was severe and manifested in medically documented exacerbation of symptoms, disruption of medically necessary therapy, loss or reduction of essential in-home assistance, and heightened risk of permanent physical injury, all during the period Oaktree maintained enforcement posture after notice and refused to implement a temporary pause. (Exs. F-3; F-4.)

Plaintiff alleges Oaktree's post-notice conduct was willful and carried out with conscious disregard of Plaintiff's rights and safety, constituting malice and/or oppression within the meaning of Civil Code § 3294, supporting punitive damages on this cause to the extent permitted by law.

**NINTH CAUSE OF ACTION – ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (Civ. Code § 1788 et seq.)**

(Against Oaktree and Servicer (DOE))

Key authority (Rosenthal Act / mortgage servicing collection): Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283; Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568.

87. Plaintiff realleges and incorporates paragraphs 1 through 27.

88. Defendants attempted to collect and enforce amounts under a defective, disputed transaction while refusing to provide core documentation and while continuing billing/collection pressure after notice and dispute. (Exs. T-1; T-2; Tables Section—Table B.)

89. Plaintiff suffered damages according to proof.

1  **TENTH CAUSE OF ACTION – CANCELLATION OF INSTRUMENT (Civ. Code**

2  **§ 3412)**

3  Key authority (cancellation of instrument): Civ. Code § 3412; See Robinson Helicopter

4  Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979 (fraud/independent duty); LiMandri v.

5  Judkins (1997) 52 Cal.App.4th 326 (concealment duty).

6  **VI. PRAYER FOR RELIEF**

7  WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

8  1. For general, special, and consequential damages according to proof;

9  2. For punitive and exemplary damages against the appropriate Defendants on the tort

10  causes of action, pursuant to Civil Code § 3294, according to proof.

11  3. For restitution/disgorgement of escrow fees, premiums, and amounts wrongfully

12  retained;

13  4. For declaratory relief under Code Civ. Proc. § 1060;

14  5. For preliminary and permanent injunctive relief stopping enforcement activity pending

15  cure/adjudication;

16  6. For cancellation of instruments under Civil Code § 3412;

17

18

19  8. For costs of suit and such other relief as the Court deems just and proper.

20  **VII. DEMAND FOR JURY TRIAL**

21  Plaintiff demands trial by jury on all causes of action so triable.

22  **VIII. SIGNATURE**

23  Dated: 1/28/26

1    /s/ Audrey Little (for electronic filing)

2    AUDREY LITTLE, Plaintiff in Pro Per

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2