Audrey Little, Pro Se
81439 Merv Griffin Way
La Quinta, CA 92253
310-283-4448
Audrey.little458@gmail.com

Case No. 5:26-cv-00402-MEMF-MBK

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

AUDREY LITTLE,

Plaintiff,

v.

Case No. 5:26-cv-00402-MEMF-MBK

OAKTREE FUNDING CORPORATION; ROCKET CLOSE, LLC;
ROCKET COMPANIES, INC.; and DOES 1-50, inclusive,

Defendants.

**SECOND AMENDED COMPLAINT**
(STATE-LAW CAUSES OF ACTION ONLY)

Plaintiff voluntarily withdraws any UDAAP claim (if any) without prejudice and

proceeds on the remaining state-law causes of action.

Plaintiff asserts only state-law causes of action and seeks remand to state court.

Plaintiff does not assert any federal cause of action and does not allege any claim

under federal criminal statutes. Any references to federal statutes, regulations, or

standards (if any) are provided solely as factual background and/or as evidence of

duties and do not create an independent federal claim.

**I. INTRODUCTION / NATURE OF ACTION**

1. This is not a case about a loan payment dispute. The undisputed documentary record incorporated by reference shows that the regulated safeguards and gatekeepers that make California real-estate closings safe and workable were not satisfied, yet Defendants seek to enforce the transaction as if compliance does not matter. The closing instructions required, among other non-discretionary conditions, that (i) the loan record in verified second-lien position on or before the disbursement date and (ii) Oaktree perform final QC prior to funding. (Exs. A-1, A-2; D-1.) The record shows disbursement occurred on July 14, 2025 while recording occurred on July 15, 2025. (Exs. B-1; B-2; B-6.) As a matter of timing alone, the transaction could not have recorded in the required lien position on or before disbursement and therefore could not have been verified as such prior to the irreversible release of funds. These are independent, redundant gatekeepers; if even one had been satisfied, the transaction would not have funded into an impaired lien stack. Instead, the record reflects failure at every independent gate identified in the closing instructions and title/insurance pipeline, including: (1) verified second-lien recordation on or before disbursement; (2) lender final QC prior to funding; (3) current title/bring-down currency through funding/recording; (4) recording sequence controls; and (5) insurance/CPL attachment and claim-handling

safeguards. The record further shows facially stale title materials bearing an
October 15, 2024 date were used in the title/commitment package-months outside
the funding window-thereby infecting downstream underwriting inputs and closing
gates that depended on current title. (Ex. C-1; Ex. D-2.) The record also shows
Defendants acquired notice of the defect and a title-claim posture existed, yet
enforcement and withholding continued. (Exs. E-1; E-2; T-1; T-2.) These
documents present a narrow legal question under controlling California appellate
authority: whether parties who controlled the closing pipeline may disregard
mandatory safeguards and then enforce the transaction as if those safeguards were
legally immaterial. Oaktree's own production labeled "Complete Loan File"
includes title materials bearing a facial "Production Date: October 15, 2024,"
confirming Oaktree had the stale-dated title package in its possession during the
underwriting/closing pipeline, and Oaktree's underwriting conditions required a
"Final QC review prior to funding," yet no contemporaneous QC sign-off verifying
lien position and title currency has been produced. Plaintiff alleges Oaktree
possessed the same stale-dated title materials throughout underwriting and closing
and failed to detect or act on the facial date discrepancy before authorizing
funding.

Table A summarizes the independent closing "gatekeeper" failures pled below and
where each is supported in the Binder exhibits.

3

| Gatekeeper failure | Key supporting exhibits | Why it matters to the claims |
| --- | --- | --- |
| Stale title / no timely bring-down (Oct. 2024 materials used in the July 2025 funding window) | C-1; C-6; D-2 | Shows the required current-title currency gate failed; supports breach/absence-evidence and inducement/materiality. |
| No final lender QC / no authority-to-disburse sign-off before funding | A-1; D-1; D-3 | Final QC was an express pre-funding condition; supports breach of conditions precedent and reliance. |
| Disbursement before recording (unsecured at funding) | B-1; B-2; B-6; C-2 | By timing alone, the loan could not be verified as recorded in 2nd position on/before disbursement. |
| Policy effectiveness tied to recording (uninsured at funding) | C-4; C-5; B-6 | Coverage attaches no earlier than recording/later-of clause; supports "uninsured at disbursement" and materiality. |
| Post-notice withholding + refusal to pause (continued enforcement after knowledge) | E-1; E-3; E-4; T-1; T-2; T-3 | Supports independent post-notice misconduct and damages while core file materials remain withheld. |

1K. Plaintiff's consent to the transaction was categorically limited to a verified, insurable second-lien loan intended to be refinanced immediately. Plaintiff would never have accepted a third-lien loan under any circumstances, as third-position status would render immediate refinancing infeasible and defeat the essential purpose of the transaction.

1L. Plaintiff's execution of documents, authorization of disbursement, and continued performance were expressly conditioned on satisfaction of the written

4

conditions precedent requiring verified second-lien recordation on or before disbursement, lender final QC prior to funding, and reliance on current title/bring-down through funding and recording.

1M. Disbursement constituted an affirmative representation by conduct that all express conditions precedent-particularly verified second-lien position-had been satisfied. Because disbursement was prohibited absent compliance, funding necessarily communicated compliance and induced Plaintiff not to rescind or halt the transaction.

1N. These allegations are material to inducement, causation, reliance, damages, and post-notice wrongdoing, and are incorporated by reference into each cause of action to the extent applicable.

1N-1. Defendants' shifting story--escrow error to "borrower concealment"--and threats of FBI referral are unclean hands and support equitable estoppel. (Exs. E-1, E-2, E-4.)

1O. The Note and Deed of Trust that Plaintiff and co-borrower Jacob signed were expressly prepared and presented as a second-lien transaction. Oaktree's own website and program materials represent that it only offers first- and second-lien products. Plaintiff signed the escrow instructions in the presence of a notary (Ex. A-1 and A-2). Underwriting approved the loan only as a second-lien product ("Subject lien is a 2nd mortgage") with a maximum CLTV of 75% and a represented LTV/CLTV of 69.809% based on a $2,850,000 collateral value (Ex. D-1).

1P. Plaintiff specifically asked before closing whether a reconveyance would be needed for the family/Pagel deed of trust and was told "no, there is nothing on there." Plaintiff also believed the property would appraise higher than the $2,850,000 value used. These representations were false. The family/Resnick deed of trust was already of record (Ex. C-2) and the stale October 15, 2024 title materials were used (Ex. C-1; D-2).

1Q. Plaintiff explicitly warned the broker in writing that any intervening lien would "screw" the plan. This transaction was always intended solely as a temporary high-interest bridge loan to pay off high-rate credit cards (AMEX $16,850; JPMCB $15,303; WFBN $5,799; GSBANK $22,813 - Ex. A-1) and the low-rate Kinecta HELOC at prime + 0.25%. The payoffs are listed in Oaktree's own closing instructions (Ex. A-1). Plaintiff would never have replaced the favorable Kinecta line or proceeded at all if told the truth about the lien, the true appraisal value, or that the loan would not

5A

close in second position.

1R. In the very beginning, Plaintiff felt horrible about the situation and even offered to let Defendants write the entire loan off completely so both sides could walk away cleanly. Defendants refused that offer as well.

1S. Disbursement occurred on July 14, 2025 (Ex. B-1). Plaintiff reasonably assumed the loan had closed as conditioned in verified second-lien position because Defendants released the funds. However, Oaktree acquired actual knowledge of the defect no later than September 10, 2025 and tendered its own title claim blaming an "escrow error" (Ex. E-1) - six days before Plaintiff's first payment was due on September 16, 2025 (Ex. T-3). Defendants never disclosed the defect. As a direct result, Plaintiff has already paid $56,000 to escrow and Oaktree, incurred approximately $103,000 in compounding credit-card debt that snowballed because refinancing was blocked, and lost 2,304 hours of billable time valued at $400 per hour (half her normal rate), for a total economic loss exceeding $900,000 - all of which is irreparable.

1T. Upon discovering the stale title and third-lien reality, Plaintiff immediately requested a pause in payments and offered multiple reasonable cure and mitigation options designed to make Oaktree whole (Table C; Exs. T-1, T-2, T-3). Defendants refused every request and continued enforcement. Neither Plaintiff nor the co-borrower Jacob (who had zero knowledge of the loan or the senior lien and would never have signed) would have closed, allowed any payoffs, or proceeded had the

5B

truth been disclosed. The third-lien position created by Defendants' gatekeeper failures permanently destroyed the bridge-loan purpose and made refinancing impossible.

1U. Defendants filed their Motion to Dismiss directed solely at the First Amended Complaint even though they were fully aware that Plaintiff was preparing and had requested a stipulation to the Second Amended Complaint. Defense counsel sent the pre-removal stipulation emails (Plaintiff's Second Supplemental Declaration, Exhibits D-G) on the same day the Motion to Dismiss was filed and then called Plaintiff at approximately 5:45 p.m.; Plaintiff had never discussed, authorized, or consented to Defendants filing a Motion to Dismiss a superseded pleading. The same emails show Defendants were actively negotiating the stipulation the day before removal and had already agreed in principle. This forced unnecessary motion practice on a pleading that Defendants knew was about to be replaced with an evidence-based SAC. Once the SAC is filed, their Motion to Dismiss the FAC becomes moot under standard Ninth Circuit practice.

5D

**1A. UNDISPUTED DOCUMENTARY FACTS:**

1B. A family deed of trust was dated 12/06/2024 and recorded 12/19/2024, and existed in the lien stack before the July 2025 closing; Plaintiff and co-borrower did not know it was recorded because only current title (controlled by Defendants) would reveal it. (Exs. C-2; E-2.)

1C. Underwriting opened in May 2025 and required current title/bring-down currency. The title materials later provided to Plaintiff bore an obvious "as of

5E

October 15, 2024" date-nine months stale-which Plaintiff caught within seconds the first time she saw it on November 19, 2025. (Exs. C-1; D-2; D-1.) Plaintiff alleges the stale date was facially apparent on the documents Oaktree had in its underwriting/title package from the 18 May 2025 commitment period, and would have been detected by any reasonable final QC review before funding.

1D. Oaktree's underwriting approved only a second-lien product ("Subject lien is a 2nd mortgage") with "MAX CLTV = 75%," and recorded a represented "LTV / CLTV … 69.809%" based on a $2,850,000 collateral value. (Ex. D-1.)

1E. The recorded lien stack as of 7/15/2025 yields an implied CLTV of 84.55% ($1,300,000 + $393,000 + $716,580 = $2,409,580; ÷ $2,850,000). If the $125,000 Pagel deed of trust remained unreconveyed as of 7/15/2025, the implied CLTV is 88.93%. These figures are above Oaktree's 75% cap and inconsistent with the represented underwriting premise. (Exs. D-1; C-2; F; J.)

1F. At signing, Defendants presented written closing/escrow instructions containing non-discretionary conditions precedent, including: "OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT DATE." (Ex. A-1; Ex. A-2.) Plaintiff and her co-borrower signed the closing instructions in the presence of a notary and reasonably understood them to be binding closing/escrow instructions governing authorized

6

disbursement and recording sequence. Plaintiff relied on those written conditions-particularly verified second-lien recordation on or before disbursement and lender final QC prior to funding-in consenting to the transaction and permitting funds to be released. Plaintiff signed believing the loan would close in verified second lien position so she could refinance immediately, and she would not have signed otherwise. (Exs. A-1, A-2.)

Escrow Instructions Violated (non-discretionary safeguards):

1) Final QC prior to funding. (Ex. A-1; Ex. D-1.)

2) Record in 2nd lien position on/before disbursement. (Ex. A-1; Exs. B-1, B-2; Ex. C-2.)

3) Timely current title / bring-down through funding/recording. (Ex. D-2; Ex. C-1; Ex. F.)

4) Title policy delivery/content requirements (endorsements; policy free of liens except permitted). (Ex. A-1; Ex. C-4; Final Policy; Missing Docs v5.)

5) Payoff + reconveyance completion; Pagel $125k still of record as of 7/15. (Ex. A-1; Ex. C-2; Ex. D-1.)

1G. Disbursement occurred July 14, 2025 and recording occurred July 15, 2025. The second-position condition was not met on or before disbursement. (Exs. B-1; B-2; C-2.) Plaintiff alleges disbursement is an irreversible act: once escrow

7

released the funds, the transaction could not be unwound by simply 'taking back' the proceeds.

1G-1. Because Rocket Close was the settlement/escrow agent controlling the funding and recording sequence, Rocket Close necessarily knew at the moment it disbursed funds on 11 July 14, 2025 that recording had not yet occurred and therefore that the express condition requiring recordation in verified second-lien position on or before the disbursement date had not been satisfied. (Exs. A-1; B-1; B-2.) Plaintiff further alleges that the written instructions assigned final QC to Oaktree ("OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING"). Plaintiff is not aware of any contemporaneous lender QC sign-off tied to verified lien position being obtained before funds were released, and Defendants have not produced such a sign-off or authority-to-disburse documentation. (Ex. A-1; Ex. D-1; D-3

1H. Oaktree had actual knowledge no later than September 9-10, 2025 and tendered a title claim dated September 10, 2025-before Plaintiff's first payment was due on or about September 16, 2025-yet Plaintiff was not told and enforcement and billing continued. (Ex. E-1 (Notice of Claim dated 09/10/2025); Ex. T-3 (servicer payment confirmation email dated 09/17/2025 reflecting Payment Date 09/16/2025; Binder p. 206).)

1I. The denial letter is dated October 24, 2025 and addressed to Oaktree (Teague), not Plaintiff. Plaintiff alleges she first obtained the denial materials on or about December 10, 2025 and invoked CPL coverage the same day. (Ex. E-2; Exs. H-2, H-3.)

21D-3. Plaintiff alleges she first obtained the denial materials package on or about 5 December 10, 2025. The same day, Plaintiff invoked Closing Protection Letter ("CPL") coverage and requested a CPL coverage determination and production of the CPL instrument, claim file, and any appeals/arbitration materials. Plaintiff also notified Rocket Title's claims counsel that the denial letter relied on an "Exclusion 3(c)" 'no loss' provision that did not appear in the policy materials produced to Plaintiff, underscoring that Defendants were invoking unproduced incorporated policy terms while withholding the complete policy jacket/conditions/endorsements and full claim record.

21D-1. The October 24, 2025 denial letter addressed to Oaktree acknowledges that the Resnick deed of trust appears to fall within the policy's lack-of-priority coverage provision, then denies present relief based on a "no loss" posture and instructs re-tender only upon foreclosure-related events; it also discloses arbitration and complaint rights. Plaintiff alleges that denial posture was invalid as applied to the documented defect and should have been formally appealed or arbitrated, yet

no Defendant pursued CPL coverage or a meaningful cure. (Ex. E-2; Ex. E-3; Exs. H-2; H-3.)

1J. Continued enforcement after knowledge is not a neutral servicing act. Once Oaktree and the Rocket enterprise had notice that express conditions precedent failed and the promised insured second-lien status was never achieved, continued billing, collection pressure, default escalation, autopay/withdrawal attempts, and adverse credit reporting (Ex. T-3 (servicer billing/withdrawal materials); Ex. U-1 (prior declaration describing attempted ACH withdrawals despite instruction to stop; Binder p. 592).) threats became knowing post-notice conduct. Plaintiff alleges that conduct is independently actionable and independently exposes Defendants under California law and (Exs. E-1; T-1; T-2; T-3.)

21F. Plaintiff alleges that by September 9-10, 2025 Defendants knew the loan had not closed as conditioned and was defectively secured, yet allowed Plaintiff's first payment to come due on or about September 16, 2025, continued sending payment/late notices, and maintained an enforcement posture while withholding the escrow file, QC sign-off, and any current title/bring-down documentation. (Ex. E-1 (Notice of Claim dated 09/10/2025); Ex. T-3 (servicer payment confirmation email dated 09/17/2025 reflecting Payment Date 09/16/2025; Binder p. 206); Exs. E-4; H-2; H-3; T-1; T-2; T-3.) Defendants and their servicer also sent periodic mortgage statements and collection notices in Oaktree's name, including

delinquency-related notices and communications containing debt-collection disclosures, while refusing to pause and while withholding the file. (Ex. T-3 (billing/collection notices; e.g., Binder pp. 288-297).) evidence, and the CPL instrument. (Exs. E-1; T-1, T-2, T-3; H-2, H-3; D-3

21D-2. To Plaintiff's knowledge, no Rocket entity tendered or processed a Closing Protection Letter ("CPL") claim despite written acknowledgments of escrow instruction failure and lien-priority impairment, and despite Plaintiff's repeated (Exs. H-2; H-3; H-3A.)

21G. On information and belief, Defendants knew Plaintiff was not at fault. Defendants had access to title materials within their files prior to closing, controlled the title/escrow pipeline, and knew that the required pre-disbursement quality control tied to lien position could not have been completed as instructed. Despite knowledge that conditions precedent failed and the loan was defectively secured, Defendants chose to continue enforcement month after month-sending billing/late communications, maintaining collection posture, refusing a pause, and withholding the complete escrow/QC/bring-down/CPL file-thereby shifting risk and cost onto Plaintiff and her co-borrower. (Exs. A-1; D-1; D-2; E-1; T-1; T-2; T-3.)

**I.B. EXISTING APPELLATE FRAMEWORK AND WHAT IT MEANS IF ENFORCEMENT IS PERMITTED HERE** California appellate authority also recognizes that mortgage servicers and owners can be subject to California's Rosenthal Fair Debt Collection Practices Act, and that debt collection / foreclosure-related conduct may be actionable where the collector attempts to collect despite having no legal right or while engaging in unlawful or unfair collection practices. (Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568; Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283.) California appellate authority recognizes that escrow instructions and conditions precedent are not optional; escrow holders must comply strictly with written instructions and may not disburse contrary to conditions precedent. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.) California law also enforces title insurance policy language as written; policy scope, effective-date clauses, and covered risks are determined by the contract, and post-knowledge conduct can create independent exposure. (Hovannisian v. First American Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group, LLC v. Stewart Title Guaranty Co. (2002) 105 Cal.App.4th 315; Karl v. Commonwealth Land Title Ins. Co. (1993) 20 Cal.App.4th 972.) Plaintiff alleges that if the Court were to permit continued enforcement of a loan funded in violation of express conditions precedent and

12

under a false underwriting premise- while Defendants withhold the escrow file, CPL, and QC/bring-down proof-it would functionally nullify the regulated safeguards that make California secured real-estate closings workable. Plaintiff is disabled and alleges she faces immediate forced-sale pressure if enforcement continues. The Court is therefore presented with a narrow question on undisputed documents: whether Defendants may shift the risk and cost of their own closing-process violations onto the only parties without access to the true lien stack (Plaintiff and her co-borrower). (Exs. A-1, A-2; D-1; T-1; T-2.)

2. Plaintiff consented to one narrow transaction only: a verified, insurable second-lien refinance based on accurate, current title and underwriting inputs. Plaintiff would never have accepted a third-lien loan under any circumstances because the loan was accepted as a temporary second-lien bridge intended to be refinanced immediately. Plaintiff was induced to consent based on a represented combined loan-to-value ratio ("CLTV") of approximately 69%, not the approximately 85% CLTV that resulted once the true recorded lien stack existed at/after recording. (Exs. D-1; C-2; C-7.)

3. The only party who did not have access to correct, current lien information was the borrower. Defendants-lender, escrow, and title participants-controlled the closing pipeline, controlled the title search/bring-down process, and controlled the disbursement and recording sequence. Plaintiff relied on Defendants'

13

representations and the regulated closing process. (Exs. C-1; D-2; A-1; A-2; Tables Section-Table A.)

3A. Had current title been run correctly at the outset of underwriting in May 2025, the transaction would not have proceeded at all. The second-lien underwriting premise and CLTV feasibility depended on accurate lien position and recorded encumbrances; stale title and lack of a timely bring-down concealed the intervening lien-priority reality until after disbursement/recording. (Exs. D-1; D-2; C-1; C-2.)

4. The closing did not occur as conditioned. Disbursement occurred July 14, 2025, while Oaktree's deed of trust recorded July 15, 2025, and did not land in the contractually required second position-facts that were not disclosed to Plaintiff at the time of signing or funding. (Exs. B-1; B-2; A-1; C-2.)

5. The title policy language ties effectiveness to recording ("…or the date of recording of the insured mortgage, whichever is later"), meaning the loan was funded before the insured mortgage recorded and before coverage could attach as written. (Exs. C-4; C-5; B-6.) Plaintiff further alleges that when she requested the lender's title insurance policy materials, Oaktree initially provided only the ALTA commitment/commitment jacket (without the underlying title report and without the final policy/endorsements) and presented it as "the policy," thereby

14

withholding or mischaracterizing the operative policy and title materials needed to assess coverage, currency, endorsements, and Schedule B exceptions.

5A. The lender's policy form ties effectiveness to the later of the stated policy date or the recording of the insured mortgage; accordingly, where disbursement occurred before recording, the transaction was funded before policy coverage could attach as written. Rocket Close, as the closing agent handling policy issuance and recording, knew or should have known this timing consequence when it released funds before recording. (Exs. C-4; C-5; B-6; B-1; B-2.)

6. After Defendants had notice of the defect, Plaintiff demanded an immediate enforcement stop (including disabling autopay/withdrawals and freezing adverse credit (Ex. T-3 (servicer billing/withdrawal materials); Ex. U-1 (prior declaration describing attempted ACH withdrawals despite instruction to stop; Binder p. 592).) reporting) and requested a temporary pause while the defect was cured and reviewed by the Court. Defendants refused, continued enforcement, and withheld core closing/escrow/CPL documentation. (Exs. T-1; T-2; D-3; H-2; H-3; H-3A.)

7. Plaintiff repeatedly offered cure and settlement terms designed to make Oaktree whole while minimizing everyone's exposure (including a structured offer ladder and multiple cure options). Defendants refused or ignored those mitigation attempts and escalated enforcement instead. (Tables Section-Table C; Exs. T-1, T-2, T-3.)

27M-1. Plaintiff repeatedly requested a temporary pause of billing, drafts, and adverse credit/enforcement activity while the defect and coverage/cure pathways were evaluated, and Plaintiff communicated that if Oaktree implemented a pause and promptly produced the missing QC/authority-to-disburse/bring-down and claim/CPL records, Plaintiff would streamline the pleadings and reduce motion practice to avoid unnecessary litigation expense. Oaktree refused to pause and continued enforcement posture, thereby increasing foreseeable harm and compounding Plaintiff's damages while the underlying defect remained unresolved. (Exs. T-1; T-2; E-3; E-4.)

7E. Plaintiff alleges that, having reviewed the appellate authority, the continued enforcement pressure after notice is inexplicable on any innocent reading of the record. The only explanation aligned with the documentary evidence is that continued pressure shifts risk and cost onto the borrower even though post-knowledge conduct carries independent exposure under California law.

7D. In the secured-lender context, appellate authority recognizes that a title-policy 'loss' analysis cannot be manipulated by post-knowledge delay; the law fixes the relevant measurement principles and attaches exposure to wrongful denials and bad-faith conduct. (Karl v. Commonwealth Land Title Ins. Co. (1993) 20 Cal.App.4th 972; Karl v. Commonwealth Land Title Ins. Co. (1997) 60 Cal.App.4th 858.)

16

7C. Title insurance is indemnity for covered loss and is governed by the policy language; courts enforce those terms, including termination and scope provisions. (Hovannisian v. First American Title Ins. Co. (2017) 14 Cal.App.5th 420; Elysian Investment Group, LLC v. Stewart Title Guaranty Co. (2002) 105 Cal.App.4th 315; Lick Mill Creek Apartments v. Chicago Title Ins. Co. (1991) 231 Cal.App.3d 1654.)

7B. The escrow agency is limited-but it is real. The escrow holder's duties are defined by the escrow instructions, and deviation from conditions precedent (especially disbursement and recording sequence) creates liability and voidable consequences. (Summit, supra, 27 Cal.4th at 712-716; Amen, supra, 58 Cal.2d at 534.)

7A. California courts have long held that an escrow holder is an agent and fiduciary of the parties and must comply strictly with the parties' written instructions. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705; Lee v. Title Ins. & Trust Co. (1968) 264 Cal.App.2d 160.)

**I.A. KEY CALIFORNIA APPELLATE AUTHORITY (NON-EXHAUSTIVE)**

**II. PARTIES**

17

8. Plaintiff AUDREY LITTLE ("Plaintiff") is an individual residing in Riverside County, California.

9. Defendant ROCKET CLOSE, LLC (formerly Amrock Title California Inc.) ("Rocket Close") acted as escrow holder and settlement agent for the refinance closing. (Exs. A-1, A-2; B-3.)

10. Defendant ROCKET COMPANIES, INC. ("Rocket Companies") is the parent/enterprise entity that exercised control over the Rocket closing/title ecosystem, received enterprise notice, assigned "Client Resolution" handling, and continued to withhold and refuse cure/pause despite full notice. (Exs. N-1 through N-4; Ex. N- Rocket Corporate Materials (N-1/N-2)

11. Defendant OAKTREE FUNDING CORPORATION ("Oaktree") is the lender/beneficiary on the deed of trust and the party demanding and/or permitting continued enforcement after notice of the lien-priority defect, despite its own written conditions precedent and QC requirements. (Exs. A-1, A-2; D-1; E-4; T-2.)

12. Plaintiff is ignorant of the true names and capacities of DOES 1-50 and therefore sues them by fictitious names. Plaintiff will amend when their identities are ascertained.

**III. JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction because the amount in controversy exceeds the jurisdictional minimum for unlimited civil cases.

18

13A. Plaintiff asserts only state-law causes of action. Plaintiff does not assert any federal cause of action and does not allege any claim under federal criminal statutes. Any references to federal statutes, regulations, or standards (if any) are provided solely as factual background and/or as evidence of duties and do not create an independent federal claim.

14. Venue is proper in Riverside County because the property is located in Riverside County and substantial events and injuries occurred here.

**IV. GENERAL ALLEGATIONS**

15. Plaintiff incorporates by reference the Master Exhibit Binder submitted in support of this Second Amended Complaint, including Exhibits A through U, the Tables Section, and all Section I supplemental exhibits and updates. The exhibits are incorporated by reference as though fully set forth herein.

15A. Chronology of Origination and Inducement (Borrower Perspective; Undisputed Where Documented)

15B. Plaintiff initially contacted a mortgage broker to open a loan for a HELOC/short-term bridge structure with the express intent to refinance promptly. At intake, the broker obtained title information through the Rocket title/closing ecosystem and reviewed the lien stack. Plaintiff expected to see the existing Kinecta HELOC and the $125,000 Pagel deed of trust, which were to be

19

addressed/combined through the new transaction. (Ex. A-1 (payoff requirements); Exs. C-1, C-2; D-1.)

15B-1. As underwriting proceeded, Plaintiff and her co-borrower were informed of the key underwriting maximums and were comfortable with them because the transaction was intended to be short-term and refinanced immediately. The underwriting conditions reflected a second-lien product with "MAX CLTV = 75%" and "MAX DTI = 50%," and recorded a represented "LTV / CLTV … 69.809%." (Ex. D-1.)

15B-2. Plaintiff understood any elevated debt-to-income ratio would be temporary only and would be cured by immediate refinance once the transaction closed as represented in verified second-lien position. Plaintiff's consent was therefore conditioned on the closing process safeguards working as designed: current title verification, strict escrow compliance, recording sequence, and insurance attachment. (Exs. A-1; D-1; D-2; Tables Section-Table A.)

15C. Plaintiff told the mortgage broker she had a family loan for which she had signed documents, and Plaintiff specifically asked whether any lien related to that family loan appeared on title because Plaintiff understood she would not be approved if it did. Plaintiff was assured that the title information being reviewed did not show any lien regarding a family loan. (Exs. C-1, C-2; D-2.)

20

15D. Unknown to Plaintiff (and unknowable to Plaintiff without a current title search controlled by Defendants), a family deed of trust had been dated December 6, 2024 and recorded in December 2024 (recording reflected as December 2024 (dated 12/06/2024; recorded 12/19/2024) in the file) and existed in the lien stack. The title insurer later characterized the intervening deed of trust as a family loan. (Ex. E-2.)

15D-1. Plaintiff did not know that the family deed of trust had been recorded. Plaintiff alleges she learned only after Oaktree finally disclosed that a recorded deed of trust existed. At that point, Plaintiff contacted a third party with access to title data who advised that the deed of trust appeared to have been recorded in December 2024. Plaintiff did not learn the specific recorded date until Plaintiff later obtained a title report "as of 11 July 15, 2025," which reflected the recorded deed of trust and recording information. (Exs. B-2; C-2.)

15E. Plaintiff then proceeded to signing/closing. At signing, Plaintiff executed the loan package and the borrower acknowledgment to the written closing/escrow instructions. Those instructions contained express conditions precedent, including: "OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING" and "THIS LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT DATE." (Ex. A-1; Ex. A-2.)

15F. What Plaintiff did not know-because it was not disclosed and because Defendants controlled the title pipeline-was that although underwriting proceeded in May 2025, the title summary/commitment materials being relied upon bore an "October 15, 2024" date (nine months stale) and/or were not timely updated with a bring-down through funding/recording. Plaintiff first saw that stale date on November 19, 2025 and recognized and flagged the discrepancy within seconds. (Exs. C-1; D-2; D-1.) Plaintiff alleges the stale-dated title materials were in Oaktree's possession as part of the commitment/title package used for the transaction, and that noticing the stale date would have compelled a current bring-down and prevented disbursement under the underwriting cap and the express second-lien-on-or-before-disbursement condition.

20D. ALTA Commitment currency and the required bring-down gate. The ALTA Commitment for Title Insurance (Commitment No. 74346744, dated May 8, 2025) was issued/countersigned by Rocket Close and Title, Inc. and contains express currency warnings: to close using the commitment and have a policy issued, the Commitment Revision Date must be within 14 days of closing, and after 180 days the commitment is void. Plaintiff alleges Defendants therefore were required to obtain and rely on a timely pull-down/bring-down immediately before funding/recording. A timely bring-down would have revealed the senior/intervening lien stack and prevented funding under both Oaktree's MAX

CLTV cap and the express condition precedent requiring recordation in verified second-lien position on or before disbursement. Plaintiff pleads in the alternative that (1) no timely bring-down/current title was obtained and relied upon before disbursement, or (2) a bring-down/current title was obtained, revealed the intervening lien(s) and third-position outcome, and Defendants proceeded anyway. (Exs. D-2; A-1; A-2; B-4; D-1; C-1; C-2; B-1; B-2.)

20F. ALTA Commitment issuance/currency details are incorporated in ¶20D (no separate allegation; retained for numbering continuity).

20E-1. The alternative pleading and "missing file" allegations are incorporated in ¶20E (no separate allegation; retained for numbering continuity).

20E. Plaintiff alleges this outcome could not occur if Defendants followed the basic, non-discretionary safeguard of current title verification immediately before funding/recording. Had Defendants obtained and relied on a current title report / bring-down within the required currency window, the senior/intervening lien stack would have been visible and the loan would not have been funded as a second-lien product. Accordingly, either (1) no timely current title / bring-down was obtained and relied upon prior to disbursement, or (2) a timely current title / bring-down was obtained, revealed the intervening lien(s) and third-position outcome, and Defendants proceeded anyway. Plaintiff further alleges she still has not received from Rocket the contemporaneous title/bring-down evidence, escrow officer notes,

or internal clearance records that would resolve which alternative occurred. (Exs. D-2; A-1; D-1; B-1; B-2; C-2; D-3                         down within the required currency window, the senior/intervening lien stack would have been visible and the loan would not have been funded as a second-lien product. Accordingly, either (1) no timely current title / bring-down was obtained, or (2) a current title / bring-down was obtained, revealed the intervening lien(s), and Defendants proceeded anyway. Plaintiff alleges either alternative constitutes unlawful conduct and breach of the written conditions precedent. (Exs. D-2; A-1; D-1; F; B-1; B-2.) contemporaneous title/bring-down evidence, escrow officer notes, or internal clearance records that would resolve which alternative occurred. Accordingly, Plaintiff pleads in the alternative that (1) no timely bring-down/current title was obtained and relied upon prior to disbursement, or (2) a bring-down/current title was obtained, revealed the intervening lien(s) and third-position outcome, and Defendants proceeded anyway. Plaintiff further alleges that, to the extent Rocket or escrow personnel obtained current title reflecting the defect, Oaktree either (a) did not receive that information due to process failure, or (b) received it and nonetheless permitted or directed funding contrary to its own written conditions precedent. Plaintiff further alleges that to the extent Rocket or escrow personnel obtained current title reflecting the defect, Oaktree either (a) did not receive that information due to process failure, or (b) received it and

24

nonetheless permitted or directed funding contrary to its own written conditions precedent.

15G. Process Failure Chain (Step-by-Step - Why the Documentary Record Is Dispositive) The record shows this was not a single isolated mistake. Multiple independent, mandatory checkpoints were required to prevent funding into an impaired lien stack, and the documentary evidence shows the critical checkpoints did not occur as required. The closing instructions required verified second-lien recordation on or before disbursement and lender final QC prior to funding. (Ex. A-1; Ex. D-1.) The record shows disbursement on 7/14/2025 and recording on 7/15/2025, which alone establishes the second-lien-on-or-before-disbursement condition was not met. (Exs. B-1; B-2.) The record further shows facially stale title materials (dated 10/15/2024) were used in the title/commitment package and transmitted as part of the closing pipeline, despite express currency warnings requiring timely updates close to closing. (Ex. C-1; Ex. D-2.) The required QC/authority-to-disburse and bring-down records remain unproduced. Accordingly, the only reasonable inferences are that the required gates were not performed, or were performed and ignored, and Defendants proceeded anyway. These documentary facts do

20G. Underwriting and Final QC were expressly required as a pre-funding gate. Oaktree's underwriting/QC conditions state, among other things, that the "Subject

lien is a 2nd mortgage," identify maximum CLTV constraints, and require Clear-to-Close/QC review and verification steps prior to funding (including verification tasks performed by Oaktree). (Ex. D-1.) These conditions are not "conventional" post-closing paperwork; they are the stated prerequisites to authorizing disbursement.

20H. By May 2025-well before the July 14, 2025 funding-Defendants were already operating under a title commitment dated May 8, 2025 (issued by Rocket Close and Title, Inc.) and the closing instructions expressly reference that preliminary title report/commitment date. (Exs. A-2; B-4.) At the same time, the title materials transmitted in the closing pipeline included a preliminary title report prepared on October 15, 2024-facially stale for a July 2025 closing-triggering express currency warnings and the need for a timely bring-down immediately before funding/recording. (Ex. C-1; Ex. D-2.) not depend on any borrower narrative: they are the gatekeeper facts that should have stopped funding, or required an immediate pause and cure once discovered. disclosure, the written conditions precedent required verified second-lien recordation on or before disbursement and lender final QC prior to funding, and the disbursement/recording chronology establishes those conditions were not satisfied before funds were irreversibly released. The transaction had multiple independent, mandatory checkpoints designed to prevent exactly this outcome. Each checkpoint was controlled by

Defendants' process, and each checkpoint failed. Even if Defendants attempt to attribute fault to Plaintiff, none of the borrower-attribution theories would change the dispositive outcome: a current title/bring-down and the written conditions precedent would have prevented funding or would have required an immediate cure before enforcement. (Exs. A-1; D-1; D-2; B-1; B-2; C-2.)

15H-1. Borrower-attribution defense immateriality is incorporated in ¶15H (no separate allegation; retained for numbering continuity).

15H. Immateriality of borrower-attribution defenses. Defendants may argue Plaintiff "should have disclosed" or "should have known." Plaintiff alleges she disclosed the family loan, asked specifically whether any related lien appeared on title because she understood she would not qualify if it did, and was told it did not. (Exs. C-1, C-2; D-2.) But even if Defendants dispute that exchange, it would not change the dispositive outcome: the controlling failures were Defendants' failure to use current title and a timely bring-down, failure to satisfy express conditions precedent before disbursement (including verified second-lien recordation on or before disbursement and lender final QC prior to funding), and failure to stop enforcement after knowledge. A timely bring-down would have revealed the senior lien stack and prevented funding under the underwriting cap and the second-position-before-disbursement condition; alternatively, if a bring-down/current title was obtained and Defendants proceeded anyway, the misconduct is worse. Either

27

way, borrower narrative cannot cure Defendants' process failures. (Exs. D-2; D-1; A-1; B-1; B-2; C-2; E-1; T-1; T-2; T-3.) outcome: the controlling failures were Defendants' failure to use current title, failure to obtain a timely bring-down, failure to satisfy express conditions precedent before disbursement, and failure to stop enforcement after knowledge. Those failures are independent of borrower intent and would have defeated eligibility and/or barred funding regardless. (Exs. D-1; D-2; A-1; B-1; B-2; C-2.) Plaintiff "should have disclosed" or "should have known" the recorded deed of trust. title, and was told it did not, and further alleges she did not know the deed of trust was recorded until Oaktree finally disclosed it. But even if Defendants dispute those facts, it would not change the dispositive outcome because the closing process required Defendants to run current title and a timely bring-down and to satisfy express conditions precedent before disbursement. A timely bring-down would have revealed the senior lien stack and prevented funding under the underwriting cap and the second-position-before-disbursement condition; alternatively, if the bring-down was run and Defendants proceeded anyway, the misconduct is worse. Either way, borrower narrative cannot cure Defendants' process failures. (Exs. D-2; D-1; A-1; C-2; B-1; B-2.)

16. Oaktree's written closing instructions imposed conditions precedent to funding/disbursement and required second-lien recordation on or before the

28

disbursement date, as well as lender final QC prior to funding. (Exs. A-1, A-2; D-1.)

16A. The written closing instructions include multiple non-discretionary safeguards. For example, the instructions expressly state: "CONDITIONS TO BE SATISFIED PRIOR TO DISBURSEMENT OF LOAN PROCEEDS: OAKTREE TO PERFORM FINAL QC REVIEW PRIOR TO FUNDING." (Ex. A-1.)

16B. The title/recording conditions are equally explicit. The instructions state: "THIS LOAN MUST RECORD IN 2ND LIEN POSITION ON OR PRIOR TO THE DISBURSEMENT DATE NOTED ABOVE." (Ex. A-1.)

16C. The instructions further require delivery of "DUPLICATE ORIGINALS OF THE ALTA TITLE POLICY," specify required endorsements, and require that the "ALTA Title Policy must be free from liens, encumbrances, easements, encroachments and other title matters" except limited items and taxes paid current. (Ex. A-1.)

16D. Oaktree's underwriting conditions confirm the transaction was approved only as a second-lien product with strict feasibility limits. Oaktree's approval conditions state: "MAX CLTV = 75%" and "Subject lien is a 2nd mortgage." (Ex. D-1.)

29

16E. The underwriting file also records the represented leverage at approval: "LTV / CLTV / HCLTV 25.144% / 69.809% / …" with a collateral home value of $2,850,000.00. (Ex. D-1.)

16F. Using the $2,850,000.00 collateral value reflected in underwriting, the minimum known lien stack at/after recording included approximately $1,300,000 (first lien) + $393,000 (Resnick) + $716,580 (Oaktree) = $2,409,580, yielding an implied CLTV of 84.55%-above Oaktree's "MAX CLTV = 75%" cap and above the represented 69.809% CLTV. If the $125,000 Pagel deed of trust remained unreconveyed as of 7/15/2025, the implied CLTV is higher still (88.93%). (Exs. D-1; C-2; F; J.)

16F-1. The July 15, 2025 title evidence shows that a deed of trust in the amount of $125,000 recorded December 7, 2022 (Pagel) remained of record, meaning the payoff/reconveyance documentation and recording confirmation were not completed or not recorded when represented as paid off. This is further 'absence evidence' of escrow/title process failure and explains why the lien stack available on 7/15 still contained the $125,000 lien. (Exs. C-2, D-1; D-3

16G. Plaintiff and her co-borrower, Jacob Little, had no knowledge that the intervening lien existed in the recorded lien stack at the time they were asked to sign. Defendants' documents and process positioned the loan as a second-lien

refinance based on current title and a ~69.8% CLTV, and the closing instructions/underwriting conditions were not optional. The borrower was the only party without access to the actual, current recorded lien stack. (Exs. A-1; D-1; C-2; Tables Section-Table A.)

16H. Plaintiff and her co-borrower did not have access to the actual lien stack and could not independently verify lien priority or bring-down status. They relied on Defendants' regulated closing process and expressly assumed that loan proceeds would not be disbursed unless the written conditions precedent were satisfied- including verified second-lien position on or before disbursement and lender final QC prior to funding. (Ex. A-1; Ex. D-1; Tables Section-Table A.)

16H-1. Anticipated defense 'borrower should have known' is contradicted by the documentary record. The title commitment itself warns that it is void/ineffective for closing unless the revision date is within 14 days of closing and that after 180 days it is void-confirming that currency is controlled by the title/escrow pipeline, not the borrower. (Ex. D-2; Ex. C-1.)

16I. Plaintiff and her co-borrower did not receive current title evidence before funding; Oaktree's own chronology identifies that the borrower's first receipt of a preliminary title item occurred months later (November 19, 2025), after disbursement/recording. (Exs. H-1; T-1.)

31

16J. Anticipated defense 'borrower failed to disclose' is also contradicted by Defendants' admissions and by withheld file evidence. Defendants characterize the intervening deed of trust as a family loan and threatened Plaintiff with criminal referral over a "0% family loan" listed as borrowers customarily list family loans- while still refusing to produce the complete origination/underwriting/escrow file that would resolve the question. (Exs. E-2; C-8; D-3; H-2; H-3; U (Court/Procedural); T-2; Tables Section-Table A; D-3

16K. The recorded Resnick deed of trust was a matter of public record within Defendants' constructive notice, and Defendants-as the title/escrow professionals and lender controlling the title/escrow pipeline-had an independent duty to verify current title and lien position through a timely bring-down before funding/recording. Plaintiff disclosed the existence of a family loan, repeatedly focused on whether it would "appear on title," and was affirmatively told the title report was clear and consistent with a second-lien transaction. (Exs. U-1; C-1; C-2; C-7; D-1.) Defendants' later claim-handling correspondence acknowledges the Resnick deed of trust was omitted from Schedule B and that the lien purports to be senior, confirming the defect was discoverable from the public record and title process. (Exs. E-1; E-2; C-8.)

32

17. Underwriting materials reflect the second-lien premise and maximum CLTV/DTI constraints for a second mortgage, and specifically describe the subject lien as a "2nd mortgage." (Ex. D-1.)

18. The recorded public record and Defendants' own disbursement/recording proof show disbursement occurred July 14, 2025 and recording occurred July 15, 2025, violating the "record in 2nd position on or prior to disbursement" condition. (Exs. B-1; B-2; A-1.)

19. A recorded intervening deed of trust (the "Resnick" lien) existed in the recorded lien stack before Oaktree's deed of trust recorded, defeating the transaction feasibility and CLTV eligibility premise if current title had been run and accounted for. (Exs. C-2; C-7.)

20. Title materials show the use of stale title information and the absence of a timely bring-down through the July 2025 disbursement/recording window, including currency warnings and an extended gap between title work and funding. (Exs. C-1; D-2; C-6.)

20A. Current title should have been run at the outset of underwriting in May 2025 (Commitment/Prelim dated May 8, 2025) and then timely updated through closing with a bring-down within the commitment's currency window. Instead, Defendants relied on or transmitted title materials bearing an "October 15, 2024" date and/or failed to obtain a timely bring-down through funding/recording. (Ex. C-1; Ex. D-2;

33

Ex. A-1.) Plaintiff alleges the October 15, 2024 date was obvious on the face of the

transmitted materials; Oaktree had the same materials in its file, and a basic QC

review would have flagged the currency failure before funding.

20C. Reasonable inference regarding the missing bring-down. Plaintiff alleges that

a timely pull-down/bring-down search was required immediately prior to funding

and/or immediately prior to recording to confirm the then-current lien stack and the

required second-lien outcome. It is a reasonable inference that no timely bring-

down was run before disbursement, because a bring-down would have shown the

senior/intervening lien stack and would have prevented funding under both the

underwriting feasibility cap and the express second-position-before-disbursement

condition. In the alternative, if a bring-down was run after disbursement and

revealed the defect, proceeding anyway was an intentional disregard of conditions

precedent. Either scenario is fatal. (Exs. D-2; A-1; D-1; F; B-1; B-2.)

21A. Defendants did not disclose any lien-priority defect at closing, at funding, or

at the time payments began. Plaintiff learned only because the loan was intended to

be Plaintiff learned of the lien-priority defect when she attempted to refinance in

early September 2025 and was informed she could not proceed due to the recorded

lien stack/position, which is shown in the title and lien visibility exhibits. (Exs. C-

2; C-7.) During that refinance process, Plaintiff was informed there was a defect

34

preventing refinance but was not told the nature of the defect, and refinancing could not proceed. (Exs. T-1, T-2; Tables Section-Table A.)

21E. Plaintiff did not learn that the preliminary/title materials bore an "October 15, 2024" effective date until November 19, 2025, when Plaintiff first saw the document and immediately recognized and flagged the discrepancy. Plaintiff alleges Defendants controlled the title/escrow pipeline and had access to the date-stamped materials but failed to disclose the mismatch at or before closing and funding. (Exs. C-1; D-2; D-1.)

21E-1. Plaintiff alleges Defendants had access to the public record and closing file at all times, while Plaintiff and her co-borrower did not. Plaintiff did not learn the recorded date details until she obtained the July 15 title report months later; Defendants' failure to provide prompt notice and the complete file forced Plaintiff to reconstruct the record herself. (Exs. F; J; D-3; D-3

21D. The title insurer's denial letter is dated October 24, 2025 and was addressed to Oaktree (Robert Teague), not to Plaintiff, confirming Defendants' early knowledge posture. (Ex. E-2.) Plaintiff did not receive that denial materials package at the time it was issued; Plaintiff alleges she first obtained the denial materials on or about December 10, 2025 and invoked CPL coverage the same day. (Ex. E-2; Exs. H-2, H-3.)

21B. Plaintiff was told by her mortgage broker that there was "a problem with title," but the broker did not know what it was and did not provide current title details. Plaintiff had emphasized throughout underwriting that if the family loan appeared as a recorded lien she would not qualify and would not proceed, and relied on the broker's recitation that the title report was clear and consistent with the loan being in second position. (Ex. U-1.) Plaintiff and the broker did not know what it was and did not provide current title details. Plaintiff and her co-borrower did not yet know the nature of the defect, including the reliance on stale title and/or the absence of a timely updated bring-down through funding/recording, and reasonably relied on Defendants' controlled title/escrow process. (Exs. C-1, C-2; A-1; D-1.)

21C. The exhibit record reflects that Rocket and Oaktree had knowledge of the defect no later than September 9-10, 2025, including Oaktree's Notice of Claim to Rocket Title dated September 10, 2025. (Ex. E-1.)

21. The lender's title policy form language ties effectiveness to recording of the insured mortgage. Because recording occurred after disbursement, the loan was funded before coverage could attach under the policy's own clause. (Exs. C-4; C-5; B-6.) Final Title Policy (as provided)

22. Oaktree tendered a title claim asserting impairment of the loan position and unsaleability absent cure, demonstrating actual notice of the defect. (Ex. E-1.)

36

23. Rocket Title's denial admitted the intervening lien was not excepted on Schedule B and "appears to fall within" the lack-of-priority coverage, yet denied present relief on a "no loss" posture and instructed re-tender only upon foreclosure-related events. (Exs. E-2; C-8.)

**IV.B. Post-Notice Admissions, Lender's Policy Context, Withheld Escrow and CPL Records, and Continued Enforcement**

24. Plaintiff does not allege that she is the insured under the lender's title insurance policy or that she is entitled to payment of policy proceeds. The title policy insured Oaktree Funding Corporation's lien position. References to the policy and denial are pled solely to establish Defendants' knowledge, their post-notice conduct, and the reasonableness of Plaintiff's requests for pause and cure. (Ex. E-2; Final Policy; Exs. T-1/T-2.)

24A. Plaintiff has repeatedly requested the complete escrow/closing file and the complete claim-related record, including all title-claim communications, appeals, reconsideration requests, arbitration materials, and determinations, and all Closing Protection Letter ("CPL") issuance and claim materials. Defendants have not produced these items. Plaintiff further alleges that the production labeled "Complete Loan File" is not complete and omits core categories such as (i) authority-to-disburse documentation, (ii) pre-funding QC sign-off tied to verified lien position, (iii) bring-down/current title evidence through funding/recording, and

(iv) claim/CPL appeal or determination records. Plaintiff pleads these omissions as absence evidence supporting the reasonable inference that required safeguards were not performed or, if performed, revealed the defect and were ignored. Oaktree's own production includes a stale-dated title item (Production Date: October 15, 2024) while omitting the gatekeeper proof that would show compliance (final QC sign-off, authority-to-disburse, and bring-down/current title evidence).

25. Plaintiff pleads concrete, present damages and irreparable harm already incurred that are independent of any future foreclosure event, including loss of refinance opportunity, ongoing enforcement leverage, credit impairment risk, and health-related impacts from payment triage and withheld-file pressure.

26. The October 24, 2025 denial letter itself quotes the policy's lack-of-priority insuring provision and states that the intervening deed of trust appears to fall within that coverage grant. (Ex. E-2.)

27. After admitting that escrow errors had occurred and after Oaktree Funding Corporation tendered a title claim based on lien-priority impairment, Defendants advised Plaintiff that protection would not apply unless and until foreclosure or similar enforcement events occurred. Defendants did not identify any policy provision requiring foreclosure as a prerequisite to protection for lien-priority defects. (Ex. E-2.)

38

27A. Based on Defendants' statements, their refusal to grant any pause, and their continued enforcement posture, it appears Defendants accepted a "no loss until foreclosure" position despite acknowledging an existing lien-priority impairment. Plaintiff is informed and believes that lien-priority protection under the applicable policy is not conditioned on foreclosure, sale, or liquidation events, and that no such prerequisite appears in the policy language governing lack-of-priority coverage. (Ex. E-2; Final Policy.)

27B. Plaintiff repeatedly requested copies of all title-claim appeals, coverage challenges, arbitration filings, determinations, and correspondence, as well as all Closing Protection Letter ("CPL") claims, coverage letters, denials, appeals, and related communications. Defendants produced none. (Tables Section-Table A; Exs. H-2; H-3; H-3A; D-3

27C. Civil discovery production demand. Plaintiff has served Requests for Production of Documents under Code of Civil Procedure § 2031 et seq. Rocket Close is required to serve code-compliant written responses stating whether it will comply, lacks ability to comply, or objects (CCP § 2031.210), and to produce responsive documents in a usable form (CCP § 2031.280). Any refusal to produce, evasive response, or improper withholding constitutes a misuse of discovery (CCP § 2023.010) and will be addressed by motion to compel and sanctions. (Tables Section-Table A; D-3

27D. Scope of custodians/systems (Amrock/Rocket Close). For avoidance of doubt, Plaintiff's discovery requests and production demands include documents held by Rocket Close's custodians and systems operating under any "Amrock"/amrock.com mailboxes or branded departments used on this transaction (e.g., title clearance/funding), and Rocket Close and Title, Inc. where referenced in closing/title documents; Defendants may not avoid production by re-labeling custodians or systems. (Exs. N-1/N-2; Tables Section- Table A.)

27E. On information and belief, and based on Defendants' failure to produce any such documents despite repeated written requests, it appears that no appeal of the title-claim denial was pursued, no CPL claim was tendered prior to Plaintiff's express CPL invocation, and no CPL coverage determination was issued before enforcement continued. (Ex. E-3; Exs. H-2/H-3; Tables Section-Table A.)

27F. Defendants also failed to produce the complete escrow file, including but not limited to: current title and bring-down evidence, lien-priority verification, final quality-control approval, authority-to-disburse documentation, recording sequencing records, reconveyance confirmations, escrow officer notes, and CPL issuance or processing records. These materials are mandatory for a lawfully closed, insured second-lien transaction and are uniquely within Defendants' possession, custody, or control. (Ex. A-1; Ex. D-1; Ex. D-2; Ex. D-3; D-3

40

27G. Notwithstanding admitted escrow error, acknowledged lien-priority impairment, unresolved coverage obligations, and Plaintiff's repeated written requests for a temporary pause, Defendants continued billing, collection pressure, enforcement threats, and refusal to pause, while withholding the escrow file and all documentation reflecting coverage review, appeal, or CPL processing. (Exs. T-1, T-2, T-3; D-3; H-2; H-3.)

27H. The absence of these records supports the reasonable inference that required escrow, title, quality-control, and CPL safeguards were either not performed or were performed, revealed the defect, and Defendants proceeded anyway. Either alternative constitutes negligent, reckless, and/or intentional post-notice misconduct under California law. (Exs. D-2; A-1; D-1; F; T-1; T-2.)

27I. At all relevant times after Defendants acquired actual knowledge of the defect, Oaktree Funding Corporation knew that Plaintiff is disabled, knew that continued enforcement posed an immediate and irreparable risk of Plaintiff losing her home, and knew that coverage and cure obligations had not been resolved. Despite this knowledge, Oaktree refused any pause, continued enforcement pressure, advised Plaintiff that foreclosure would be required before protection could apply, and escalated enforcement with threats of criminal referral, conduct undertaken with reckless disregard of the probability of causing severe emotional distress. (Ex. E-4; Exs. T-1, T-2, T-3.)

41

27J. Plaintiff does not seek to adjudicate insurance coverage or compel payment under the title policy; the existence of the policy and denial are alleged solely to demonstrate Defendants' knowledge, unreasonable reliance, and continued enforcement despite unresolved defects.

27K. Mitigation ladder and avoidable escalation. Plaintiff presented multiple cure and settlement options designed to make Oaktree whole and stop harm early, including a documented offer ladder beginning with $0 to Plaintiff and full payment of Oaktree's principal balance ($716,580), followed by higher combinations (e.g., $63,000 + 1 $716,580; $98,000 + $716,580; $412,000 + $716,580) and other structures to unwind or cure the transaction. These proposals were made while Plaintiff's damages were comparatively limited (under approximately $100,000) and before enforcement pressure compounded harm. Defendants refused or ignored these mitigation attempts and continued enforcement posture instead. (Tables Section-Table C; Exs. T-1, T-2, T-3.)

27L. Enterprise escalation and delegated inaction. Plaintiff escalated the defect and enforcement harm to Rocket Companies' executive level. Rocket Companies responded by delegating the matter to Rocket Close's operations leadership (Vice President/operations role) as the point of contact. Plaintiff continued copying Rocket Companies on correspondence and repeatedly requested a pause and cure, yet no effective action was taken and the refusal-to-mitigate posture continued.

42

(Exs. N-1/N-2 (enterprise escalation communications); Tables Section-Tables A-C; Exs. T-1/T-2). Plaintiff requested enterprise-level coordination because Rocket's title, escrow, and insurance participants were pointing responsibility to one another; Rocket Companies' CEO-level escalation resulted in delegation to Rocket Close operations leadership, but the record reflects continued non-coordination and withholding after that handoff.

27M. Where allegations are made on information and belief, such allegations are based on Defendants' statements, conduct, admissions, and failure to produce documents uniquely within their possession, custody, or control, despite repeated written requests. (Tables Section-Table A; D-3

27N. Damages and Irreparable Harm (Concrete Consequences of Defendants' Conduct):

27O. Plaintiff is disabled and depends on consistent, paid in-home assistance. Defendants' continued enforcement posture and resulting financial disruption caused Plaintiff to lose or reduce essential aide services, creating immediate safety and health consequences. (Exs. F-3, F-4; Exhibit Binder v18-VOL2 (CONFIDENTIAL PHI).)

27P. Plaintiff was forced to triage payments and could not fund pre-planned, once-in-a-lifetime events and family commitments that had been scheduled and paid in reliance on a promptly refinanced short-term bridge/HELOC structure. Plaintiff

missed those events because funds were diverted to avoid compounding default/collection pressure from Defendants. (Exs. T-1/T-2; Tables Section-Tables A-C). Plaintiff alleges this period also caused her to miss significant family events and caregiving opportunities, including time with her newborn grandchild and the ability to assist elderly and ill family members, as described in her declarations.

27Q. Plaintiff was unable to host her annual holiday gathering, a longstanding family tradition, due to the forced payment triage, loss of liquidity, and ongoing enforcement pressure. (Exs. T-1, T-2, T-3.)

27R. Defendants' refusal to pause and their continued billing/collection posture after notice created an ongoing and irreparable risk of adverse credit reporting and credit impairment to both Plaintiff and her co-borrower, which in turn impaired refinancing ability and increased borrowing costs. (Exs. T-1; T-2; T-3.)

27S. These harms are separate from (and in addition to) title-policy proceeds: they arise from Defendants' closing-process failures and post-notice enforcement decisions, including withholding the escrow file, QC records, bring-down evidence, and CPL records needed to resolve the defect. (Exs. IV.B; D-3

27T. Plaintiff has spent at least 1,598 hours of unpaid time investigating, documenting, communicating, and preparing filings and evidence to address Defendants' process failures and ongoing enforcement posture-time that Plaintiff

alleges constitutes substantial lost professional and personal capacity directly caused by Defendants' conduct. (Tables Section-Tables A-C; Exs. F-3, F-4.)

27U. Plaintiff's treating providers have advised that, due to the medically documented stress and functional decline caused by this prolonged enforcement pressure and financial disruption, Plaintiff may require eight months or more to return to prior baseline physical functioning. (Exs. F-4; Exhibit Binder v18-VOL2 (CONFIDENTIAL PHI).)

27V. Plaintiff was forced to curtail or stop regular therapies and medically recommended treatment because the loan's cost and Defendants' refusal to pause enforcement depleted available funds. Plaintiff alleges this interruption itself worsened health outcomes and increased recovery time. (Exs. F-4; Exhibit Binder v18-VOL2 (CONFIDENTIAL PHI).)

**V. CAUSES OF ACTION FIRST CAUSE OF ACTION - BREACH OF CONTRACT (CONDITIONS PRECEDENT / CLOSING INSTRUCTIONS)**

(Against Rocket Close and Oaktree)

Key authority (contract/escrow conditions precedent): Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

28. Plaintiff realleges and incorporates paragraphs 1 through 27.

45

29. Oaktree's written closing instructions and conditions precedent governed disbursement, lien position, recording, and the intended second-lien transaction, and were incorporated into the closing and funding process. (Ex. A-1; Ex. D-1.) These written closing/escrow instructions-including the non-discretionary conditions precedent to funding and disbursement-were part of the escrow transaction documents presented at signing. Plaintiff and her co-borrower were required to sign an acknowledgment of those instructions and Plaintiff relied on them as governing the escrow holder's authority to disburse. Under California law, an escrow holder must comply strictly with the parties' written escrow instructions and may not disburse contrary to conditions precedent. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528, 531-532.) Plaintiff alleges she was at minimum an intended beneficiary of these instructions and the protections they imposed, because the conditions were expressly designed to prevent disbursement unless the required lien position and lender QC conditions were satisfied.

30. Material conditions precedent included, at minimum: (i) Oaktree final QC prior to funding; and (ii) recordation in second lien position on or prior to the disbursement date. (Ex. A-1; Ex. D-1.)

31. Defendants breached by disbursing on July 14, 2025 without satisfying the express second-position-before-disbursement condition and without producing any

contemporaneous evidence that final QC verified lien position prior to funding.

(Exs. A-1; B-1; B-2; D-3

31A. Plaintiff further alleges that the written instructions assigned final QC to Oaktree prior to funding; yet no contemporaneous QC sign-off tied to verified lien position has been produced. On information and belief, Oaktree did not complete the promised final QC verifying lien position before authorizing funding, or such documentation exists and has been withheld. (Exs. A-1; D-1; D-3

32. Defendants further breached by proceeding on a second-lien underwriting premise that depended on accurate, current title; the intervening recorded lien defeated feasibility and pushed the implied CLTV above Oaktree's maximum. (Exs. D-1; C-2; C-7.)

33. Plaintiff was damaged as a direct and proximate result, including loss of refinancing opportunity, compounding interest, and credit/collection pressure after notice. (Exs. T-1; T-2; Tables Section-Tables A-C.)

**SECOND CAUSE OF ACTION - BREACH OF ESCROW INSTRUCTIONS**

**(STRICT COMPLIANCE)**

(Against Rocket Close only)

Key authority (escrow holder strict compliance): Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Lee v. Title Ins. & Trust Co. (1968) 264 Cal.App.2d

160; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

34. Plaintiff realleges and incorporates paragraphs 1 through 27. This breach-of-instructions claim alleges deviation from the written conditions precedent that defined escrow's authority to disburse. It is distinct from (and complements) Plaintiff's fiduciary-duty claim, which targets escrow's misuse of entrusted funds-authorizing and releasing loan proceeds while knowing, or being obligated to confirm, that conditions precedent had not been satisfied. (Ex. A-1; Exs. B-1/B-2.) These instruction failures were material conditions precedent to authorized disbursement and caused present prejudice, including funding into an impaired lien stack, loss of immediate refinance opportunity, and post-notice enforcement leverage that compounded damages. (Exs. A-1; B-1/B-2; D-1; F; T-1/T-2.)

35. Rocket Close, as escrow holder/settlement agent, owed a duty of strict compliance with the written escrow/closing instructions and lacked authority to disburse contrary to conditions precedent. (Ex. A-1.)

35A. Plaintiff alleges she was at minimum an intended beneficiary of the written closing/escrow instructions and the protections they imposed, because those conditions were expressly designed to prevent disbursement unless the required lien position and lender QC conditions were satisfied. Under California law, an escrow holder must comply strictly with the parties' written escrow instructions

48

and may not disburse contrary to conditions precedent. (Amen v. Merced County Title Co. (1962) 58 Cal.2d 528, 531-532.)

36. The escrow/closing instructions imposed at least five non-discretionary safeguards: (1) Oaktree final QC review prior to funding; (2) second-lien recordation on or prior to disbursement; (3) accurate final Closing Disclosure reflecting specified payoffs; (4) delivery of duplicate originals of the ALTA title policy with specified endorsements; and (5) ALTA policy free from liens/encumbrances except limited enumerated matters and taxes paid current. (Ex. A-1.)

37. Rocket Close breached by disbursing funds when the deed of trust had not been recorded into the required lien position on or before the disbursement date. (Exs. A-1; B-1; B-2; C-2.)

37A. Rocket Close's breach was not a mere administrative timing issue. At the moment of disbursement, Rocket Close knew recording had not yet occurred (recording occurred the following day) and therefore knew the required second-lien recordation condition had not been met on or before disbursement. Rocket Close nonetheless released funds, exceeding escrow's limited authority and defeating the very safeguard the instructions imposed. (Exs. A-1; B-1; B-2.)

49

38. Rocket Close's breach caused foreseeable harm, including the creation of an improperly secured loan, subsequent enforcement pressure, and economic loss. (Exs. T-2; Tables Section-Table B; Tables Section-Table C.)

**THIRD CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY**

**(ESCROW HOLDER)**

(Against Rocket Close only)

Key authority (escrow fiduciary duties): Lee v. Title Ins. & Trust Co. (1968) 264 Cal.App.2d 160; Amen v. Merced County Title Co. (1962) 58 Cal.2d 528; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

39. Plaintiff realleges and incorporates paragraphs 1 through 27.

40. As escrow holder, Rocket Close owed fiduciary duties of fidelity, neutrality, and strict adherence to escrow instructions regarding handling of funds and documents.

41. Rocket Close breached those duties by acting outside written authority, funding/disbursing without satisfaction of conditions precedent, and enabling an unlawful disbursement/recording sequence that defeated the promised lien position. (Exs. A-1; B-1; B-2; C-2.)

41A. Rocket Close's fiduciary breach includes knowingly disbursing while the deed of

50

41B. Disbursing funds before recordation and before the policy could attach constituted an extreme departure from the minimum closing safeguards and from Rocket Close's fiduciary obligation to strictly comply with the written escrow/closing instructions. Disbursement functioned as an affirmative representation by conduct that all express conditions precedent to authorized funding had been satisfied, yet the funds were released into an unsecured and uninsured window that cannot be undone. This conduct constitutes gross negligence-i.e., a want of even scant care / extreme departure from ordinary standards-given the centrality of lien-priority and title-insurance attachment to a secured closing. (Exs. A-1; B-1; B-2; C-4; C-5; B-6.) trust remained unrecorded and while the promised second-lien position had not been secured. Because the policy's effectiveness is tied to recording, Rocket Close further knew or should have known that releasing funds before recording created an uninsured funding window under the policy language. (Exs. C-4; C-5; B-6; B-1; B-2; A-1.)

42. Plaintiff suffered damages according to proof. (Exs. T-2; Tables Section-Table B; Tables Section-Table C.)

**FOURTH CAUSE OF ACTION - NEGLIGENCE / PROFESSIONAL NEGLIGENCE (INCLUDING GROSS NEGLIGENCE)**

(Against Rocket Close and Oaktree)

51

Key authority (negligence duty / economic loss factors): Biakanja v. Irving (1958) 49 Cal.2d 647; J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799; Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co. (2002) 27 Cal.4th 705.

50. Plaintiff realleges and incorporates paragraphs 1 through 27.

51. Defendants owed duties of reasonable care in the closing process safeguards pleaded herein, including underwriting feasibility review as conditioned, current title verification/bring-down, lien-priority confirmation, and compliance with the funding/recording sequence required by the written conditions precedent. (Exs. D-1; D-2; A-1.) With respect to Oaktree, Plaintiff does not allege only a conventional lender role; Plaintiff alleges Oaktree expressly undertook and required specific pre-funding safeguards-including "FINAL QC REVIEW PRIOR TO FUNDING" and verified second-lien recordation on or before disbursement-as conditions to authorized disbursement. (Exs. A-1; D-1.) Having undertaken those safeguards as part of the transaction's conditions precedent, Oaktree owed a duty to exercise reasonable care in performing them and not to authorize disbursement unless the required QC and lien-position conditions were satisfied. Oaktree's duty is further supported by the fact that Oaktree possessed the stale-dated title materials in its file and tracked title/CPL currency as underwriting conditions, making detection of a facially stale title package and verification of lien position central to the pre-funding QC gate Oaktree undertook.

52. Defendants breached by relying on stale title, failing to obtain a timely bring-down

52A. The foregoing failures-funding before recordation and before title-insurance attachment, reliance on a facially stale title package, and the absence of any timely bring-down/QC sign-off tied to verified lien position-constitute gross negligence (an extreme departure from the ordinary standard of conduct / want of even scant care) in the context of a California secured real-estate closing. (Exs. B-6; B-1; B-2; C-1; C-4; C-5; D-1; D-2.) through the disbursement/recording window, failing to verify second-lien position before disbursement, and funding before recording contrary to mandatory conditions. (Exs. C-1; D-2; B-1; B-2; C-2.) As to Oaktree specifically, Plaintiff alleges Oaktree breached its undertaken pre-funding QC safeguard by permitting or authorizing funding and disbursement without performing the promised final QC tied to verified lien position and without ensuring the express second-lien-on-or-before-disbursement condition had been satisfied. As a further breach, Oaktree possessed the title materials bearing the facially stale October 15, 2024 date and failed to notice or act on that obvious discrepancy before authorizing funding; had the date been flagged, a current bring-down would have been required and the transaction would not have funded into an impaired lien position. As a further breach, Oaktree had the stale-dated title package in its possession and nevertheless authorized funding without verifying

53

current title/bring-down through the disbursement/recording window and without producing any contemporaneous final QC sign-off tied to verified lien position.

53. Plaintiff suffered damages according to proof. (Tables Section-Table B; Tables Section-Table C; Ex. T-2.)

**FIFTH CAUSE OF ACTION - FRAUDULENT INDUCEMENT BY CONCEALMENT (ESCROW) / POST-NOTICE CONCEALMENT (AND, IN THE ALTERNATIVE, NEGLIGENT MISREPRESENTATION) CONCEALMENT (ESCROW) / POST-NOTICE CONCEALMENT**

(Against Rocket Close, LLC (pre-closing and at disbursement) and Rocket Companies, Inc. (post-notice concealment and inducement of continued performance))

Key authority (concealment / duty to disclose / inducement): LiMandri v. Judkins (1997) 52 Cal.App.4th 326; Lazar v. Superior Court (1996) 12 Cal.4th 631; Robinson Helicopter Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979.

62. Plaintiff realleges and incorporates paragraphs 1 through 27.

63. Plaintiff's consent to execute the loan documents, to permit disbursement of loan proceeds, and to accept the transaction at all was expressly and unambiguously conditioned on Defendants' satisfaction of the written conditions precedent set forth in the closing and escrow instructions, including but not limited to: (a) verified recordation in second-lien position on or before disbursement; (b)

54

lender final quality-control approval prior to funding; and (c) reliance on current title/bring-down through funding and recording.

64. Plaintiff would never have accepted, signed for, or permitted funding of a third-lien loan under any circumstances, because the transaction was approved, priced, and accepted solely as a temporary second-lien bridge transaction intended to be refinanced immediately. A third-lien position would have made immediate refinancing infeasible and would have defeated the essential purpose of the transaction.

65. Defendants concealed and failed to disclose material facts within their exclusive possession, custody, and control, including: (a) absence of a timely current title bring-down through funding/recording; (b) failure to satisfy the written requirement that the loan record in second-lien position on or before disbursement; (c) failure to complete lender final QC tied to verified lien position prior to funding; and (d) disbursement before recording and before the promised insured lien-priority status could attach under the policy's effectiveness clause. (Exs. A-1; A-2; B-1; B-2; C-2; D-2; C-4.)

65A. Defendants further concealed and continue to withhold the complete claim and coverage handling record (including any appeals, arbitration submissions, coverage determinations, and CPL issuance/claim processing materials), while maintaining enforcement posture and refusing a pause. Plaintiff alleges this

55

withholding was material to her ability to pursue timely cure, loss-mitigation relief, and protection from avoidable harm.

65B. In addition to concealment by omission and conduct, Defendants and/or their agents made affirmative representations that the transaction was properly cleared, feasible, and consistent with a second-lien loan, including by reciting/communicating that the title report was clear and by delivering closing documents reflecting a "2nd mortgage" premise. (Exs. U-1; D-1; B-3.) These representations were made without reasonable grounds because Defendants relied on stale title materials and failed to obtain a timely bring-down/current title verification through the funding/recording window. (Exs. C-1; D-2; C-6; B-1; B-2.) In the alternative, if Defendants lacked intent to defraud, the same facts constitute negligent misrepresentation: false statements made without reasonable grounds, inducing Plaintiff to sign and allow disbursement.

66. These facts were material because they went to the existence and feasibility of the only transaction Plaintiff agreed to enter-namely, a verified and insurable second-lien transaction permitting immediate refinancing. Plaintiff and her co-borrower had no access to the true, current recorded lien stack and could not reasonably discover these facts, which were controlled by Defendants' title, escrow, and funding pipeline.

67. Defendants' disbursement of loan proceeds constituted an affirmative representation by conduct that the express conditions precedent had been satisfied. Because the written instructions prohibited disbursement absent compliance-particularly verified second-lien position-Defendants' act of funding necessarily communicated compliance.

68. Plaintiff reasonably and justifiably relied on Defendants' concealment and on the affirmative compliance representation inherent in disbursement. Had Defendants disclosed that the conditions precedent were not satisfied, or that the loan would record in third position, Plaintiff would have rescinded, halted, or refused to permit completion of the transaction and would not have allowed funding to proceed.

69. After Defendants had notice of the lien-priority defect and failed conditions precedent, Rocket Close and Rocket Companies continued enforcement pressure while withholding the escrow file, QC sign-off, bring-down evidence, and CPL materials, thereby continuing to conceal material facts and inducing Plaintiff's continued performance. Plaintiff alleges malice, oppression, and/or fraud within the meaning of Civil Code § 3294, supporting punitive damages to the extent permitted by law. (Exs. T-1; T-2; H-2; H-3.)

**FIFTH-A CAUSE OF ACTION - RESCISSION (Civ. Code §§ 1689 et seq.)**

(Against Oaktree Funding Corp., Rocket Close, LLC, and DOES 1-50)

Key authority (rescission): Civ. Code §§ 1689, 1691; Runyan v. Pacific Air Industries, Inc. (1970) 2 Cal.3d 304.

69A. Plaintiff realleges and incorporates paragraphs 1 through 27 and paragraphs 62 through 69.

69B. Plaintiff is entitled to rescind the loan and related closing instruments because Plaintiff's consent was induced by Defendants' concealment and because Defendants failed to satisfy the express, non-discretionary conditions precedent to funding and recordation in verified second-lien position on or before disbursement, resulting in an impaired lien stack and failure of the essential purpose of the transaction. (Exs. A-1, A-2; B-1, B-2; D-1; T-2.)

69C. Plaintiff elects rescission and has provided notice and demand for cure/pause, including repeated written requests for the complete escrow file, current title/bring-down evidence, final QC sign-off, and CPL/claim-handling materials. Defendants have refused and/or failed to provide these core records while continuing enforcement pressure. (Exs. T-1; T-2; H-2; H-3.)

69D. To the extent any tender or restoration is required, Plaintiff offers to do equity as the Court deems just, including restoration net of borrower-paid charges, payments, and damages proximately caused by Defendants' wrongdoing. Plaintiff seeks a decree rescinding the loan and related instruments, ordering appropriate restitution/offsets, and restoring the parties to the status quo ante.

**SIXTH CAUSE OF ACTION - UNFAIR COMPETITION LAW (Bus. &**

**Prof. 6 Code § 17200)**

(Against All Defendants)

Key authority (UCL): Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co. (1999) 20 Cal.4th 163; Kwikset Corp. v. Superior Court (2011) 51 Cal.4th 310; Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134.

70. Plaintiff realleges and incorporates paragraphs 1 through 27.

71. Defendants engaged in unlawful, unfair, and fraudulent practices by closing and enforcing a purported second-lien loan contrary to written conditions and recorded reality, and by refusing to pause and withholding core closing documents after notice. (Exs. A-1; B-1; B-2; C-2; T-2; Tables Section-Tables A-C.)

72. Defendants' enterprise materials emphasize urgency and compliance standards inconsistent with the conduct at issue and are relevant to willfulness and unfairness. (Exhibit N (N-1/N-2)

73. Plaintiff seeks restitution and injunctive relief under § 17200. Restitution is sought to the extent Defendants received borrower-paid closing and settlement charges and premiums in connection with the transaction (including escrow/settlement/title-related charges reflected on the Closing Disclosure), and injunctive relief is sought to stop continued enforcement and related unfair practices pending cure/adjudication.

**SEVENTH CAUSE OF ACTION - WRONGFUL POST-NOTICE ENFORCEMENT AND COLLECTION (NEGLIGENT, RECKLESS, AND/OR INTENTIONAL)**

**(REFUSAL TO PAUSE / WRONGFUL ENFORCEMENT PRESSURE)**

(Against Oaktree and Rocket Companies)

Key authority (post-notice enforcement / debt collection): Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568; Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283; Minser v. Collect Access, LLC (2023) 93 Cal.App.5th 102.

74. Plaintiff realleges and incorporates paragraphs 1 through 27.

75. After receiving notice of the lien-priority defect and the disbursement/recording sequence, Defendants owed a duty to exercise reasonable care and to refrain from reckless and/or intentional collection and enforcement pressure while the defect was investigated and cured, particularly after Defendants acknowledged escrow/recording errors and lien-priority impairment.

76. Plaintiff requested temporary pauses and offered cure/mitigation paths designed to make Oaktree whole. Defendants refused or ignored those requests and continued billing/collection pressure. (Tables Section-Table B; Tables Section-Table C; Exs. T-1, T-2, T-3.) Plaintiff further alleges Oaktree directed her to the servicer for a pause while the servicer indicated it could not grant relief without Oaktree's authorization, delaying mitigation and compounding harm.

60

77. Defendants' post-knowledge enforcement conduct caused additional foreseeable harm, including credit risk, bounced payment risk, and escalating damages. (Exs. T-2; Tables Section-Table B.) The SAC pleads non-speculative, present harm from this post-notice conduct, including inability to refinance, forced payment triage, loss/reduction of essential services and therapies, time loss, and irreparable credit risk, all occurring while Defendants withheld the closing file and refused a pause. (Exs. T-1, T-2, T-3; D-3; H-2; H-3; F-3; F-4; IV.B.) Plaintiff alleges Rocket Companies' post-notice involvement is shown by executive-level escalation and delegated handling through Rocket Close operations, followed by continued refusal to pause, cure, or mitigate while Plaintiff continued copying Rocket Companies on written requests. This enterprise-level inaction and obstruction is pled as part of Defendants' wrongful post-notice conduct and wrongful risk-shifting. (Exs. N-1/N-2; Tables Section-Tables A-C; Exs. T-1/T-2.) Plaintiff seeks recovery of all reasonably foreseeable damages proximately caused by this post-notice conduct, including economic loss, irreparable credit harm risk, and severe emotional distress and health impacts (loss of aide services, interrupted therapies, and physician-advised extended recovery time) as pled in the damages section. This is the substance sometimes labeled "NIED," but is pled here as negligence damages flowing from Defendants' post-notice breach of duty. (Exs. F-4; T-1, T-2, T-3.)

**SEVENTH-A CAUSE OF ACTION - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

(Against Oaktree Funding Corp. and Rocket Companies, Inc.)

Key authority (implied covenant): Carma Developers (Cal.), Inc. v. Marathon Development California, Inc. (1992) 2 Cal.4th 342; Guz v. Bechtel Nat. Inc. (2000) 24 Cal.4th 317.

77A. Plaintiff realleges and incorporates paragraphs 1 through 27 and paragraphs 74 through 77.

77B. The loan and servicing relationship imposed an implied covenant of good faith and fair dealing requiring Defendants to refrain from doing anything that would unfairly frustrate Plaintiff's right to receive the benefits of the agreement, including the benefit of the transaction as a verified, insurable second-lien bridge loan and the benefit of good-faith mitigation and information-sharing after notice of a closing defect.

77C. After Defendants had actual notice of the lien-priority defect and failure of conditions precedent, Defendants acted in bad faith by refusing a temporary pause, maintaining enforcement and billing/collection pressure, and withholding core cure records (escrow file, QC sign-off, current bring-down evidence, and CPL/claim-handling materials), thereby depriving Plaintiff of the ability to cure, refinance, and mitigate harm. (Exs. T-1; T-2; Tables Section-Tables A-C.)

77D. Plaintiff suffered damages according to proof and seeks contract damages and equitable relief, including injunctive relief pending adjudication. (Exs. T-1, T-2, T-3; F-3, F-4; Tables Section-Tables A-C.)

**EIGHTH CAUSE OF ACTION - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)**

(Against Oaktree only)

Key authority (IIED): Hughes v. Pair (2009) 46 Cal.4th 1035; Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965; Christensen v. Superior Court (1991) 54 Cal.3d 868.

80. Plaintiff realleges and incorporates paragraphs 1 through 27.

80A. Plaintiff alleges Oaktree's post-notice conduct went far beyond routine servicing. After Oaktree had actual notice that the loan did not close as conditioned (including failure of the second-lien-on-or-before-disbursement condition and failure of pre-funding QC), Oaktree repeatedly refused to implement any temporary pause, failed to respond substantively to documented requests, redirected Plaintiff to the servicer while the servicer indicated it could not act without Oaktree's authorization, maintained enforcement posture, and withheld core closing/QC/bring-down and claim/CPL records needed to cure the defect. Plaintiff further alleges she requested a temporary pause and communicated that if a pause were implemented and core cure records were produced, she would

63

streamline the pleadings to avoid unnecessary expense; yet Oaktree refused to pause and continued enforcement posture despite actual knowledge of Plaintiff's disability-related vulnerability and foreseeable risk of severe distress. Oaktree's IIED exposure arises from post-notice conduct: after Oaktree had actual knowledge of escrow instruction failure and lien-priority impairment, Oaktree refused to pause enforcement, continued monthly pressure, and escalated the matter with threats of criminal referral while knowing Plaintiff is disabled and that continued enforcement created an immediate risk of forced sale and serious health consequences. Plaintiff alleges this refusal-to-pause posture-despite notice and repeated requests-is the core outrageous conduct supporting IIED against Oaktree. (Exs. E-4; T-1; T-2; T-3; IV.B.)

80B. Oaktree's outrageous conduct was carried out through its attorneys and agents. After missing the state-court opposition deadline on Plaintiff's noticed injunction, Oaktree removed the case on January 29, 2026, foreseeably delaying emergency relief and increasing leverage while enforcement and billing continued. (Ex. U (Court/Procedural-CM/ECF docket excerpts; Notice of Removal timing).) Oaktree and counsel then pursued a strike-the-record strategy directed at Plaintiff's irreparable-harm evidence rather than curing the known closing defect, further escalating foreseeable distress. (Ex. U (Court/Procedural); Exs. T-1, T-2, T-3.)

80C. Plaintiff also alleges Oaktree and Rocket had knowledge of the lien-priority defect and title process failures no later than September 9-10, 2025 (notice of claim)-before Plaintiff's first payment was due on or about September 16, 2025- and October 24, 2025 (written admissions in claim correspondence), yet did not timely disclose the defect to Plaintiff, and instead continued billing/enforcement while withholding the complete escrow/closing/QC/claim/CPL file needed to cure and mitigate harm. (Ex. E-1 (Notice of Claim dated 09/10/2025); Ex. T-3 (servicer payment confirmation email dated 09/17/2025 reflecting Payment Date 09/16/2025; Binder p. 206); Exs. E-2; C-8; D-3; H-2; H-3; T-1; T-2; T-3.)

81. After notice and admissions establishing the defect, Oaktree continued enforcement pressure and refused any pause while withholding core documentation needed to cure, including QC/authority-to-disburse and bring-down evidence, and while maintaining collection posture through billing/withdrawal attempts and delinquency/return notices. (Ex. T-3 (servicer billing/withdrawal materials); Ex. U-1 (prior declaration describing attempted ACH withdrawals despite instruction to stop; Binder p. 592).) Plaintiff alleges this conduct was intentional or carried out with reckless disregard of the probability of causing severe emotional distress, given Oaktree's actual knowledge of Plaintiff's disability, health sensitivity to stress, and risk of forced sale. (Exs. F-1; F-4; T-1; T-2; E-4.)

82. Plaintiff suffered severe emotional distress and damages according to proof.

65

82A. Plaintiff alleges the distress was severe and manifested in medically documented exacerbation of symptoms, disruption of medically necessary therapy, loss or reduction of essential in-home assistance, and heightened risk of permanent physical injury, all during the period Oaktree maintained enforcement posture after notice and refused to implement a temporary pause. (Exs. F-3; F-4.) Plaintiff alleges Oaktree's post-notice conduct was willful and carried out with conscious disregard of Plaintiff's rights and safety, constituting malice and/or oppression within the meaning of Civil Code § 3294, supporting punitive damages on this cause to the extent permitted by law.

**NINTH CAUSE OF ACTION - ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (Civ. Code § 1788 et seq.)**

(Against Oaktree and Servicer (DOE))

Key authority (Rosenthal Act / mortgage servicing collection): Davidson v. Seterus, Inc. (2018) 21 Cal.App.5th 283; Best v. Ocwen Loan Servicing, LLC (2021) 64 Cal.App.5th 568.

87. Plaintiff realleges and incorporates paragraphs 1 through 27.

88. Defendants attempted to collect and enforce amounts under a defective, disputed transaction while refusing to provide core documentation, while ignoring written servicing/document demands, and while continuing billing/collection

66

pressure after repeated notice and dispute. (Exs. D-3; H-2; H-3; T-1; T-2; T-3; E-4.)

88A. Plaintiff repeatedly demanded (i) a payment pause/standstill while Defendants investigated and cured the admitted closing defects, and (ii) complete servicing/escrow documentation sufficient to verify lien position, title currency, and disbursement authority. Those demands are documented in Plaintiff's document requests and written follow-ups (including a written "QWR"/servicing information demand) and Defendants' continued non-response. (Exs. D-3; H-2; H-3.)

88B. Despite notice and dispute, Defendants continued billing and enforcement pressure, issued written refusals, and continued collection activity after repeated written pause requests-approximately fifteen separate requests reflected in the chronology/table-and after counsel-level notice. (Exs. T-1; T-2; T-3; E-4.) This constitutes unlawful and unfair debt-collection conduct within the meaning of the Rosenthal Act. Plaintiff suffered damages according to proof. Defendants' billing and collection communications included repeated delinquency notices and communications sent under Oaktree's name and containing debt-collection disclaimers. (Ex. T-3 (e.g., Binder pp. 296-297).) transaction while refusing to provide core documentation and while continuing billing/collection pressure after notice and dispute. (Exs. T-1; T-2; Tables Section-Table B.)

89. Plaintiff suffered damages according to proof.

**TENTH CAUSE OF ACTION - CANCELLATION OF INSTRUMENT (Civ. Code 2 § 3412)**

Key authority (cancellation of instrument): Civ. Code § 3412; See Robinson Helicopter Co., Inc. v. Dana Corp. (2004) 34 Cal.4th 979 (fraud/independent duty); LiMandri v. Judkins (1997) 52 Cal.App.4th 326 (concealment duty).

**VI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For general, special, and consequential damages according to proof;

2. For punitive and exemplary damages against the appropriate Defendants on the tort causes of action, pursuant to Civil Code § 3294, according to proof.

3. For restitution/disgorgement of escrow fees, premiums, and amounts wrongfully retained;

4. For declaratory relief under Code Civ. Proc. § 1060;

5. For preliminary and permanent injunctive relief stopping enforcement activity pending cure/adjudication;

6. For cancellation of instruments under Civil Code § 3412;

7. For rescission of the loan and related instruments, restitution/offsets, and restoration of the parties to the status quo ante, as the Court deems just;

8. For costs of suit and such other relief as the Court deems just and proper.

**VII. DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all causes of action so triable.

**VIII. SIGNATURE 23 Dated: 1/28/26 /s/ Audrey Little (for electronic filing)**

**AUDREY LITTLE, Plaintiff in Pro Per**